UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | . | Case No. 23-60507-6-PGR |
| | . | |
| THE ROMAN CATHOLIC | . | |
| DIOCESE OF OGDENSBURG, | . | 10 Broad Street |
| NEW YORK, | . | Utica, NY 13501 |
| | . | |
| Debtor. | . | October 3, 2023 |
| . . . . . . . . . . . . .. | | 1:00 p.m. |
| THE ROMAN CATHOLIC | . | |
| DIOCESE OF OGDENSBURG, | . | |
| NEW YORK, | . | |
| | . | |
| Plaintiff, | . | |
| | . | |
| v. | . | Adv. Case No. 23-80013-6-PGR |
| | . | |
| CERTAIN UNDERWRITERS AT | . | |
| LLOYDS, LONDON, *et al.,* | . | |
| | . | |
| Defendants. | . | |
| . . . . . . . . . . . .. | | |

TRANSCRIPT OF:

[11] - MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE USE OF CASH COLLATERAL AND (B) GRANTING ADEQUATE PROTECTION

[15] - MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING, BUT NOT DIRECTING, THE DIOCESE TO (I) CONTINUE USING EXISTING BANK ACCOUNTS, BANKING PRACTICES AND BUSINESS FORMS, (II) MAINTAIN INVESTMENT ACCOUNTS AND PRACTICES, AND (III) CONTINUE USING CREDIT CARDS, AND (B) GRANTING LIMITED RELIEF FROM THE REQUIREMENTS OF BANKRUPTCY CODE SECTION 345(b)

[16] - MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING, BUT NOT DIRECTING, THE DIOCESES TO CONTINUE TO ADMINISTER THE DEPOSIT AND LOAN FUND AND DIOCESAN TRUST FUND IN THE ORDINARY COURSE OF BUSINESS AND CONSISTENT WITH PAST PRACTICE

[17] - MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE CONTINUED MAINTENANCE OF THE DIOCESE'S INSURANCE PROGRAM; AND (II) AUTHORIZING THE PAYMENT OF OBLIGATIONS IN RESPECT THEREOF

[18] - MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. SECTIONS 105(a) AND 362(a) CONFIRMING THE APPLICABILITY OF THE AUTOMATIC STAY

[19] - APPLICATION TO EMPLOY STRETTO, INC. AS ADMINISTRATIVE
ADVISOR EFFECTIVE AS OF THE PETITION DATE

[20] - APPLICATION TO EMPLOY STRETTO, INC. AS ADMINISTRATIVE
ADVISOR EFFECTIVE AS OF THE PETITION DATE

[44] - MOTION FOR ENTRY OF AN ORDER REFERRING CERTAIN MATTERS
TO MEDIATION

[75] - MOTION FOR ENTRY OF AN ORDER ESTABLISHING BAR DATES FOR
FILING PROOFS OF CLAIM AND APPROVING THE FORM AND MANNER OF
NOTICE THEREOF

[138] - MOTION FOR 2004 EXAMINATION

[5] - MOTION FOR ENTRY OF AN ORDER REFERRING CERTAIN MATTERS TO
MEDIATION


                    BEFORE HONORABLE PATRICK G. RADEL
                  UNITED STATES BANKRUPTCY COURT JUDGE
                    BEFORE HONORABLE WENDY A. KINSELLA
                UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


APPEARANCES:

For the Debtor:              Bond Schoeneck & King, PLLC
                             By:  CHARLES SULLIVAN, ESQ.
                                  STEPHEN A. DONATO, ESQ.
                                  GRAYSON WALTER, ESQ.
                             One Lincoln Center
                             Syracuse, NY 13202

For the Official             Pachulski Stang Ziehl & Jones, LLP
Committee of                 By:  ILAN D. SCHARF, ESQ.
Unsecured Creditors:         780 Third Avenue, 14th Floor
                             New York, New York 10017

For Century Indemnity        O'Melvenly & Myers, LLP
Company:                     By:  ADAM HABERKORN, ESQ.
                             Times Square Tower
                             7 Times Square
                             New York, New York 10036

Appearances continue on next page:

```
For Certain Underwriters   Duane Morris, LLP
at Lloyd's London and      By:  JEFF KAHANE, ESQ.
Certain London Market      865 Figueroa Street. #3100
Companies:                 Los Angeles, California 90017

                           Buckland Law Offices
                           By:  BRAD BUCKLAND, ESQ.
                           59-61 Court Street, #5B
                           Binghamton, New York 13901

For Employers Insurance    Goldberg Segalla
Company of Wausau:         By:  JONATHAN SCHAPP, ESQ.
                           65 Main Street
                           Buffalo, New York 14203

For William K.             Office of the United States Trustee
Harrington, United         By:  ERIN CHAMPION, ESQ.
States Trustee:            105 U.S. Courthouse
                           10 Broad Street
                           Utica, New York  13501

For Interstate Insurers:   Parker Hudson Rainer & Dobbs, LLP
                           By:  MATT WEISS, ESQ.
                           303 Peachtree Street NE, #3600
                           Atlanta, Georgia 30308

For NTB Bank:              Barclay Damon, LLP
                           By:  JEFFREY A. DOVE, ESQ.
                           125 East Jefferson Street
                           Syracuse, New York 13202

For the Survivors:         Jeff Anderson & Associates
                           By:  TAYLOR STIPPEL, ESQ.
                           366 Jackson Street, #100
                           St. Paul, Minnesota  55101

Audio Operator:            Colleen Johnson
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

**WWW.JJCOURT.COM**

4

1           COURTROOM DEPUTY:  All rise.  United States

2   Bankruptcy Court for the Northern District of New York with the

3   Honorable Patrick G. Radel presiding is now in session.

4           You may be seated.

5           THE COURT:  Good afternoon.

6           MR. SULLIVAN:  Good afternoon, Your Honor.

7           THE COURT:  So I'm going to take appearances.

8   Ms. Johnson will call the case.  I'm going to take appearances

9   and then I'm going to step off the bench.  We -- Ms. Johnson,

10  we have Chief Judge Kinsella on the phone?

11          COURTROOM DEPUTY:  Yes, we do.

12          THE COURT:  Great.  And we'll have Chief Judge

13  Kinsella on the phone.  Ms. Johnson then will call the motions

14  that have -- are the subject of the recusal order and then

15  they'll let me know when I can come back out and then we'll

16  address the rest of the motions.

17          Okay.  So we'll start with appearances from the

18  parties in court, please.

19          MR. SULLIVAN:  Yes, Your Honor.  Good afternoon.

20  Charles Sullivan, Bond Schoeneck & King, counsel for the

21  Diocese of Ogdensburg.

22          Also appearing with me today is Mr. Stephen Donato,

23  Grayson Walter and Brendan Sheehan on the phone.

24          From the Diocese of Ogdensburg on the phone we have

25  Father Kevin O'Brien and Mark Mashaw, the Diocesan and fiscal

 1 officer.

 2          (Music playing.)

 3          I couldn't have imagined a better capstone to my

 4 appearances.

 5          (Laughter)

 6          MR. SCHARF:  Good afternoon, Your Honor.  Ilan

 7 Scharf, Pachulski Stang Ziehl & Jones, proposed counsel to the

 8 Official Committee of Unsecured Creditors, and I believe Karen

 9 Dine from my firm is also on the phone.

10          THE COURT:  Very good.  Good afternoon.

11          Any appearances here?

12          MR. HABERKORN:  Yes, Your Honor.  Adam Haberkorn of

13 O'Melvenly & Myers on behalf of Century Indemnity Company.

14          THE COURT:  Good afternoon.

15          MR. KAHANE:  Good morning, Your Honor.  Jeff Kahane

16 of Duane Morris.  I'm bankruptcy counsel for the London Market

17 insurers.

18          THE COURT:  Good afternoon.

19          MR. SCHAPP:  Good afternoon, Your Honor.  Jon Schapp

20 on behalf of Employers Insurance Company of Wausau.

21          THE COURT:  Good afternoon.

22          Any appearances from counsel on the telephone?

23          MS. CHAMPION:  Good afternoon, Your Honor.  Erin

24 Champion on behalf of the United States Trustee.

25          THE COURT:  Good afternoon, Ms. Champion.

1          MR. WEISS:  Good afternoon, Your Honor.  Matt Weiss

2   on behalf of Interstate Fire & Casualty Company.

3          THE COURT:  Good afternoon.

4          All right.  Thank you, counselors.  As indicated, I

5   will step off the bench now and Ms. Johnson will call the first

6   matter that's the subject of the recusal order.  Thank you.

7          MR. SULLIVAN:  Thank you, Your Honor.

8          COURTROOM DEPUTY:  23-60507, the Roman Catholic

9   Diocese of Ogdensburg, New York.  First motion for interim and

10  final orders authorizing, but not directing, the Diocese to

11  continue using existing bank accounts, banking practices and

12  business forms, maintain investment accounts and practices, and

13  continue using credit cards and granting limited relief of

14  requirements of Bankruptcy Code §345(b).

15         THE COURT:  Good afternoon, counselors.  This is

16  Judge Kinsella.  The parties previously noted their appearances

17  on the record.

18         Why don't we start with the debtor.

19         MR. SULLIVAN:  Yes, Your Honor.  Your Honor, this is

20  Charles Sullivan on behalf of the debtor.

21         Your Honor, before the Court is the debtor's motion,

22  which appears at Docket No. 15 for interim and final orders

23  authorizing the debtor to continue using existing bank

24  accounts, banking practices and business forms and to maintain

25  its investment practices.  And as the Court is aware, the

1  matter is on for a request for a final order in connection with

2  the motion today.

3        I do note for the record today that Mr. Mark Mashaw,

4  the fiscal officer for the Diocese, is participating by

5  telephone in today's hearing.  Mr. Mashaw has submitted two

6  declarations in support of the motion.  Those declarations

7  appear at Docket Nos. 6 and 144.  I would ask the Court to

8  accept those declarations as proffers of Mr. Mashaw's testimony

9  in connection with the motion if he were called to testify.

10        With the Court's permission, I would like to begin by

11  providing a little bit of procedural background and context for

12  this motion and updating the Court about the debtor's efforts

13  to narrow the scope of the U.S. Trustee's objection.

14        First, as the Court is aware, this motion was

15  initially filed as one of the debtor's first day motions and

16  has been carried on the Court's calendar since July 17.  The

17  Court has entered two orders granting the relief sought by the

18  motion on an interim basis.  The first was entered on July 19

19  and the second was entered on August 29 at Docket No. 100.

20  Each of those orders contained a provision waiving the

21  requirements of §345(b) on an interim basis without prejudice

22  to the debtor's right to seek a further interim order or a

23  final waiver, which is what the debtor is requesting from the

24  Court today.  Under the terms of both orders, the interim

25  waiver of 345(b) extends through the date of entry of a final

1  order on the motion.

2          At the last hearing, which took place in connection

3  with this motion, the U.S. Trustee requested that the relief be

4  granted on a further interim basis, rather than a final basis,

5  and there were three separate reasons for that request to which

6  the debtor did consent, Your Honor.

7          The first reason was that the debtor had not yet

8  filed his schedules and Statement of Financial Affairs.  That

9  has occurred.  That took place on August 30.  The second reason

10 was the §341 meeting of creditors had not yet taken place.

11 That also has occurred.  That took place on August -- I'm

12 sorry, September 11th.

13         And thirdly, Your Honor, the U.S. Trustee sought

14 additional time for the Committee to be appointed to select as

15 counsel and to have that attorney get up to speed on the

16 motion, which has also occurred.  In fact, the debtor further

17 agreed to an additional one month of adjournment from

18 September 5, the original scheduled hearing date to today, to

19 give the Committee time to get up to speed on the requests

20 sought in the motion.

21         I am very happy to report that my office has worked

22 extensively with the Committee counsel to answer the questions

23 that Committee counsel had about this particular motion and I

24 note that the Committee has filed no objection to the relief

25 requested in the motion.

1          I do want to be clear that Mr. Scharf has requested

2   on behalf of the Committee certain language in the final order

3   that clarifies that in granting the motion on a final basis the

4   Court is making no determination regarding whether any

5   property, any portion of the investment accounts represent

6   property of the debtor's estate and reserving all of the

7   Committee's rights with respect to that issue, and we have

8   agreed to the inclusion of that language in the final order.

9          I also note for the debtor -- that the debtor's July

10  2023 operating report has been filed.  Pursuant to an agreement

11  with the U.S. Trustee's Office, the debtor's August 2023

12  operating report will be filed on or before October 20, along

13  with the September operating report.  The Diocese needed to

14  request additional time because its finance staff was busy with

15  the press of business associated with the filing of this

16  Chapter 11 case, as well as dealing with its auditors in

17  connection with the year-end audit.

18         The sole question before the Court today and the sole

19  remaining issue arising out of the motion is the debtor's

20  request for a waiver of the requirements of §345(b) of the

21  Bankruptcy Code, as applied to the debtor's investments in its

22  investment accounts and three bank accounts with banks other

23  than MTB Bank.

24         For the Court's information, as outlined in the

25  supplemental declaration of Mr. Mashaw, the investment accounts

1   are overseen by a six-person investment advisory committee

2   comprised primarily of persons outside of the Diocesan staff

3   who have extensive backgrounds in business, finance and

4   accounting.  The Diocese investment policies are codified in a

5   formal investment policy statement that is appended to the

6   supplemental Mashaw declaration as Exhibit A, which sets forth

7   a very conservative investment policy that by its terms is

8   intended to conform to and be subject to the New York Prudent

9   Management of Institutional Funds Act.  I'll refer to that as

10  the Institutional Funds Act, Your Honor, because of the length

11  of that statutory name.

12         This is very important, Judge, because as noted in

13  Judge Buckeye's decision in the Diocese of Buffalo case that is

14  cited in our papers, that arose out of a motion very similar to

15  the one that's presently before the Court, Judge Buckeye

16  specifically found that cause exists to grant a 345(b) waiver

17  where the Institutional Funds Act is controlling with respect

18  to the particular funds at issue.

19         Your Honor, the Investment Advisory Committee that is

20  employed by the Diocese employs an investment consultant, DHK

21  Financial Advisors.  That advisor analyzes the Diocese's

22  investments practices and provides information and advice to

23  the Committee as it's dispensing its duties.

24         As detailed in the Mashaw declaration, each of the

25  investment accounts are professionally managed by multiple

11

1   investment managers who invest across diverse asset classes in

2   a manner that is designed to diversify, minimize risk, preserve

3   principle and generate a reasonable return on the investments.

4        Your Honor, I would now like to turn to the debtor's

5   argument applying the service merchandise factors that cause

6   exists for granting a waiver as requested by the debtor.

7   First, however, I want to briefly touch upon a point in the

8   U.S. Trustee's objection.

9        Your Honor, in the U.S. Trustee's objection, the U.S.

10  Trustee I think grossly oversimplifies the cause articulated by

11  the debtor in its motion and concludes that if cause can be

12  shown in this case, then it is universally available in every

13  case.

14       I want to point out to the Court that it -- that the

15  U.S. Trustee's position is fundamentally incorrect.  The

16  circumstances of this debtor with its size, sophistication of

17  management, its prudent investment practices, as have been

18  outlined in the Mashaw declarations as imposed upon it by the

19  Institutional Funds Act, and its significant reliance upon

20  income from endowed funds to fund its operating expenses put

21  this debtor in stark contrast from the vast majority of cases

22  that come before this or any other bankruptcy court.

23       As the Court knows, §345 applies to all bankruptcy

24  cases, whether individual or corporate debtors, and whether

25  Chapter 7, 13, 12 or 11.  Less than one percent of those cases

12

1  are Chapter 11 cases and even among the tiny sliver of

2  Chapter 11 cases that make up the total number of cases

3  administered by the U.S. Trustee's Office, the bulk of those

4  are entities plagued with mismanagement and a lack of financial

5  sophistication that brought them to the Court's doorstep in the

6  first place.

7        Judge, I would submit that none of that is present

8  here.  In contrast, this case was precipitated by the

9  litigation that has been outlined in the first day pleadings

10  and in the schedules in this case, the CDA litigation, and it

11  is not commentary on the debtor's financial management that it

12  is in Chapter 11.

13        Turning to the service merchandise factors, as this

14  Court is aware, the Court has the discretion to grant a waiver

15  of compliance with the requirements of §345(b) of the

16  Bankruptcy Code.  The debtor respectfully asserts that in his

17  demonstrated ample cause in the motion for the requested

18  waiver, service merchandise identifies a number of factors for

19  consideration as part of any inquiry of the total -- of the

20  totality of the circumstances.  All of those factors are

21  addressed in the motion.

22        But I do want to identify for the record today some

23  of the key factors that I'd like to bring to the Court's

24  attention.  First, as I've alluded to already, Your Honor, the

25  sophistication of the debtor's business weighs heavily in favor

1   of our request.  The debtor's operations are large and complex,

2   as are its cash management systems.  The Diocese supports the

3   efforts of more than 80 parishes and serve approximately 71,000

4   Catholic faithful and its ministries and operations rely in

5   large part upon the income generated by the investments.

6        The debtor's investment practices are sophisticated

7   and overseen by independent professionals, who are outside of

8   the Diocese, who ensure that a diversified mix of investments

9   is maintained to achieve moderate, targeted growth with minimal

10  exposure to downside risk in any particular investment.

11        Your Honor, factor two of the service merchandise

12  factors that I want to highlight for the Court's consideration

13  is that the size of the debtor's business operations and amount

14  of investments involved supports the waiver.  The debtor itself

15  is a large financially sophisticated organization that employs

16  an accounting staff who are devoted to proper oversight and

17  management of the debtor's finance.  The sheer size of the

18  debtor's endowed investment holdings distinguish it from the

19  small and unsophisticated debtor that §345(b) was meant to

20  protect.  And it's precisely the type of debtor that is

21  described in the legislative history of the 1994 amendment that

22  gave rise to the four-cause waiver.  The debtor has a long

23  prepetition track record of responsibly investing its funds to

24  achieve reasonable growth and limited risks.

25        The debtor and the other Catholic entities for whom

1   it holds funds use the income generated from certain of the

2   investment accounts to fund portions of their annual budgets.

3   The charitable gift annuity investment account creates income

4   to fund the debtor's obligations to pay annuitants.  And if the

5   debtor were forced to liquidate its current holdings and

6   instead invest in such things as Treasury securities or

7   maintain a collateralized deposit account in strict compliance

8   with §345(b), it would not be able to obtain a comparable rate

9   of interest or growth and a reduced income would have a highly

10  detrimental effect on the debtor's ongoing operations.

11         Also, the reduction in income would negatively affect

12  creditors to the extent investment account funds may be

13  unrestricted and available to pay creditor claims.

14         Your Honor, I would also highlight the factor from

15  the service merchandise test that I'd ask the Court to consider

16  whether appropriate safeguards are in place within the debtor's

17  own business system that support the waiver.

18         As described above, there are a number of safeguards

19  already in place to ensure that the investment accounts are

20  properly managed and that any risk of loss is minimized.

21  First, the Diocese's investment practices are overseen by

22  investment -- by an investment advisory committee and its

23  policies are codified in the investment policy statement that

24  has been submitted to court.  The investment accounts in turn

25  are managed by experienced third-party professional financial

1  advisors who bring valuable experience and knowledge to any

2  investment decisions and ensure that the debtor avoids taking

3  on undue risk.

4       Secondly, the debtor's investments are primarily

5  comprised with professionally managed mutual funds and other

6  securities which are widely traded and, thus, exposed to a

7  constant market scrutiny and valuation.  It is, therefore,

8  unlikely that any underlying investments will be subject to

9  unexpected or otherwise severe fluctuations in value.

10      Third, in accordance with the Institutional

11 Investment Act and the prudent investor standard mandated by

12 §1110 of the New York insurance law, which is applicable to the

13 insurance annuities, the debtor's investments have been

14 selected to encourage steady growth over a long-term investment

15 horizon, but to avoid taking speculative risk that could put

16 the portfolio at risk of substantial loss.

17      And lastly, Your Honor, of the service merchandise

18 factors that I want to highlight I want to identify it that the

19 debtor in its bankruptcy estate will experience significant

20 benefit if the current system of investments is continued but

21 will suffer serious harm if it is discontinued.

22      As described in the motion, there are many benefits

23 to the debtor of maintaining its practices with respect to the

24 investment accounts, most important of which is the

25 significantly better return that the debtor expects to receive

1  from those investments.  If that money were moved to a savings

2  account earning little or no interest over time, the lost of

3  investment income would have a negative effect on the Diocese's

4  finances and would, therefore, impact not only the Diocese but

5  its creditors.

6       On balance and in light of the reasons articulated in

7  the motion, the debtor respectfully asserts that its requested

8  waiver is reasonable and appropriate and that it has

9  demonstrated cause for the requested waiver under §345(b) of

10  the Bankruptcy Code.  Thank you, Your Honor.

11       THE COURT:  Thank you, Mr. Sullivan.

12       Before we have the Committee weigh in, let's hear

13  from Ms. Champion.

14       MS. CHAMPION:  Thank you, Your Honor.  Erin Champion

15  for the United States Trustee.  Your Honor, in order to protect

16  the interests of creditors, §345 and the U.S. Trustee

17  guidelines provide two things:  the debtor's funds can be

18  deposited in an entity that has posted a bond or at a bank

19  approved by the United States Trustee that's entered into a

20  Uniform Depository Agreement.  It's one of the many duties of

21  the United States Trustee, Your Honor, that ensure that those

22  protections to creditors and other parties or interests -- and

23  other parties in interest are afforded in every single

24  Chapter 11 case.  And as pointed out in both the debtor's

25  motion and the United States Trustee's pleadings, the Court can

1  waive those requirements upon a showing of cause.

2          I would submit, Your Honor, that because of two

3  particular considerations in this case, a finding of cause

4  should be based on sufficient information.  First, I think

5  history can tell us based on the other Diocesan filings that

6  this case will not reach an expeditious conclusion.  In fact,

7  the other Diocesan bankruptcy cases have been pending in this

8  district and neighboring districts for several years without a

9  plan.  This -- so this is not an in-and-out process and,

10  therefore, the banking safeguards should be closely examined

11  given the length of time it might take for creditors to see

12  recovery in this case.

13          And, Your Honor, second, while such motions seeking a

14  waiver in Chapter 11 cases has become very common, the waiver

15  should not be something that's routine.  Especially in the wake

16  of the banking volatility earlier this year, it's important

17  that debtors be required to submit appropriate evidence that

18  cause does, in fact, is just to warrant such a waiver.

19          And at the time the motion was made, Your Honor, we

20  had no schedules.  We didn't have a 341 meeting.  As noted by

21  Mr. Sullivan, those things have occurred.  And then as of

22  yesterday evening, we have the monthly operating report for the

23  partial period of July.

24          Your Honor, the information -- the additional

25  information through those mechanisms regarding the investment

1 account and the underlying investment was also provided in the

2 debtor's supplemental declaration that was filed last week and

3 that information was, in fact, helpful.

4 But I first wanted just to address before I talk

5 about the investment accounts just the non-investment banking

6 accounts. Your Honor, the schedules did report and -- that

7 the -- and the 341 meeting testimony confirmed that with

8 respect to the accounts held at NBT, which is an authorized

9 depository, there's money in excess of three million dollars on

10 deposit. And, therefore, you know, with respect to that, I

11 would just ask that any order entered on this motion just be --

12 just -- that it include language requiring that NBT sufficient

13 collateralize beyond the 250,000 protected by the FDIC.

14 And also, to the extent that the debtor is going to

15 be continuing to use bank accounts that are not authorized

16 depositories and I note that they -- there was not a

17 significant amount of money on deposit, but I would still ask

18 that an order include language requiring the debtor to notify

19 the U.S. Trustee that those amounts do change or get close to

20 or exceed the $250,000 limit.

21 Your Honor, with respect to the investment accounts,

22 it's -- the United States Trustee submits that it is the

23 discretion of the Court to find that there is sufficient cause

24 to allow the waiver other requirements under 345. And,

25 therefore, I would defer to the Court whether the information

1  in the supplemental declaration, as well as the July monthly

2  operating report, is sufficient to find cause.

3        If the Court is so inclined and finds that the

4  service merchandise factors have been met in this case, I would

5  just request that the order include language similar to what

6  was ordered in the Diocese of Syracuse case, that the United

7  States Trustee by motion on notice of the Diocese may request

8  that the Court reconsider the waiver based on a showing that

9  there has been a material and sustained diminution in the

10  investment account and that cause no longer exists to support

11  the waiver, and that the Diocese include as part of its monthly

12  operating reports the monthly investment account information

13  and statements.  Thank you, Your Honor.  I've nothing further.

14        THE COURT:  Thank you.

15        Mr. Sullivan, would you like to respond to those

16  requests before we turn to Mr. Scharf?

17        MR. SULLIVAN:  Yes, Your Honor.  I would.  First, let

18  me take them actually in reverse order, if I may, Your Honor.

19        Ms. Champion raised the request to include a

20  provision in the order akin to what appears in Judge Cangilos-

21  Ruiz's order in the Diocese of Syracuse case that would permit

22  the U.S. Trustee to request reconsideration of the waiver on

23  shortened notice.  The Diocese would consent to that, Your

24  Honor, of course, as well as confirmation that it will include

25  reporting concerning the investment accounts in the monthly

1   operating reports.  Of course, Your Honor, that makes sense.

2             Your Honor, with respect to the other points raised

3   by Ms. Champion with respect to the bank accounts that are not

4   investment accounts, first of all, the requiring of the posting

5   of a bond by NBT Bank for the balance in excess of the FDIC

6   insured limit, that is a new matter that was not raised in the

7   U.S. Trustee's objection.  In fact, I think the objection made

8   clear that there was no portion of the objection that applied

9   to that account and that's not something we've explored with

10  M&T Bank, nor do I -- you know, I think that the 345(b) waiver

11  request would apply equally to the non-investment bank accounts

12  that Ms. Champion referenced because they're all part of the

13  cash management system.

14            The other accounts, including the accounts at

15  Community Bank and Citibank, Your Honor, those are merely

16  disbursement accounts that deal with particular obligations of

17  the Diocese as indicated in the motion.  It's my understanding

18  that very limited amounts are ever held in there.  The money is

19  moved out of the operating account and then disbursed from

20  them.  So I do want to make clear that the request for the

21  345(b) waiver applies to those bank accounts, as well as to the

22  investment accounts.

23            THE COURT:  Thank you.

24            MS. CHAMPION:  Your Honor, if I may just briefly

25  address that, I think I can resolve that, one of these issues

1  anyway, pretty easily.

2           NBT Bank, Your Honor, is an authorized depository and

3  it's required of the bank under the Uniform Depository

4  Agreement with the United States Trustee to collateralize it

5  beyond the 250,000.  I just want to ensure because of the

6  amount of money on deposit that NBT is made aware of that and

7  that they -- you know, if they need to provide

8  collateralization to protect that, that they will do that under

9  the Uniform Depository Agreement.

10          I'm sure we can probably figure out what the language

11 needs to look like in the order to make sure that that is

12 effectuated, but I don't -- we're not asking for anything above

13 and beyond what would be required of the bank under the UDA.

14          THE COURT:  Well, Ms. Champion, it seems to the Court

15 that that's something between NBT and the U.S. Trustee's Office

16 in terms of if they're qualified, depending on the level of

17 deposit with them.  It doesn't seem like that's appropriate in

18 the particular matter that's before the Court right now.  That

19 would seem either they're approved and they have the collateral

20 or they're not.  Am I missing something?

21          MS. CHAMPION:  No, Your Honor, you're right.  It's

22 just that the debtor is responsible for making sure the bank is

23 on notice of how much is in the bank account so that they can

24 go ahead and post additional collateral if that's necessary.  I

25 just wanted to make sure we weren't waiving that piece of that

22

1  requirement.

2         THE COURT:  All right.  I think what Mr. Sullivan is

3  saying was 345(b) is being requested for everything.  It just

4  so happens that it's not applicable at this juncture to NBT or

5  have an impact because NBT is approved to the U.S. --

6         MS. CHAMPION:  Right.

7         THE COURT:  Is that -- so that is correct, NBT is

8  approved?

9         MS. CHAMPION:  That is correct, yes.

10        THE COURT:  Thank you.

11        Why don't we hear from Mr. Scharf?

12        MR. SCHARF:  Good afternoon, Your Honor.  Ilan

13  Scharf, Pachulski Stang Ziehl & Jones, on behalf of the

14  Committee.  We reviewed the motion.  We discussed it with the

15  debtor, debtor's counsel.

16        Have no objection to the relief requested in the

17  motion with the exception of some language that we did agree on

18  with the debtor preserving everybody's rights regarding the

19  question of whether or not funds that are held by the debtor

20  are property to the estate or not and that language will be

21  included in the final order.

22        THE COURT:  Thank you.

23        Is there anyone else who wishes to be heard on this

24  particular motion?

25        (No response.)

1            Hearing none, the Court has reviewed the motion, as

2    well as the two declarations of Mr. Mashaw in support of the

3    relief requested, and certainly has reviewed the cause for the

4    waiver as defined in the service merchandise case and the ten

5    factors under the totality of the circumstances in this case.

6            The Court believes that there has been safeguards

7    sufficient to preserve the assets here based on diversification

8    and the funds, the management team, the experienced third-party

9    investment managers that exist, as well as the committee that

10   oversees this investment.  That is bolstered by the Diocese's

11   obligation to comply with the New York prudent management of

12   Institutional Funds Act that further, as correctly pointed out

13   by the debtor, the Western District of New York Bankruptcy

14   Court has found is -- was one of the factors that is relevant

15   to the analysis.

16           The Court is concerned.  It doesn't want to handcuff

17   this debtor.  The Court believes while it may not be a mega

18   case, certainly is a large sophisticated case and has been

19   outlined in great detail in the various pleadings and first day

20   motions here.

21           The Court further concerns that if it -- a waiver was

22   not granted, the harm to the debtor's estate if it was forced

23   to liquidate would reduce the rate of return, would create

24   expenses in liquidation, as well as the administrative expenses

25   and the burden.  And quite frankly, the Court would be

concerned it might prompt litigation of the underlying issue of

ownership in the investment accounts if these other entities

decided that they did not want them pulled from the investment

accounts and whatever situation that may create for the debtor

in that circumstance.

The Court also must procedurally note that the

Unsecured Creditors' Committee, who are the primary

representatives for the survivors here, are not objecting to

the relief.  They are not objecting to the relief requested

when ultimately they are the ones with the largest stake in the

outcome of this case.  So in light of that, the Court is

generally going to overrule the U.S. Trustee objection with the

two caveats that I believe were previously discussed.

Paragraph 14 of the Syracuse order outlines the

request that the Trustee made and I'm going to -- and not only

the U.S. Trustee, but the Committee may also request

reconsideration of this waiver if there's a material and

sustained diminution in accounts such that cause no longer

exists.  And I believe paragraph 10 of that same order

addresses the Creditors' Committee reservation of rights that

it's without prejudice.  Well, I guess it has to be without

prejudice for the Diocese to seek an order determining some of

the investments are not property of the estate and the

Committee and all parties' rights to object to any such

determination are fully preserved.  So this is not making any

1  type of a determination in terms of who owns what in the

2  account, nor is the Court adopting the allocation as indicated

3  by the debtor in its papers in terms of the 16.1 million that's

4  the debtor's and the other millions of dollars that are not the

5  debtor's, so there's to be a full reservation of rights

6  regarding that issue in the order.

7          With that said, the Court is going to grant the

8  motion on a final basis, overrule the Trustee objection with

9  those caveats and will look to you, Mr. Sullivan, for an order

10 after reviewing it with Ms. Champion and Mr. Scharf on behalf

11 of the Committee.

12         MR. SULLIVAN:  Yes, Your Honor.  Thank you, Your

13 Honor.

14         COURTROOM DEPUTY:  Continue with Docket No. 11,

15 motion for entry of interim and final orders authorizing the

16 use of cash collateral and granting adequate protection.

17         MR. DONATO:  Good afternoon.  Steve Donato, Bond

18 Schoeneck & King, for the Diocese of Ogdensburg.  Good

19 afternoon, Your Honor.

20         THE COURT:  Good afternoon.

21         MR. DONATO:  The motion before you, Docket 11, is a

22 cash collateral motion in which the Diocese is requesting

23 authorization to continue to use cash collateral in accordance

24 with 11 U.S.C. §363 in the ordinary course of business.

25         We made the motion because we have an obligation to

1  NBT Bank and NBT's security interests reflects an interest in

2  the Diocese cash collateral.

3       At present, there's a letter of credit that's

4  outstanding in the approximate sum of just below two million

5  dollars as a Workers' Comp letter of credit.  It's $1,950,707

6  and there's also a pledge agreement that creates a blocked

7  account in the sum of 2.3 million dollars, which provides

8  collateral to NBT if and when that line of credit is ever

9  drawn.  At present, the line of credit is not drawn, there's no

10  indication that it would be drawn.

11       We made the application in accordance with §363 to

12  request the authority from the Bankruptcy Court to utilize the

13  bank's -- excuse me -- the Diocese cash collateral in the

14  ordinary course recognizing that there is an obligation to NBT,

15  as I said, slightly less than two million dollars and, of

16  course, maintaining the blocked collateral account, which I

17  indicated is 2.3 million dollars.

18       We've had communications with NBT.  We've received no

19  objections concerning the relief and we would respectfully

20  request the Court enter an order.

21       THE COURT:  Thank you.

22       Ms. Champion, does the United States Trustee take any

23  position on the cash collateral motion?

24       MS. CHAMPION:  No, thank you, Your Honor.

25       THE COURT:  Thank you.

1          Mr. Scharf?

2          MR. SCHARF:  Yes, Your Honor.  The Committee reviewed

3    the motion, discussed it with the debtor and, given the limited

4    purpose of the cash collateral, believes the debtor is properly

5    exercising its business judgment entering into this motion.

6          THE COURT:  Thank you.

7          Is there anyone appearing that noted their appearance

8    from NBT?  I believe that was Mr. Dove in the first day orders.

9          MR. DOVE:  Yes, Your Honor.  Thank you.  Jeffrey Dove

10   of Barclay Damon on behalf of NBT.  We have no opposition to

11   the motion.

12          THE COURT:  Thank you.

13          Is there anyone else on the line or in court who

14   would like to be heard on the cash collateral motion?

15          (No response.)

16          Mr. Donato, are you seeking the relief on a final

17   basis.  Is that correct?

18          MR. DONATO:  Yes, Your Honor.

19          THE COURT:  That's what I thought.  Thank you.

20          The Court has reviewed the cash collateral motion on

21   the record before it and the prior proceedings with respect to

22   the motion.  The Court is going to grant the authorization to

23   use cash collateral and grant adequate protection as outlined

24   in the motion on a final basis and will look to you,

25   Mr. Donato, for an order after NTB's consent and the parties

1  have signed off on the final version of that order.

2          MR. DONATO:  Thank you, Your Honor.

3          COURTROOM DEPUTY:  Next motion is motion number 16,

4  motion for interim and final orders authorizing but not

5  directing the Diocese to continue to administer the deposit and

6  loan fund and Diocesan Trust Fund in the ordinary course of

7  business and consistent with past practice.

8          MR. WALTER:  Good afternoon, Your Honor.  Grayson

9  Walter on behalf of the debtor.  Your Honor --

10         THE COURT:  Good afternoon.

11         MR. WALTER:  Your Honor, by this motion the Diocese

12 is seeking authority to continue to administer in the ordinary

13 course of business consistent with its prepetition practices

14 two different financial programs that it runs for the benefit

15 of parishes and other related Catholic entities.

16         The Court has already entered two interim orders

17 granting the relief requested in the motion on a temporary

18 basis.  Your Honor, the Diocese submits that further relief is

19 needed to ensure the parties -- those related parties have

20 access to monies that -- the Diocese takes the position it

21 belongs to them.  Understand that the Committee has not -- has

22 reserved its rights on that, but they are held in the name of

23 the Diocese.  The Diocese respectfully submits that the

24 facilitating -- the fiscal and operational needs of parishes

25 and related entities is a large part of the Diocese's mission

1  and also necessary is the Diocese derives a large part of its

2  own operational revenue from those related parties.

3         Your Honor, the two programs the Diocese is seeking

4  authority to continue pursuing this motion are the deposit and

5  loan fund, which operates akin to a bank account for parishes,

6  as well as a Diocesan Trust Fund, which houses endowed

7  permanently restricted monies, but also invests them and grows

8  them and pays off dividends to the parishes on a quarterly

9  basis.

10        The Committee filed a limited objection to the motion

11 asserting a need to conduct additional diligence.  We've

12 reached agreement with the Committee for entry of a third

13 interim order that will allow time for that investigation to

14 continue and also agreed with the Committee on additional

15 withdrawal amounts from the deposit and loan fund and from the

16 trust fund.

17        Your Honor, the Diocese is seeking limited interim

18 authority over the next month to continue to honor deposits up

19 to a maximum of $175,000 in withdrawals from the deposit and

20 loan fund, as well as authority to originate up to $30,000 in

21 new loans out of the deposit and loan fund.

22        We've also agreed to provide the Committee with 14

23 days' prior notice before honoring any withdrawal in excess of

24 $25,000.  We've agreed to assemble a reservation of rights to

25 the Committee on the property of the estate question.

1          Your Honor, with respect to the Diocesan Trust Fund,

2    at this point in time we are seeking authority to honor

3    $218,750 in previously scheduled third-quarter dividends out of

4    the Diocesan Trust Fund, which is the same total dividend

5    amount that was paid out to DCF participants in third quarter

6    of 2022.  So same amount as last year.

7          Your Honor, other than the Committee's limited

8    objection, which I'll let Mr. Scharf speak, but I believe it's

9    been resolved and received no other opposition or responses to

10   the motion, I would ask that it be granted again on a further

11   interim basis.

12         THE COURT:  Thank you, Mr. Walter.  When you said,

13   what -- what was the time frame for the $175,000 withdrawal and

14   the $30,000 new loan?

15         MR. WALTER:  Your Honor, that would be from today

16   until the next time we're in front of the Court, which I think

17   is November 2.  I'm not sure if we're working off of Your

18   Honor's standard hearing dates or Judge Radel's but, you know,

19   it would be approximately a one month additional extension.

20         THE COURT:  Certainly.  We will be -- this court will

21   work with Judge Radel's calendar, so it would be November 7th

22   at 1:00, believe, is the next date that we've talked about for

23   follow-up proceedings.

24         And the $30,000 for new loan, is that per entity per

25   participant or is that --

31

1              MR. WALTER:  No, that's in total, Your Honor.

2              THE COURT:  In total.  Okay.  Thank you.

3         Okay.  Why don't we hear from the Committee?

4              MR. SCHARF:  Ilan Scharf, Pachulski Stang Ziehl &

5    Jones, for the Committee.  Thank you, Your Honor.

6              The Committee has requested information from the

7    Diocese, has received some, is continuing to do its diligence

8    with respect to the DTF and the DLF.  We did agree on

9    reservation -- language regarding reservations of rights.  That

10   would expect to continue through to a final order.

11             We've talked with the Diocese about a number of

12   different options for a final order in terms of something

13   longer term or month to month that would continue with

14   Committee consent and the Committee recognizes the importance

15   of funding operations for the non-debtor entities and at the

16   same time wants to make sure that assets are preserved and will

17   do its diligence and work to negotiate a resolution with the

18   Diocese.

19             THE COURT:  And Mr. Scharf, the Committee doesn't

20   have any objection to the dividends?

21             MR. SCHARF:  No, Your Honor.  We reviewed the

22   dividends and a schedule of prior year's dividends that tracked

23   since it's dividends and not principal being paid out we

24   were -- to the various operations, we're not objecting to that.

25             THE COURT:  Thank you.

32

1          Ms. Champion, does the United States Trustee take any

2    position on this motion?

3          MS. CHAMPION:  Your Honor, thank you.  The U.S.

4    Trustee previously had requested the relief be entered on an

5    interim basis only just to allow the Committee to retain

6    counsel to get up to speed.  And it appears that they have done

7    so, so at this point in time, Your Honor, the United States

8    Trustee is not taking a position on this motion and will defer

9    to the Committee.

10         THE COURT:  Thank you.  Is there anyone else either

11   in the courtroom or on the phone who would like to be heard on

12   this motion?

13         MR. DOVE:  Your Honor, Jeffrey Dove of Barclay Damon

14   representing the ad hoc committee of parishes.  The parishes

15   support the extension of the authority.

16         THE COURT:  Thank you.

17         The Court considered the motion, previously entered

18   interim orders and will grant the relief as outlined on the

19   record with the limitations in both the withdrawals and the new

20   loans on the dividends.  We will look to you, Mr. Walter, for a

21   further interim order after reviewing that with the Committee

22   and then we'll adjourn for further proceedings to November 7th

23   at 1:00, which as indicated would be a regular Utica court

24   date.

25         MR. WALTER:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          So with that, I believe that concludes my activities

3  for the day and will defer to Ms. Johnson to recall Judge Radel

4  back to the stand.

5          COURTROOM DEPUTY:  Thank you, Judge Kinsella.

6          THE COURT:  Thank you.

7                     (Pause)

8          COURTROOM DEPUTY:  All rise.  You may be seated.

9          The next motion in the Roman Catholic Diocese of

10  Ogdensburg, New York is Docket No. 19, application to employ

11  Stretto, Inc., as claims and noticing agent effective as of the

12  petition date.

13          MR. DONATO:  Thank you, Your Honor.  Steve Donato.

14  Grayson Walter is going to argue that motion or at least advise

15  you.

16          What we were hoping to do, was to address all

17  uncontested motions first, get those removed.  So that would be

18  the Stretto motion, the 105 stay motion, the insurance program

19  motion, and then the second Stretto application.  So if we can

20  do that, I think it's in line actually with the calendar,

21  anyway.

22          THE COURT:  The stay motion I don't have as

23  unopposed, though.  Stay motion is opposed.

24          MR. DONATO:  Oh, sorry.  And it's resolved, so sorry.

25          THE COURT:  Okay.

34

1          MR. DONATO:  It is opposed, but it is resolved.

2          THE COURT:  Very good.

3          MR. DONATO:  Then what I would propose to do, is we

4   have basically three more motions then.  We have the mediation

5   motion, we have the proof of claim bar date motion, and then we

6   have the 2004 exam.  I think the best way to handle this would

7   be to do it in the following order.  Do the mediation motion.

8   This is after the uncontested motions.  Mediation motion claims

9   bar date, then do the 2004.  Some of the issues raised in the

10  2004 would be addressed in the mediation of the bar date

11  motion.  So from an order -- a logical order, we think that

12  would be the best way to approach it.

13         THE COURT:  Fine with me.

14         MR. DONATO:  Thank you, Your Honor.

15         THE COURT:  So why don't you call, Ms. Johnson,

16  please, the -- yeah, the two -- I think like we originally

17  planned, the two Stretto motions.

18         COURTROOM DEPUTY:  Two Strettos?

19         THE COURT:  Yeah.  Call those together.  The two

20  Stretto motions can be called together, I think.

21         COURTROOM DEPUTY:  Okay.  Also Docket No. 20,

22  application to employ Stretto, Inc. as administrator advisor

23  effective as of the petition date.

24         THE COURT:  Thank you.

25         MR. WALTER:  Thank you, Your Honor.  Good afternoon.

35

1  These -- both these applications are unopposed.  Stretto is

2  going to facilitate the Diocese providing mailings and also

3  claims handling services on a confidential basis, which is

4  necessary to preserve the confidential nature of the proofs of

5  claim in this case.  And we'll also be looking to them to

6  provide certain other services when it comes time to solicit

7  plans, which we would seek to have approved as an

8  administrative advisor role under 28 U.S.C. 156(c).  There's

9  been no opposition or responses filed to these.  They've been

10 entered as interim orders and we'd ask that the Court enter

11 them as final orders at this point.

12       THE COURT:  Thank you, Mr. Walter.  Applications are

13 granted.  We'll look to you for an order.

14       MR. WALTER:  Thank you.

15       COURTROOM DEPUTY:  Now, which one?

16       THE COURT:  The insurance motion, Docket 17.

17       COURTROOM DEPUTY:  Okay.  So we'll have them in

18 order, then?

19       THE COURT:  Right.

20       COURTROOM DEPUTY:  Docket No. 17, a motion for entry

21 of interim and final orders authorizing the continued

22 maintenance of the Diocese insurance program and authorizing

23 the payment of obligations in respect thereof.

24       MR. WALTER:  Thank you.  Again, good afternoon, Your

25 Honor.  Grayson Walter.

36

1          Your Honor, as outlined in our papers, the Diocese

2    maintains a joint insurance program that covers the Diocese,

3    parishes and other related entities.  By this motion, we're

4    simply asking the Court to approve a continuation of that

5    program in the ordinary course of business.  The Court has

6    already entered two interim orders granting the relief on a

7    temporary basis.  We're now seeking the entry of a final order.

8          The Committee did file limited response to this

9    motion.  We've, I believe, resolved all those issues.  First,

10   we've agreed to the same reservation of rights language with

11   the Committee on property estate arguments, as far as insurance

12   funds are concerned.  We've also agreed to provide the

13   Committee with 14 days' prior notice before entering into any

14   litigation settlement agreements or if claim abuse defense --

15   these claim defense costs exceed $10,000 in any given month.

16         Subject to any questions that the Court may have or

17   additional comments that Mr. Scharf may want to add, I'd ask

18   that this motion also be granted on a final basis.

19         THE COURT:  Thank you, Mr. Walter.

20         Mr. Scharf?

21         MR. SCHARF:  Your Honor, we filed our limited

22   response and with the language that's been added we consent to

23   entering the order.

24         THE COURT:  Very good.  Thank you.

25         Motion is granted.  Order on consent to be submitted.

1  We'll look to you for that, Mr. Walter.

2          MR. WALTER:  Thank you, Your Honor.

3          COURTROOM DEPUTY:  Docket No. 138 --

4          THE COURT:  Actually, sorry --

5          COURTROOM DEPUTY:  -- motion for 2004 --

6          THE COURT:  Sorry, Ms. Johnson.  Can we do the stay

7  confirmation motion at Docket No. 18?

8          COURTROOM DEPUTY:  Docket No. 18, motion for entry of

9  an order pursuant to 11 U.S.C. §§105(a) and 362(a) confirming

10 the applicability of the automatic stay.

11         MR. WALTER:  Good afternoon again.  Grayson Walter,

12 Your Honor.

13         By this motion, the Diocese is seeking entry of an

14 order confirming the applicability of the automatic stay to the

15 approximately 124 pending lawsuits naming the Diocese as a

16 defendant.  In the motion, the Diocese also sought the Court's

17 guidance under the Second Circuit's *Fogerty* decision that

18 plaintiffs may wish to sever the Diocese from those actions

19 would need to first obtain a modification of the automatic stay

20 from this Court before proceeding with the motions to sever in

21 state court.

22         The Committee did file an objection to the motion

23 suggesting that this was requesting an advisory opinion and

24 that the -- to the extent *Fogerty* should only be tested in the

25 context of a live case controversy.

38

1        Your Honor, the Diocese would respectfully submit

2   that there is a live case controversy here, 124 of them, and

3   that the Diocese is a debtor in bankruptcy, is entitled to know

4   the extent to which the automatic stay applies.  However, in

5   agreement with the Committee we've agreed to remove the

6   language from the proposed order that was included in the prior

7   interim order regarding stay applicability to severance

8   actions.  Your Honor, the Diocese, of course, reserves its

9   right to pursue appropriate remedies in the event there is a

10  violation of the automatic stay, but we think we've made our

11  point clearly that we think it does apply to request to sever.

12  We're not looking to push that issue as far as the final order

13  here.

14        THE COURT:  So the order will confirm the

15  applicability of the stay to any action in which the Diocese is

16  named as a defendant --

17        MR. WALTER:  Full stop.

18        THE COURT:  -- without -- yes, come --

19        MR. WALTER:  So --

20        THE COURT:  In parentheses in between the lines

21  without any determination as to whether that would in -- the

22  stay would include a motion to sever, discontinue against the

23  Diocese, bifurcate against the Diocese.

24        MR. WALTER:  Correct, Your Honor.  Basically, from

25  the interim order that Your Honor entered, we would just

1  excise, I believe it was paragraph 3, so the paragraph dealing

2  with severance.

3           THE COURT:  Thank you, Mr. Walter.

4           Mr. Scharf.

5           MR. SCHARF:  Since Mr. Walter did say that he

6  believes that there is no -- there is a live case for

7  controversy I'll just have to retort we do not believe there is

8  a live case for controversy.  With that said, the order will

9  essentially stay, as Your Honor said.  The stay applies with

10 the Diocese as named, full stop, without any explanation as to

11 whether -- what the limits of the stay may be and parties can

12 take action at their own peril.

13          THE COURT:  Thank you, Mr. Scharf.

14          Order on consent to be submitted.

15          MR. WALTER:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          Now motion for mediation.

18          COURTROOM DEPUTY:  Mediation?

19          THE COURT:  Yes.

20          COURTROOM DEPUTY:  Qualifications?

21          THE COURT:  Yeah.  44 and then 5 in the adversary.

22          COURTROOM DEPUTY:  Okay.  Case number -- or motion

23 number 44, motion for entry of order referring certain matters

24 to mediation.  There's also a motion number 5 for an entry of

25 an order referring to certain matters to mediation in the

1   adversary 23-80013.

2          MR. DONATO:  Thank you, Your Honor.  Steve Donato for

3   the Diocese.  Before the Court is a motion to request referral

4   to mediation in regard to an insurance adversary proceeding

5   that we filed on a petition date.  That insurance adversary

6   proceeding is an action involving all of the carriers asking

7   for determinations of coverage.  Coverage liability, coverage

8   obligations, things like that.

9          Not a lot of new things going on here.  We've -- this

10  is our fourth Diocesan case.  We've done this four times now.

11  We're getting a few different iterations from my adversaries,

12  which I'll discuss, but the general concept here is we have,

13  excuse me, multi-party litigation.  This is a mass tort.  We've

14  got multiple insurance carriers.  We have a Creditors'

15  Committee.  We have a Diocese.  We have the parishes, all the

16  non-Diocesan entities.

17         This case, we respectfully submit, is perfectly set

18  up for mediation.  There is no reason to be withdrawing

19  references and seeking to pull the case, go to the District

20  Court, litigate.  And frankly, when I read all the responses,

21  weeding it all out, everybody says mediation is the way to go.

22  Frankly, I'm surprised that there was even any opposition.

23         However, excuse me, as indicated, it's not our first

24  rodeo and frankly, just about every carrier in this case with

25  the exception of Century we have dealt with the other cases and

1  it has gone fine.  It has been very good cooperation.  So it's

2  true.  We filed our motion early.  Then at the request of the

3  Creditors' Committee, the U.S. Trustee, we adjourned the

4  hearings.  And then we get jammed with these responses from the

5  carrier saying, they want mediation yesterday.  We don't have

6  any documentation.  My God, the house is on fire.

7           Stop.  It's all hyperbole.  It's all games.  The

8  bottom line is, we understand to go to mediation.  All our

9  adversaries must have discovery document production.  It's been

10 done before.  Everybody over there knows that.  Okay.  Except

11 for Century because they haven't been in this case before.

12          So -- but there's no games.  Bottom line is we would

13 set a time frame that works.  We have extensive discovery that

14 is ready to be sent out, you know, for things like that.  So

15 just that first you read these things.  You think the house is

16 on fire and the world is burning down because somehow we're

17 going to drag people to mediation, in three hours they're not

18 going to have their stuff.  We've done this before.

19          So I ask all the carriers to kind of take a breath

20 here and let's kind of address the reality of the situation.

21 Every case has been resolved through these Diocesan cases.  I'm

22 going to ballpark about 24 or 25.  It's about 20 that has been

23 resolved.  Every one of them mediation.  Okay.  No full bore

24 litigation.  I read some of the carriers' responses.  They

25 wanted to gin this thing up.  It's -- I don't understand it.

42

So the mediation request we submit makes perfect sense.

Now, we have to pick a mediator and in our other cases we were successful in several of actually getting a unanimous selection of a mediator.

Now, things change, tensions flare, demands, things like that. But what I'm suggesting now, not what's in our papers. Again, because of our courtesies in extending and adjourning things, the carriers are jamming us on dates. I'm suggesting that we pick a date of October 25. Doesn't have to be October 20 -- we could pick Halloween to allow for a two or three-week period like we've done in every other case. We reach out to our friends at the carriers. We said, you're a mediation party. You've got input on potential mediators? Give them to us.

We talked to our friends at the Creditors' Committee. They already have one candidate. Okay. It's all fine. We do this in a controlled fashion, not a lot of emotion, not a lot of stress. We make phone calls. Former Judge Sontchi, he's a potential candidate. We have concerns about him, but we're going to interview him, of course, and we will give some suggestions to the mediation parties.

Will we have an agreement? I don't know. Unfortunately, as these cases drag on frankly, just parties' positions harden in all respects. Plaintiffs are more aggressive, carriers are less aggressive and the Diocese is

43

1  right in the middle.  Okay.  But the bottom line is mediation

2  is the way to go.

3         I'm proposing October 25.  If one of the carriers

4  wants to go to Halloween, I'm fine with that.  The idea is

5  allow a little air out of the balloon.  Let's go back to our

6  offices.  We'll say we'll contact everybody and say, you've got

7  ideas, tell us who they are.  Surely cost is a concern.  Some

8  of these mediators charge 12, 15 grand a day.  Okay.

9         Ogdensburg is not Rockefeller Center.  So we need to

10 be careful about those kinds of issues.  However, that's the

11 first piece because everybody was concerned about who would

12 pick the mediator or when it would be done.  I'm respectfully

13 suggesting 10/25 is the cutoff date.  If people want a little

14 more time, we're totally fine with that.

15        Just so the Court is aware, I did this -- I think

16 it's appropriate to do the mediation motion first, but in the

17 bar date motion, just so we can get that out again with the

18 idea that we adjourn things at the request of people, the

19 Creditors' Committee asked us to make the bar date January 18,

20 2024.  We are in agreement.  I'll bring that up later and, of

21 course, it's your discretion.  But just so you are aware,

22 there's no resistance.  We had originally proposed November 23.

23 Time rolls, time moves and so we are in agreement with the

24 Creditors' Committee to set the bar date subject to your input

25 on January 18th.  That gives us a lot of time to work on trying

44

1  to have a consensual mediator, to provide extensive discovery,

2  which we have done in all of our Diocesan cases.  We have done

3  these voluntarily.  Okay.  We don't see the need to be filing

4  adversary proceedings, filing motions, things like that.  We do

5  this on a voluntary basis.  That's how you get cases done and

6  that's how you keep administrative expenses down.

7         So I wanted to note that bar date change, which I

8  will do later.  We'd seek a consensus of a mediator by

9  October 25.  If we can't, then what we've done in the past is

10  we would ask the mediator parties, we'd work with the Court,

11  set a time frame, submit a list of three choices, present it to

12  Your Honor.  Some judges have then sought further input.  Other

13  judges just made a decision.  That's all fine.

14         But hopefully, we can either narrow the choices so

15  maybe it's one of two kind of a thing or if we can't, then we

16  submit suggestions to you.  And once in a while there's

17  crossovers where we might submit something and the Committee

18  might say there's a match or a carrier is going to be a match

19  and, of course, it's all on your discretion.

20         But the first piece in mediation, besides getting an

21  order to go to mediation, is who's going to be the mediator.

22  There are not that many mediators out there that had the skill

23  set to address this mass tort issue, to rep specifically with

24  CBA background.  State court counsel are major players.

25  There's a Creditors' Committee, but the state court counsel run

45

the case.  So you have to understand what goes on in those

rooms and there's not that many people that do it, but we're

obviously in the process now of selecting or seeking to find

candidates.  We have some.  I'm asking for basically October 25

to do that.

Another issue, the carriers file things and said, oh,

my God, we're going to be dragged to mediation in six hours.

Let the mediator pick the date for the first session.  Just

stop with all this other gamesmanship.  Just let the mediator

do it.  We think there could be a benefit in having a mediation

session in advance of the proof of claim bar date generally.

The meat of the negotiations, of course, after the

claims are filed.  Then we go through the mapping process,

right.  We've got seven carriers.  We take 124 claims, we line

them up.  Okay.  We pull them, we look at LMI, you know.

You've got, you know, 28, you know, that kind of thing.  We

can't do that mapping yet because we have to get the proofs of

claim, which I'll bring up later in the argument.  That's why

we need some detail as far as what's transpired.

So the meat of the mediation occurs after the bar

date, after an opportunity to map the claims so that you can

see who's the biggest carrier with the largest potential

exposure and work down from there and then that starts the

mediation process.

But as far as the timing, when is the first mediation

1  just let's put it in the mediator's discretion.  If the

2  mediator's position is, no, it has to be in February, you know,

3  after the bar date, that's fine.  Okay.  The Diocese is not

4  trying to jam anyone, but frankly, the way they wrote the

5  papers back to us, they gave it the appearance that we were.

6         Sharing mediation costs, nobody has objected to this.

7  We're the ones that brought it up.  We did it in our first

8  case.  The way we work it out is we're concerned.  You know, at

9  10, 12, $15,000 a day we've got concerns.  But the idea would

10 be, and not even opposed to it in the hundreds of pages I've

11 got, to split the mediation costs 50/50:  50 for the estate, so

12 that's the debtor and the Committee, and then 50 percent share

13 among the carriers.  Okay.  And we've done that successfully in

14 the past.  And again, nobody raised any issues on that, but I

15 just wanted to make an observation.

16        We do seek a stay of the insurance adversary

17 proceeding.  We seek a tolling of all deadlines.  We seek an

18 absolute full reservation of rights for everybody.  There's no

19 games.  Nothing.  Putting it on the record so there's no grey

20 area because when you read these things, all of a sudden people

21 think we're trying to do something impossible.  Playing no

22 games at all.  Stop the litigation.  Preserve all rights.  Go

23 across the street, work on mediation in an informal fashion,

24 see if there's a way to get this done.  That's all we're

25 seeking as far as the stay of the pending adversary proceeding.

1          Responses.  The Committee raised a good issue and it

2    was my oversight when we drew the papers.  The mediator that we

3    seek would be a mediator for the case.  It is not just, I

4    apologize for that, we should have been clearer on that, no

5    issues.  That mediator must understand plan and disclosure

6    statements, third-party releases and every other issue you

7    could imagine that will arise in these cases.  So the mediator

8    for the case is absolutely acceptable to the Diocese.

9          I mentioned the Committee had proposed a mediator.

10   We're happy to interview that mediator.  As I indicated, we

11   have some concerns, but we -- that will be on our list and

12   we'll make that happen and we'll be able to then assess moving

13   forward, possibly with the Committee's selection.  Committee

14   has, in the past, provided other selections as well and we're

15   working on that as well.

16         Carriers want documents.  Oh, my goodness.  We

17   understand and we are going to do it.  We have what we're

18   working on, a package of thousands of pages of documents.  This

19   case is not that old.  This is -- we're just starting this.

20   But we understand -- and by the way, mediation is voluntary.  A

21   mediator can compel you to call.  A mediator can make you show

22   up, but a mediator can't force you to settle.  So a media -- a

23   mediation party can talk with their feet at any time meaning,

24   Mr. Mediator, you brought me here but the Diocese didn't give

25   me any financial information; I'm not willing to give you a

dime.  That's what mediation is.  We understand how this is played, so there can be no issues that we have to produce these documents and we will.

THE COURT:  Let me ask you this.  So I hear you saying, look, been there, done that, no need to reinvent the wheel and I get that.

But one way to read the objections is been there, done that, and we're trying to do it better and we're trying to apply lessons learned, and set this up for a more successful, more expedited, less cost-intensive mediation.  And part of that is adjusting the deadlines, adjusting the disclosure, kind of keeping a tighter hold on my end, rather than just motion granted, come back and let me know when you've worked it out.

So what say you to that?

MR. DONATO:  What I say is all of those carriers, except for Chubb knows it's already worked.  There may not be -- but there is a settlement in Rochester.  We've got a settlement with LMI.  We've got a settlement with Interstate, right?  We've got one non -- it has worked.

But nobody's complaining at these mediation -- they're not saying the Diocese didn't give me this or that.  The reason they're not settling is that demands are high and the carrier numbers are low.  Let's cut through it.  Okay.  That's the issue.  It is not the Diocese.  The Diocese is trying to exit this case as soon as possible so that it is

1  moving as expeditiously as possible.

2       If the Court wants to put some more guidelines on it,

3  that is totally fine.  All I'm sharing with you is, it has

4  worked fine.  There has been no issues, as far as I know.  Now,

5  carriers will come up here and tell you there have been, but in

6  mediation it's natural.  You get thousands of pages of

7  documents, then you're drilling down and then oftentimes, you

8  know, a carrier would say, hey, can give me this little piece,

9  that kind?  Sure.  We do that.  Committee, hey, we need some

10 supplemental.  And we do that a flowing -- free flowing basis.

11      So I think it works.  I guess if we listen to a

12 parade of carriers and they tell you that I'm full of hot air,

13 we'll put some more guidelines on it or if you want to do that.

14 All I'm sharing with you is the reason we're doing it

15 informally is specifically to avoid the 35-page motion we got

16 on a 2004 exam in a case that's very young, right?  We're not

17 going anywhere.  So that's what I'm asking for as far as, you

18 know, the discovery process.

19      The Committee, as I indicated, the -- has a possible

20 candidate.  We will review that.  The carrier is -- the thrust

21 of the carriers is basically we need documentation before we go

22 to mediation.

23      Now, LMI -- interesting, this is new and I'm

24 surprised because LMI -- actually, we've settled with LMI.

25 Okay.  We know lawyers very well.  We live with them.  But they

50

support mediation.  No question.  Their Docket No. 139 says
they support mediation.

        But then they want to withdraw the reference.  They
want to respond to the complaint -- to the adversary proceeding
complaint, and then they want to do discovery and I can't
square that.

        THE COURT:  Well, I read that and I'll -- we can ask
about that.  I read that as an argument about what's the escape
hatch.  How do we get out of this and to what extent can we
just get -- right.  We don't need to go back and make a motion
to get out of mediation, like some built-in escape hatch, which
could be a motion to discontinue litigation or a motion to
withdraw the reference.  That's how -- that's -- I had put that
under this -- the bucket of we need a built-in escape hatch
here so we know that we have that as a lever here and to induce
appropriate diligence and also an escape hatch if we find it's
not -- we're not making the progress we need to be making.

        MR. DONATO:  Sure.  And I mean, if -- I don't know
what's -- I mean, if it's an escape hatch, meaning they've got
to make a motion so we have an opportunity to respond, that's
fine, you know.  While there's frustration, there's a
settlement in Syracuse in regard to the Dioceses and the
parishes.  There's settlements in Rochester.  There's ongoing
mediation going on in Buffalo.  We're involved in Albany.  You
know, yes, it's frustrating, but it is actually working.  Okay.

1 It may not be working to the speed that people want, but we're

2 trying to move it as much as possible.

3       THE COURT:  And why not -- why not just defer your

4 motion, let the adversary -- they put their answers in, do some

5 preliminary discovery document exchange and then put it in

6 mediation.  Why not if you're going to do document exchange

7 anyway, why is it better done in the context of informal

8 exchange through mediation versus formal discovery with

9 deadlines and --

10       MR. DONATO:  It's much faster and it's much more

11 administratively better for the estate to do it in an informal

12 manner.  I cannot understand why we would ever seek to withdraw

13 the reference at this stage of the case.  One, if it goes

14 upstairs, with all due respect to the District Court judges,

15 they're not bankruptcy lawyers.  And frankly, I don't think

16 they're going to move the case.  I think that's a slow-down

17 process.

18       Now, if you're a carrier, and they always disagree

19 with me, carriers get paid to keep their money in their pocket.

20 Okay.  Defense costs, they don't care.  That's in their budget.

21 As long as they're going to avoid the indemnity obligation,

22 that's fine.  They tell me, no way they want to resolve it.

23 Well, if they want to resolve it, then don't go through some

24 delay attempt going up to the District Court, all that other

25 stuff, when we are telling you right now, you'll get the

1  documents and our actions have confirmed that in our prior

2  cases.

3        So that piece about LMI did surprise me and if it's

4  an escape hatch that's fine.  But at this stage when I read all

5  of the objections, I walked away saying everybody agrees to

6  mediation with some tweaks and some adjustments.  Okay.  So

7  we'll make some tweaks and adjustments.  We are absolutely fine

8  in producing all of the documentation.

9        You know, if somebody wants an escape hatch they

10 always have the ability to come right back here and say, you

11 know what, Mr. Donato's suggestion didn't work and here's why.

12 You know, that kind of a thing.  Again, if it was our first

13 case, you know, maybe there'd be something but we've

14 demonstrated that we've done this before.

15        And that's pretty much it.  I think the mediation

16 concept really just makes, you know, complete sense and based

17 on our experience and the fact that you'll give the mediation

18 parties escape hatches which, you know, what --

19        THE COURT:  But you wouldn't oppose the inclusion of

20 an escape hatch in an order granting me -- if I said mediation

21 granted without prejudice to the right of any party to seek to

22 withdraw the reference, terminate mediation, obviously on

23 notice opportunity to be heard --

24        MR. DONATO:  Right, the only thing I'd like is I'd

25 like you to be the gatekeeper.  You know, I mean, you're the

53

1 primary judge, so I want everybody to have to come to you.

2 That's the only thing I'd want.  I don't want to be in a

3 position where somebody is coming to you, now I'm going to the

4 District Court.  You're the presiding judge over the insurance

5 adversary.  Escape hatches are fine.  We use a loose term.

6 That's why I'm just more mature.  I know what I'm saying.  If

7 they have to come back to you and somebody says, you know what,

8 it isn't working, Judge Radel, here's my motion, please send me

9 back to insurance adversary terminating me, I have no problem

10 with that.

11          THE COURT:  Thank you, Mr. Donato.

12          MR. DONATO:  Thank you.

13          THE COURT:  Do I hear from Mr. Scharf next?

14          MR. SCHARF:  Good afternoon, Your Honor.  This is the

15 first time the Committee is appearing in front of you, so I

16 just wanted to take a moment and just let you know how the

17 Committee is working, who the Committee members are and how we

18 kind of run these cases.

19          THE COURT:  Thank you.

20          MR. SCHARF:  I think it will be helpful.  And if you

21 don't want to hear that I can --

22          THE COURT:  No.

23          MR. SCHARF:  -- launch into the dark.

24          And so my firm has been representing survivors in

25 Creditors' Committees for about 20 years, a little -- maybe a

54

1  little over at this point and I've been doing it personally for

2  about 15, and we've mediated every single case that's gone to

3  conclusion, has done so through a mediation process.

4          The Committee members in this case are seven

5  individuals who were sexually abused as children while they

6  lived within the Diocese of Ogdensburg.  We meet with them on a

7  weekly basis.  We both skip an occasional meeting, but we do

8  meet with them and report to them every detail that's going on

9  in the case and they will be involved every step of the way,

10 including attending mediations.

11         Those folks are represented by state court counsel,

12 who are also a very important part of this because there are

13 about 124 cases pending and state court counsel who represent

14 Committee members represent in excess of 50 percent of the

15 cases out there, so it's a critical mass of the survivor

16 community within the Diocese of Ogdensburg.  And we meet with

17 them, along with the Committee members.  We try to make

18 everything done on consensus and move forward with their input,

19 but recognizing that the Committee is the official voice in

20 this case.

21         In terms of -- I'll turn to the mediator motion.

22 It's important for this case to be sent to mediation.  The

23 Diocese filed the request within the context of the insurance

24 adversary proceeding.  As Mr. Donato said, he clarified that.

25 This needs to be a global mediation.  I think there's been some

55

confusion in courts in past cases, but this has to be a process that encompasses all aspects of the bankruptcy case, not just insurance and not just issues between the Diocese and the survivors.  There's -- these are all interrelated issues in a bundle.

And Your Honor, I do want to address a couple -- throughout my presentation, I'll try to address a couple of Mr. Donato's comments.  The Diocese is not caught in the middle.  The Diocese is responsible for this problem.  The survivors are caught in the middle.  The survivors are the only -- are the party that really doesn't want to be here. They are the victim here.  They are the aggrieved party.  So the Diocese is not caught in the middle between survivors and insurance companies.  And I want to avoid that kind of language that puts the problem on survivors' backs as opposed to the responsible party.

During -- when we go through the mediation process, we have to maintain flexibility.  So in this case -- and part of what we're all doing is dissecting why these cases have gone -- go on for so long and are there better ways of building the mouse trap because we want to learn from every case we've worked on.

I do want to note there's a big distinction between this case and many of the other cases in New York state.  This case filed after the CVA window closed.  The Diocese of

1    Rochester filed about a month after the window opened, maybe

2    less.  I think -- sorry, just exactly a month after the window

3    opened.  Buffalo was a few months after the window opened and

4    then we had a global pandemic that extended that one-year

5    window to a two-year window.  And the reality is that when

6    you're dealing with the insurance companies and frankly, you're

7    dealing with claims against the Diocese, it's hard to have a

8    constructive mediation process when you don't know what the

9    claims are.  So if you start a mediation process with 35 claims

10   that were filed early on in the case before a window closed,

11   okay, that's -- you know, you make a demand based on 35 claims

12   and in Buffalo we had 850 claims.  We looked -- it's hard to

13   have that kind of negotiation.

14         So this case has an advantage that it filed after the

15   CBA window closed.  We know the universe of claims.  There are

16   some adult claims that can still be filed through November, but

17   if history is a guide with respect to the other Dioceses out

18   there, there are a handful of those cases that were filed and

19   they require different levels of proof than a child victim

20   claim.

21         So the other advantage we have here is that the

22   survivor group community did have -- there was a group of

23   attorneys, an ad hoc committee of counsel who received

24   information and started discussions with the Diocese, so we

25   have had an information flow where we now -- that has to be

57

1  supplemented and we will do that.

2        In these cases it is rare for my firm to file a 2004

3  motion seeking information from a debtor.  We will do so if we

4  have to, but we found that it's more cost effective, more

5  streamlined to get that information through informal processes,

6  even under an umbrella of mediation and avoid the cost in

7  litigation over motions to compel, motions to quash, and all

8  the back and forth that that entails and that goes for

9  commercial cases as well.  That's just a better practice.

10        So our preference would be to start a process with an

11  informal process to the extent the Diocese produces documents

12  and ensures that having been produced to us we would like

13  copies of them.  We did send an NDA.  We know the Diocese is

14  going to require confidentiality.  We sent them a draft NDA

15  based on prior NDAs we've done in other cases, so we want to

16  get this process moving as quickly as possible.

17        Because of mapping out the issues for mediation,

18  there are issues about property of the estate here, issues

19  about payment from the Diocesan -- both the Diocesan grouping

20  or the Diocesan family, all the entities that are within the

21  Dioceses' orbit.  Those issues are separate from the insurer

22  issues, so we can have a mediation start.  We can have

23  discussions before the bar date.  We can talk about information

24  exchanges before the bar date.  We can get the mediator up to

25  speed on the issues for this Diocese before the bar date.

1        So parties can submit mediation statements.  They may

2   not have a final demand number on them, but we all know the

3   issues.  We all know that we're going to have an argument with

4   the insurers over what number of occurrences a particular claim

5   had or what policy limits apply and what defenses apply, but we

6   want to do it in an orderly manner.

7        So you can get the mediation started before the bar

8   date.  We do recognize that final demands require a bar date.

9   We'll talk about the bar date motion in a minute and what

10  information should be provided, but we essentially need to know

11  who was the perpetrator, what happened to the child, when did

12  it happen and where did it happen.  Sort of like our old

13  English teacher said, who, what, when, sometimes where, why.

14  So we do want to have that process started.  We're ready to hit

15  the ground running.

16       In terms of mediator selection, we -- again, we try

17  to build a better mousetrap or the right mousetrap for a

18  particular case and we have had experience with a couple dozen

19  mediators at this point throughout these cases.  And Judge

20  Sontchi stepped off the bench a few years ago.  He is uniquely

21  qualified in one sense, which he's the only judge we've

22  contacted who was -- who would -- who presided over a Diocesan

23  case and entered decisions on property of the estate and knows

24  insurance law, who fits -- checks all the boxes of the skill

25  set the mediator would need and the experience a mediator would

1   need.  And if the only issue is fees, we can address that, but

2   we really don't want to be penny-wise and pound foolish.

3          I take very seriously maintaining and limiting the

4   administrative burden.  You'll notice I'm here by myself.  I do

5   not have a team following me around.  I'll bring people when

6   it's necessary, but we try to be very efficient in the way we

7   work and we will carry that over with respect to a mediator.

8   We don't want to hire my best friend just because he happens to

9   be a nice guy and I want to give him the work.  We want to try

10  to hire the right person.

11         And, you know, we did cite Judge Buckeye's decision

12  that he entered the Diocese of Buffalo where we had one

13  mediator appointed and a desire for a co-mediator.  And there

14  was a dispute between insurers and the Diocese and the

15  Committee over who that person should be and the Committee

16  recommended a person, support of that person.  And Judge

17  Buckeye essentially said that if all the qualifications are

18  equal and you can't really distinguish among the different

19  mediators by qualification, if they're all qualified, give some

20  deference to the Committee selection as the aggrieved party

21  and, frankly, as the party that's at a disadvantage in these

22  cases.

23         Interestingly, when the insurers -- and I'll just

24  address some of the insurer requests here to kind of move this

25  case forward on the adversary -- on their adversary proceeding.

60

1   It's a bit perverse that survivor cases are stayed, stuck in

2   limbo.  And the survivor cases are really the ones that give

3   rise to the underlying liability.  That's where the liability

4   flows up from, but the insurers want to go forward with their

5   case.

6           And so a survivor may not be able to take the

7   Diocese's deposition in their state court case by operation of

8   the automatic stay, but they're going to be allowed to take

9   survivor depositions on insurance issues when they raise

10  defenses like the expected and intended defense.  And if you

11  look at the questions they raise and want to include in the

12  proof of claim form, they're really going right at the heart of

13  defenses that can be asserted in the insurance adversary

14  proceeding, as well as the underlying cases.

15          So we don't want to have a situation -- it would be

16  unjust to have a situation where survivors are disadvantaged

17  because they can't press their story, but the insurance

18  companies are allowed to press their claims, their defenses and

19  tamp down the amount of insurance that's available to

20  survivors.

21          So if there's going to be litigation, it should be a

22  broader process.  So we think that it makes sense to have some

23  calm, exchange information, get into mediation, exchange

24  information in mediation as has been the practice in many,

25  many, many cases involving abuse and otherwise and, if

1  necessary, we can always come back to court to litigate

2  matters, but we have to try the resolution process first.

3  　　　　THE COURT:  So I hear you -- thank you, Mr. Scharf.

4  I hear you saying with Mr. Donato's clarification that the

5  mediation would be global in nature.

6  　　　　MR. SCHARF:  Yes.

7  　　　　THE COURT:  The Committee is working -- would be

8  working toward an order on consent with the Diocese to refer

9  the matter to mediation --

10  　　　　MR. SCHARF:  Yes.

11  　　　　THE COURT:  That's what I hear you saying.

12  　　　　MR. SCHARF:  Um-hum.

13  　　　　THE COURT:  Okay.

14  　　　　MR. SCHARF:  And we've settled cases through

15  mediation.  It's been through -- look, the Diocese of Rochester

16  is the first New York case to have a Chapter 11 plan on file.

17  It's a joint plan between Committee and the Diocese.  It

18  resolves every issue, except for one insurer.  We didn't get

19  there -- we got there through mediation, intensive mediation.

20  But at times it was coupled with litigation when it was the

21  right time to couple it with litigation.  So there's a time and

22  a place for everything.

23  　　　　THE COURT:  But let me anticipate something I'm

24  supposing I'm going to hear from the insurance companies is

25  that in order to ascertain the scope of the Diocese's

1  liability --

2          MR. SCHARF:  Um-hum.

3          THE COURT:  -- to determine whether we think a claim

4  should be paid and, if so, what the appropriate value for that

5  is --

6          MR. SCHARF:  Um-hum.

7          THE COURT:  -- we need information, which may be in

8  the form of documentation, may be in the form of deposition.

9  You can frame that as defending litigation or you can frame it,

10  characterize it as trying to ascertain the scope of liability,

11  the extent of damage and, therefore, the appropriate settlement

12  amount.

13          So how do I -- you know, isn't it just a matter of

14  what we're calling it?

15          MR. SCHARF:  I think those things can be done through

16  mediation.  Let me just take -- let's take a case example.  I'm

17  going to make it up.  I'm just making up facts as an example.

18  Let's -- or hypothetical, if you like.  We all liked those--

19          THE COURT:  Sure.

20          MR. SCHARF:  -- in law school and as lawyers.  So

21  let's say, you have a case.  You have survivor John Doe files a

22  proof of claim with the quest -- and includes a supplemental

23  attachment.  He will -- John Doe will say he was abused by a

24  certain abuser.  It occurred at this parish, at school.  He'll

25  put in the dates.

1          Now, remember, some of these people were abused when

2    they were five years old.  They may put in approximate dates.

3    They may put it in, it was during the school year when I was in

4    first grade.  And then we will have to figure out if a policy

5    starts in October which side of the coin are we on.  So that's

6    part of the issues that go into the mix, like which policy does

7    it apply to, but they'll put in some date.

8          And when they put in an approximate date the

9    insurance company will come back to us and say, can you fine-

10   tune that for us, please, and state court counsel will meet

11   with their client, try to work with their client, see if they

12   can fine-tune it.  So they'll -- then he'll say the facts of

13   the abuse and perhaps the number of times that he was abused.

14   And we will then use that information to look at the

15   appropriate what we call slotting the insurance charts and we

16   slot the insurance.

17         You know, they'll be a -- Mr. Murray, who is -- do

18   you guys include the coverage chart in the complaint?

19         So Mr. Murray, who is counsel to the Dioc --

20   insurance counsel to the Diocese prepares a chart and it goes

21   year by year and it says, here's a primary layer.  This year is

22   this insurance company.  There's an excess layer above it.  And

23   Mr. Murray issues the insurance company and the Committee will

24   go and try and say, this is our view of the amount of number of

25   claims that hit this policy, the amount that this policy is

64

responsible for, and we'll make a demand based on that.
They'll respond.  They'll say, we have some questions.  And the
give-and-take of that process goes through the rubric of the
mediation.

A lot of folks are approaching these cases now as
massive mass tort cases.  These are not mass tort cases.  There
are a lot of claims in these cases.  There are 125 cases
asserted against the Diocese prepetition.  There will probably
be some more.  People may come out of the woodwork.

But that is a really manageable number of claims.
These are not tens of thousands or hundreds of thousands of
people who are asserting asbestos claims because they worked in
factories, so this is a manageable number of claims to address
through mediation process at first and, if necessary, move to
litigation.  But I would expect they will come -- the insurance
companies will come back asking for clarification.

They may come back and say, I want to understand why
the Diocese is liable for this person, who was not a Diocesan
employee, or something.  The facts will differ and we'll try to
respond to that in mediation in an organized way.  That's all.

THE COURT:  Thank you, Mr. Scharf.

We'll be hearing from the insurance carriers.

MR. HABERKORN:  Yes, Your Honor.  Good afternoon,
Your Honor.  Adam Haberkorn, O'Melvenly & Myers, on behalf of
Century Indemnity Company.

65

1          THE COURT:  So am I reinventing the wheel or building

2   a better mousetrap?  Which is it?

3          MR. HABERKORN:  We like to this better mousetrap,

4   sir.

5          THE COURT:  Okay.

6          MR. HABERKORN:  So starting with the mediation

7   motion, first, I appreciate Mr. Donato's statements again.  It

8   seems in reality with regards to the documents we're requesting

9   fundamentally there are no issues between us.  We both agree

10  what needs to be provided, what -- and it needs to be provided

11  ahead of mediation.  And I also appreciate the clarification on

12  the timeline of mediation.  That was helpful.

13          Our objection -- the bottom line is Century, as

14  Mr. Donato noted, hasn't been involved in these before.  We

15  haven't worked in these last three cases and it's -- experience

16  unfortunately has taught us when you simply rely on promises

17  you're going to get burned.  So the purpose of our request is

18  simply to memorialize, document the requests, what documents

19  are going to be produced and when, so we have some certainty.

20  So I can go back to my client and say, we got the 2004 order or

21  there's a stipulation or something that we can point to and

22  say, this is what will be produced and when and we'll be ready

23  for mediation.

24          The objection asks in the mediation order

25  inextricably entwined with our 2004 motion, so I apologize if I

1  bleed over into one of the other.  We're asking for the

2  production of three categories of documents.  First, the set of

3  complaints, as well as a list of those complaints; copies of

4  the documents produced to the Committee and if subsequent

5  documents are produced that they also be produced to us; and

6  then discovery documents from the tort trials, at least the two

7  that have gone far enough into discovery to have document

8  discovery and depositions that should be produced.  It just --

9  since they've been produced, the abused plaintiffs we're asking

10 that it be produced to us as well in preparation for mediation.

11        It's quite simple.  Asking for a level playing field.

12 I think everyone is in agreement.  The only way you're going to

13 have a meaningful, fruitful mediation is if everyone can show

14 up prepared and ready to negotiate.  Nobody, and I mean nobody,

15 wants to negotiate with their feet in mediation.  We've heard

16 numerous times mediators can be very expensive.  It doesn't

17 make sense to go in unprepared and walk out.

18        All of these documents that we're requesting, they're

19 relevant to plan confirmation and the claims allowance process.

20 These are bedrock issues that the Diocese is asking to have

21 discussed in mediation, have decide in mediation.  Without

22 them, the insurers, Century and the other insurers, we will

23 start miles behind everyone else before the foot race even

24 starts.

25        Importantly, this -- these requests don't pose a

67

1  burden on the Diocese.  We're simply asking for copies of

2  documents already produced, copies of the complaints they

3  already have in their files, the copies of any documents they

4  produced to the Committee.  As far as we're aware, these

5  electronic copies, these virtual data rooms, we just need

6  access to those or forwarded the same copies.  That's all we're

7  asking for and delaying production of these documents will

8  delay mediation becoming fruitful.

9        And one clarification before I wrap up on this point.

10  We do acknowledge that both the Committee and the Diocese have

11  mentioned confidentiality agreements and protective orders and

12  we are fine to -- for any physical document, we understand that

13  needs to be subject to a protective order, a confidentiality

14  agreement certainly before they can be produced.

15        On the 2004 motion, in the Diocese's reply I just

16  wanted to respond to a couple points, if I can.

17        THE COURT:  I'll come back -- we'll call that in just

18  a minute --

19        MR. HABERKORN:  Of course.

20        THE COURT:  -- if that's okay.  All right.

21        On the mediation motion, if I enter an order

22  clarifying that the mediation is global, establishing a process

23  to select a mediator, including a deadline and Mr. Donato, I

24  believe, proposed the October 25th as the deadline, and making

25  it clear that the entry of the mediation order is without

68

1  prejudice to any party's right to -- I was calling it an escape

2  hatch -- seek to exit mediation and/or bring to my attention on

3  an expedited basis an issue where I could be helpful to -- you

4  need me to resolve to facilitate mediation.

5          If I enter a mediation order with those parameters, I

6  hear you saying that that works for you and that's a process

7  that you're willing to move forward with?

8          MR. HABERKORN:  We are also asking for a documented

9  deadline for production of the documents we've requested within

10 the order itself.  Either that or the formal 2004 order.

11         THE COURT:  Okay.  All right.  Well, since we're

12 there, okay, so --

13         MR. HABERKORN:  And --

14         THE COURT:  I hear the debtor saying, your 2004 exam

15 motion is procedurally improper and practically premature.

16 We've done this.  We'll do this.  We don't need to be going

17 down this road.

18         So what if I enter the mediation order, adjourn your

19 motion for a 2004 disclosure to November 7th.  At that point

20 you should have a mediator selected and hopefully, the Diocese

21 can demonstrate and outline for you a timeline for disclosure

22 or identify -- you can identify issues where you have

23 disagreement about the scope of disclosure and then you report

24 back and see where you are on November 7th.  I mean, it seems

25 to me like there should be some sort of -- and I realize there

1  were preliminary discussions, but some sort of meet-and-confer

2  about this before it comes to me saying, you know, enter an

3  order setting those deadlines.

4          MR. HABERKORN:  Understood, Your Honor.  I would have

5  to confer with the other parties that have signed onto the 2004

6  motion, of course.

7          THE COURT:  Yes.

8          MR. HABERKORN:  But I hear you and we will certainly

9  consider it.

10         THE COURT:  Okay.  Thank you.

11         MR. HABERKORN:  Thank you, Your Honor.

12         THE COURT:  Anyone else want to be heard on the --

13  this is the motion for mediation?

14         MR. BUCKLAND:  Good morning, Your Honor.  This is

15  Brad Buckland for Underwriters at Lloyd's.  I apologize I

16  didn't get a chance to identify myself for the record earlier.

17         We had filed also an opposition to the stay of the

18  adversary proceeding and I was -- wondered if the Court would

19  like to hear argument on that or, you know, if that is going to

20  be addressed in the order.

21         THE COURT:  Yeah.

22         MR. BUCKLAND:  I wasn't quite sure if we should

23  continue to discuss that or not.

24         THE COURT:  Right.  No, I -- please do because I

25  would consider that to be part and parcel of the order granting

1 mediation would be that the adversary would be stayed pending

2 the outcome of the mediation.  So go ahead, Mr. Buckland.

3        MR. BUCKLAND:  Okay.  Our position would simply, not

4 to belabor it, but that the adversary proceeding should not be

5 stayed at this time and to continue on as planned.  If there is

6 a subsequent document production, things are moving on, you

7 know, as a matter of course, and the parties wish to renew the

8 stay, I think that would be another matter but we just believe

9 it is premature at this point when we have no information, no

10 documents to produce, you know, and we'd like to continue on

11 with it until we're in a posture to mediate.

12        THE COURT:  Well, let me anticipate something

13 Mr. Donato would say quite vigorously.  We've done this before.

14 You can rely on us to have -- we will produce documents, we

15 will do this.  There's no reason to have people putting in

16 answers and motions and serving demands for production of

17 documents in the adversary if you're worried about our ability

18 to successfully participate in mediation, look at our track

19 record.  And if we don't follow that track record, then you

20 have the right to come back before the Court.

21        So what say you to that?

22        MR. BUCKLAND:  My response would largely to be -- to

23 echo the comments of my colleague, Mr. Haberkorn.  You know,

24 that our concern is just to be relying on promises.  And we

25 would rather be in a posture where if the documents are

produced timely, as is the plan, and perhaps a new motion to

stay the proceedings could be raised, but until that time comes

we just -- we don't see a need to delay the litigation on that

side.  And we think it'd frankly expedite, you know, reaching

the point where the parties are ready to mediate in this

proceeding.

THE COURT:  Well, isn't the reason to stay the

adversary, though, to avoid the effort and expense of having to

comply with the deadlines of the adversary while mediation -- I

mean, to me, there seems to be a re -- I understand your

concern.  That concern, seems to me, to be able to be addressed

readily with the escape hatch I'm talking about.  So if the

document disclosure and information exchange is not proceeding

with appropriate speed, you're going to have the right to be

heard on expedited notice as to why the mediation shouldn't be

terminated and the adversary moved forward.

Why would we not do that, as opposed to having a set

of deadlines that we're hoping we're not going to have to

follow, but we kind of do have to follow because they're still

technically pending and we're spending time and money doing

things we might not have to do?

MR. BUCKLAND:  Okay.  So if I understand the Court

correctly then without, you know, stating the exact language

there will be some indication in the order that we will be able

to move for relief on an expedited basis if we are nearing the

72

1  mediation date and we don't have sufficient information?

2        THE COURT:  Yes.  Yeah, I'm not looking to send you

3  all off to mediation, hey, check back in in a year and let me

4  know how it's going.  I'm looking to send you off to mediation

5  with the expectation that everyone is going to do their level

6  best to move this forward in an appropriate way.  And if anyone

7  feels as though that's not happening, they're going to have the

8  right to be heard back here on an expedited basis, either if

9  it's in the nature of compelling activity or terminating the

10 mediation and putting some deadlines in place for the adversary

11 or the case more broadly.

12       MR. BUCKLAND:  Okay.  And another question, just so I

13 understand the scope of the ruling, I know that there's been

14 discussion of a deadline by which to pick a mediator, but is

15 the Court also contemplating a deadline for the initial

16 mediation session and the order following today or is that to

17 be addressed at another time?

18       THE COURT:  My inclination -- I'm open to being

19 persuaded otherwise.  My inclination is that's something that

20 you should try to work out in the first instance with the

21 mediator that -- and if you want a built-in report back, we're

22 going to have -- we're going to have a natural report back.  I

23 think I'm inclined to adjourn the motion for the 2004 exam to

24 November 7th, so we're going to have a natural report back at

25 that time and you can let me know whether you've come to

1 agreement on an initial date for the initial mediation session.

2        MR. BUCKLAND:  Okay.  Understood.  Thank you, Your

3 Honor.

4        THE COURT:  Thank you, Mr. Buckland.

5        I do have an attorney here looking to be heard.  Sir.

6        MR. SCHAPP:  Hello, Your Honor.  Jon Schapp on behalf

7 of Wausau Insurance.

8        To answer the question, we're okay with the stay as

9 long as there's this escape hatch that you've described

10 numerous times already and the case should go to mediation.  I

11 heard a lot of -- I heard all of what Mr. Donato said.  I

12 agreed with most of what he said here today.  I don't think

13 there's been a lot of hysteria from my part that he's talked

14 about.

15        And, you know, there's talk about insurers wanting to

16 delay the case.  That's not true.  It's never true, in my

17 experience.  I'm not looking to delay this case.  I'm not the

18 one who has already asked for, with no consultation with us, to

19 change the date of the proof of claims.  Judge, that's the

20 beginning.  The date the proof of claims are submitted.  We get

21 that.  We heard Mr. Donato describe the process that they'll

22 work on the claims, let us know what they think which of these

23 claims and how they fall within our policy period and what they

24 think we're responsible for.

25        That's the beginning of the process and I believe

1 Mr. Donato used those exact words, the "beginning of the

2 process."  And now we're talking about moving that date several

3 months into the future and yet, we're supposed to start some

4 sort of process now.  We don't have any documents.  We know

5 there's going to be a dispute about the documents.  Frankly,

6 I'm happy to await what they provide and then we can talk about

7 that, but I've already spoke to Mr. Sullivan about some of our

8 concerns about the documents.  I know there's going to be a

9 dispute.  Whether that dispute rises to the level of something

10 we want to bring to the Court to have resolved, we don't know.

11 We're willing to wait.  Let's see what we get.  Let's see if we

12 have enough to start the process or not.

13          But as we sit here today, we know we're not going to

14 for several months and if Your Honor sets a bar date of

15 January, the one thing we know is we're not going to have a

16 proof of claim before the last day.

17          THE COURT:  Well, let me --

18          MR. SCHAPP:  I mean --

19          THE COURT:  Let me interrupt you.  And I realize

20 we're bleeding into the bar date motion, but that's fine.

21 So I'm going to -- I'm going to anticipate I'm going to hear

22 from Mr. Scharf and Mr. Donato.  Look, this is different.  This

23 case is different.  We have 124 cases, plenty to keep us busy

24 between now and January giving you documents and information

25 that you'll be relying on those 124.  We don't expect the

1  universe to change materially because of the circumstances of

2  this case, so why not error on the side of caution and give us

3  time to make sure that everyone that, you know, would

4  potentially be interested in notice gets notice.  So what say

5  you to that?

6        MR. SCHAPP:  I understand.  My concern is, to go back

7  to what I just said, that's the start of the process.  Once we

8  get the proofs of claim --

9        THE COURT:  What -- no.  The start of the -- you

10 would be getting document disclosure and mediation would be

11 going throughout the entire -- so you are correct in that the

12 universe of claims is not fixed until the bar date, but that

13 doesn't mean that there is an empty universe in the meantime.

14 The universe is populated with at least 124 heavenly bodies

15 that you can dis -- have document disclosure of.

16       MR. SCHAPP:  Well, and going into the bar date

17 motion, we have -- we need the information that's in the proof

18 of claims supplement --

19       THE COURT:  Fair enough.

20       MR. SCHAPP:  This is the beginning.

21       THE COURT:  That's true.  That's true.

22       MR. SCHAPP:  That's the problem, Judge.  And while

23 it's great if we get documents before then, we really -- we

24 don't know what we have and what we don't and we don't know

25 what we don't know at that point --

1              THE COURT:  Fair enough.

2              MR. SCHAPP:  -- until we have that.  That's our

3    concern, Judge.

4              THE COURT:  I got it.

5              MR. SCHAPP:  We certainly agree with the concept of

6    mediation.  We agree that the case should be stayed subject to

7    what has been discussed already, but we don't know what we

8    don't know.  And moving the bar date and putting us so far down

9    the road with that process just delays the case.

10             THE COURT:  Thank you.

11             MR. SCHAPP:  Just delays our ability to put some

12   money up on the table.

13             THE COURT:  Thank you, Mr. Schapp.

14             Anyone else wish to be heard before I go back to

15   Mr. Donato on the motion to refer to mediation?

16             MR. WEISS:  Yes, Your Honor.  This is Matt Weiss on

17   behalf of Interstate Bar & Casualty.  Just wanted to state our

18   position generally.

19             We, of course, support the mediation.  We join in the

20   limited objection that Century put together on the issue.  I'm

21   primarily relating just to the documents.

22             We support the idea of the escape hatch.  I think it

23   needs to be pretty broadly worded to ensure that, you know,

24   basically every party's rights are unaffected by the entry of

25   the mediation order.  I just want to note -- I mean, I know

1  that we don't dispute -- you're the gatekeeper with respect to

2  these issues, but certainly on withdrawal to the reference,

3  which we're not saying we will or won't seek to do today, but I

4  mean, obviously I think that would be a decision of the

5  District Court, in any event.  So, you know, we wouldn't want

6  that affected.

7       On the documents issue, you know, we -- in the 2004 I

8  think we really sort of a backup, we wanted to raise it with

9  Century in connection with the mediation.  But to the extent we

10  needed to pursue an affirmative relief, that's why we filed a

11  separate motion.

12       Obviously, having our prep -- these are basic

13  documents.  These are documents we'd be entitled to.  In any

14  event, they've already been provided to the Committee or state

15  court plaintiff's counsel.

16       I mean, ideally we -- you know, that would be part of

17  the mediation order but, you know, certainly if you're inclined

18  to just push the 2004 a couple of weeks, hopefully we can get

19  them before then, but if not, then, you know, we can address it

20  as needed.

21       And then the last thing I'll just say is that, you

22  know, obviously I think I say probably for all the other

23  insurers, I would assume, but certainly for Interstate, you

24  know, we want to be involved in the selection of the mediator.

25  You know, as debtor's counsel mentioned, they'd already gotten

1  a potential name from the Committee.  You know, we've been

2  in -- we're in a lot of these cases.  It's certainly more

3  beneficial to the case in the mediation when the Diocese

4  counsel consults with the insurers in the selection of

5  mediator.  Not saying that debtor's counsel either has or

6  won't, but just putting it on the record, you know, we want to

7  be involved in that process and, you know, maybe even if

8  there's a, you know, direction for the debtor's counsel to

9  consult all parties in selection of the mediator in the order

10 that could be constructed as well, so just thank you very much.

11          THE COURT:  Thank you, Mr. Weiss.

12          Anyone else wish to be heard before I return to

13 Mr. Donato?

14          (No response.)

15          Thank you.

16          So Mr. Donato, I hear order on consent, global

17 mediation process to select a mediator or bring that to my

18 attention by October 25th and then escape hatch language.

19 Obviously, if the parties reach a point where you're, you know,

20 engaging in sword play over words, you submit the dueling

21 orders to me and I'll -- and I can sort it out.  Do I have that

22 right?

23          MR. DONATO:  Of course.

24          THE COURT:  Okay.  Thank you.

25          So motion granted, order on consent to be submitted.

79

1   We'll look to you for that, Mr. Donato.  As I indicated, please

2   circulate it amongst the parties in interest and then if you're

3   not able to reach agreement, let me know and submit the various

4   versions and I'll sort it out.

5           MR. DONATO:  Explain, Your Honor.  Are you going to

6   adjourn the 2004 motion to --

7           THE COURT:  Yes, unless anyone wishes to be heard, my

8   inclination is to adjourn the 2004 exam motion to 1:00 p.m. on

9   November 7th.  Mr. Donato, you can go ahead and show the

10  parties you're as good as your word and begin that production

11  of documents or outline a process for doing so.  And then, you

12  know, we'll hear back on the 7th in terms of, okay, we have a

13  mediator.  We are pleased or not pleased with the plan for

14  disclosure of documents and the mediation timeline.

15          Mr. Sullivan, did you wish to be heard on that?

16          MR. SULLIVAN:  Yeah, Your Honor, I do want to -- Your

17  Honor, I just because the 2004 motion and I completely

18  understand where the Court -- and I think that makes good sense

19  to adjourn that application, Your Honor.  I want to point out

20  to the Court a couple of things.  We've mentioned a

21  confidentiality agreement, confidentiality protocol.  Committee

22  counsel was good enough to prepare a version of the

23  confidentiality agreement.  I'm confident we're going to get

24  there.  We're going to have that resolved.

25          We have circulated a draft of the confidentiality

agreement to the carrier counsel.  Haven't gotten any responses

from them yet, but they've got it.  What we'd like to do is get

that signed, assembled and submitted to Your Honor so that they

can be so ordered as protective orders.  That all would, of

course, happen before we start producing documents.

I also wanted to address a point that was made by

Century that all of this stuff that they've asked for has been

produced already.  It hasn't, Your Honor.  There's one category

of documents in their proposed document demands which hasn't

been produced to the Committee and is not -- if we were to be

able to produce them, they would have to be reviewed for

privilege, they would have to be reviewed for document -- I'm

sorry, victim identifiers.  And that's all of the information

that -- you know, one of Century's requests is they want copies

of everything that has been produced by plaintiffs and

defendants in the CBA actions.

Your Honor, respectfully, that was the stumbling

block to a lot of the discussions that led to this motion.

Those are the subject of individual protective orders in all of

the state court actions.  And we're still sorting through

whether or not the terms of those protective orders in any way

limit our ability to produce this.

And I'll note, Mr. Schapp discussed production in the

other cases.  That's not a request we've seen in any of the

other cases.  It is largely duplicative of the abuse files, we

81

believe, that have otherwise been produced to the Committee.
But we had not yet made a determination about whether or not
we're able to produce those things.

So I wanted to clarify that this is not a matter
necessarily of pushing a button and all of the stuff that
Century has cooked up in its demand is immediately available
for production.  I just want to make that clear.

THE COURT:  Okay.  Let me say that then.  Let me
clarify.  I'll adjourn the motion to 1:00 p.m. on the 7th.  But
if the hold-up is the confidentiality piece, I want someone to
send a letter to the Court asking a 105 conference.  I do not
want to get here on November 7th and say, we aren't turning
anything over because we're still fighting over the
confidentiality.

MR. SULLIVAN:  Yes, Your Honor.

THE COURT:  That's not going to be acceptable.  So I
will -- if the issue is confidentiality and you're still
working on that, you know, next week, week after next, I want
someone here sending me a 105 letter and we'll put it on right
away for a conference --

MR. SULLIVAN:  Yes, Your Honor.

THE COURT:  -- so we can sort that out.

MR. SULLIVAN:  Yes, Your Honor.

THE COURT:  Thank you.

So motion to refer mediation granted.  Order on

1  consent to be submitted.  Motion for 2004 exam -- why don't you

2  just call that, Carolina, and then we'll adjourn it.  138.

3          COURTROOM DEPUTY:  Docket No. 138, motion for 2004

4  examination filed by Century Indemnity Company.

5          THE COURT:  That motion is adjourned to November 7th

6  at 1:00 p.m. for the reasons previously stated.  Okay.

7          COURTROOM DEPUTY:  Judge, also for the two consent

8  orders --

9          THE COURT:  Yes.

10          COURTROOM DEPUTY:  -- for the mediation.

11          THE COURT:  Yes.

12          COURTROOM DEPUTY:  It's two orders, right?

13          THE COURT:  Yeah.

14          COURTROOM DEPUTY:  One for the adversary and one in

15  the case?

16          THE COURT:  I'll clar -- we'll clarify that and let

17  Mr. Donato know the format and everything.

18          COURTROOM DEPUTY:  Okay.

19          THE COURT:  Thank you.  I think we're ready for the

20  bar date motion at Docket 75 in the case.

21          MR. DONATO:  Thank you, Your Honor.  I think this

22  is --

23          COURTROOM DEPUTY:  Docket No. 75 --

24          MR. DONATO:  Oh, so sorry.

25          COURTROOM DEPUTY:  -- motion to set last day to file

1 proofs of claim.

2        MR. DONATO:  Thank you very much.  Sorry for

3 interrupting you.

4        I do think this is the last motion.  This is Docket

5 No. 75.  And this is the claims bar date motion filed by the

6 Diocese.

7        THE COURT:  Let me just give you some preliminary

8 thoughts to guide your presentation, Mr. Donato.

9        MR. DONATO:  Um-hum.

10        THE COURT:  Let me look -- just get my document

11 first.  Okay.

12        So I understand the tension on the one hand between

13 keeping the barrier to claimants low given that we may have pro

14 se claimants and we may have many claimants for whom

15 participating in the process of preparing a proof of claim is

16 traumatic and might be seen as a re-victimization for them.

17        So on the one hand, we want to be sensitive to that

18 and keep the bar low enough that claimants with claims are able

19 to understand what they're being asked and can provide -- are

20 not unduly burdened by this process and thus, disincentivized

21 to make a viable claim.

22        On the other hand, we also want to create a process

23 that doesn't encourage filings that are not appropriate and

24 that creates a process that facilitates the sorts of

25 information that the parties need to move this forward

1  expeditiously such that if we have a large volume of claims

2  with limited information about the nature of those claims,

3  we're going to spend a lot of time and money trying to separate

4  the wheat from the chaff and get a better understanding on what

5  these claims are and what compensation might be appropriate for

6  each person.

7          So how do I -- how do we balance those two concerns?

8          MR. DONATO:  I'm happy to address it.

9          Just to cut right through it, as I've indicated,

10  we've done this with different courts in settling.  And I would

11  respectfully refer to the Diocese of Syracuse bar date order.

12  That bar date order contains -- and let's specifically talk

13  about -- let's kind of cut right through it -- is the ACS, the

14  abuse claim supplement.  All right.  Everybody knows you've got

15  to file a Form 410.  You've got to do that.

16          You know, the Committee would like it to be very

17  loose about filing the supplemental claim form, which is a

18  complete 180 compared to the Committee's view in other Diocesan

19  cases, which is kind of interesting, and they tell us why.

20  They said they don't want the abuse claim supplement form to be

21  used if there's any claim objections.

22          THE COURT:  Well, I --

23          MR. DONATO:  Let me explain.

24          THE COURT:  Yeah.

25          MR. DONATO:  In Rockville Center there were a serious

1  of claims objections filed by the Diocese and the basis for the

2  claim objections was the Form 10 proof of claim and the

3  supplemental claim form.  They're not shy about this.  The

4  Committee is saying they don't want to use any information in

5  the supplemental form.

6          THE COURT:  Oh, I --

7          MR. DONATO:  And that's -- I mean, that doesn't make

8  any sense.

9          THE COURT:  Well, they're saying -- you're saying the

10 reason we are, and the insurance company is saying the reason

11 we're requiring an abuse claimant to offer -- provide more

12 information than a slip-and-fall claimant would need to provide

13 to have a claim -- a valid claim, the reason we're doing that

14 is because we want to be able to move this forward in mediation

15 and get it resolved expeditiously.  So the reason you're ask --

16 you're imposing this burden on them is to facilitate mediation.

17         So I hear the Committee saying, fine, then give us

18 the protection that's afforded to mediation privilege,

19 documents and information exchanged in mediation is exchanged

20 for that purpose.  So why is that not an appropriate quid pro

21 quo?

22         MR. DONATO:  Because it's never been done before.

23 It's never been done.  I've read every bar date order.  Never

24 been done before.  What that is -- first of all, let me take a

25 step back.  The Diocese has the utmost compassion, sensitivity

1  to the victims, to the survivors.  That's what they like to be

2  called, the survivors.  There's no question.  The Diocese has

3  it.  That's why they filed this case.  They want to ensure a

4  fair and equitable distribution.  If they didn't do that

5  there'd be three CBA actions, judgments.  The first three

6  people would get judgments, the Diocese, the parishes would

7  close down, the Catholic -- you know, it'd be over.  So

8  everybody knows why a Chapter 11 case is filed and that's to

9  ensure, if at all possible, the fairest and most equitable

10 treatment; not the first two people that race to the

11 courthouse.

12         THE COURT:  I understand.

13         MR. DONATO:  Okay.  So that's our overall goal.  And

14 we have the utmost sensitivity.  The Bishop has apologized,

15 will continue to apologize and is very, very sincere.  We talk

16 about this all the time.

17         THE COURT:  But the issue here is not the sentiments

18 of any party.  It's what is the legal protection being afforded

19 to this information.

20         MR. DONATO:  Exactly.  And so when a creditor, no

21 matter what kind of creditor comes into court, when a creditor

22 files a proof of claim, that implicates a process under 301

23 where claims are reviewed.  As you know, they're allowed until

24 objected to.  We're not saying we're going to object to claims,

25 but it has happened.

1          What the attempt here is to actually remove a total

2    from either the Diocese or carriers in the event there are

3    false claims, in the events there are and we're very sensitive.

4    We haven't filed one proof of claim objection in any case that

5    questions credibility.  We have said your claim is against the

6    Methodists, not the Catholics.  We have said, you're suing a

7    clerk that was not under our jurisdiction, you know, those

8    kinds of things.

9          All I'm sharing with is this new idea of commingling,

10   it was not done in Santa Rosa.  I was told it was.  It was not.

11   It was not done in Oakland.  San Francisco hasn't had it yet,

12   so those are your most recent cases.

13         THE COURT:  Just because it wasn't done doesn't mean

14   it's not proper.  Why is it --

15         MR. DONATO:  I understand that.  But what it's doing

16   is it's turning on its head the claim allowance process under

17   the Bankruptcy Code.  Yes, these are sensitive cases.  Yes, the

18   facts are very sensitive.  Everything is 100 percent

19   confidential.  There's no issue about that.

20         But if it turns out at some point that the review of

21   the claims -- make it up.  Say, there's 100 -- say, there's 190

22   claims that come in.  Okay.  And that's going to raise a whole

23   bunch of different issues, right, because 124 -- let's say, we

24   have 190 and we look at those claims and some of those,

25   frankly, are made up.  Okay.  The Diocese should have the right

1   to process claims in accordance with the Bankruptcy Court.

2          This is -- what's going on with the Committee's

3   attempt to take the proof of claim form and make it subject to

4   mediation privilege is to cut off the ability to make an

5   objection to the details set forth in the claim.  That's

6   inappropriate.  We are sensitive.  We're not filing claim

7   objections, but that's what this is.  This is why it hasn't

8   been done before.  This is an end around.  What happened in --

9          THE COURT:  So --

10          MR. DONATO:  -- in Rockville Centre is there was some

11   claims and Judge Glenn got interested in those claims and some

12   claims were either directed to be amended or disallowed and now

13   the state court counsel said, don't forget what had happened.

14   So now we need to cloak everything into mediation privilege.

15   That's what this is about.

16          THE COURT:  So your -- the scenario you're

17   envisioning is someone files a proof of claim and on the abuse

18   claim supplement they say, I was a victim of abuse in the

19   Diocese of Omaha and you want to say, well, wait a minute,

20   objection, this is -- you're not -- this is not even in the

21   right place but, oh, no, now I can't use the abuse claim

22   supplement so now, what, I've got to do a 2004 exam to get that

23   person to say they were in the Omaha and not Ogdensburg, which

24   we all knew anyway, because that was on the abuse claim

25   supplement?  Is that the scenario you're --

1          MR. DONATO:  That's exactly correct.

2          Now, my adversary will say, no, no, you'll get a lot

3    of information in the Form 410.  No, you won't.  Everybody

4    knows the Form 410 settle more for commercial-type claim.  You

5    know, you look at your promissory note, you owed 100 bucks, you

6    attach it, I got a security interest, you know, just road kind

7    of stuff.

8          These are unliquidated claims.  They're personal tort

9    claims.  No criticism, but this isn't the kind of claim you

10   just file and say, I owe $62, you know, in the little

11   preprinted, you know, spot for the answers.  The supplemental

12   claim absolutely needs to be used.

13         We are not saying that you use a supplemental claim

14   and if you don't, the claim is disallowed.  Not saying that.

15   In Syracuse, we went around and around on this issue.  Now, my

16   adversary was not the Pachulski firm.  It was the Stinson firm.

17   The way it works around the country is either Pachulski or

18   Stinson gets the Creditors' Committee cases.  Once in awhile

19   Lowenstein.  Sorry, but our adversaries were Stinson.

20         What we agreed to, and that's why I'm asking the

21   Court to specifically look at the language, what we did, was

22   the language in the Syracuse proof of claim form says you file

23   a 410 and a supplemental form.  Encourages you to file it.  But

24   then it says, your failure to file the supplemental claim, not

25   the 410.  Everybody knows that if you don't file a proof of

1 claim, right, that's --

2         THE COURT:  Right.

3         MR. DONATO:  If you don't file the supplemental, your

4 claim may be dismissed.  Something -- you know, that kind of

5 language.  That is not pejorative.  What are we doing?  It's

6 worked.  We settled cases in our other Diocesan cases because

7 the insurers and the Diocese got enough additional information

8 from the supplemental claim form it would have settled to

9 have -- and I agree -- to pay the Diocese.  It works.

10         This is a new attempt.  The reason -- the purpose is

11 not, yes, it's protecting the victims, but they're already

12 protected.  Everything is confidential.  Everything at ACS and

13 the 410 is confidential, right.  This whole motion talks about

14 the confidentiality protocol ensuring that everybody is

15 protected.  That's fine.

16         But what this is, is this is an end around.  What

17 this is, is an attempt to gut the proof of claim review and

18 allowance process.  It is not necessary.  The mediation

19 privilege, of course, if they get that, then that bars our

20 ability to even raise the issue that your claim is against the

21 Omaha Catholic district Diocese, not the Ogdensburg Catholic

22 Diocese.

23         THE COURT:  So if the abuse claim supplements are

24 critical to trying to be able to solve the matter through

25 mediation, so critical again that we're going to impose this

1   requirement on abuse claimants that would not be imposed on a

2   slip-and-fall, why then are we waiting until the end of January

3   to get all of those proofs of claims and abuse claim

4   settlements?  Why would we wait that long?  Because I mean, I

5   understand you have information --

6          MR. DONATO:  Yeah.

7          THE COURT:  You can be disclosing documents, but as a

8   practical matter, you know, we know -- we sort of know some

9   stuff and there's stuff to keep us busy, but the actual

10  universe of claims with that additional information, we're not

11  setting that until January.  End of January.  Then someone

12  needs to sift through all that and so what -- why the -- why

13  the -- and again, I'm balancing here.  I appreciate the need to

14  make sure that people have adequate notice.  I appreciate that,

15  but I also want to move the matter forward.  So why the -- why

16  were you originally proposing later this month and now

17  proposing January, other than just trying to, you know, go

18  along with the Committee?

19         MR. DONATO:  Well, we were proposing November 23,

20  just so we --

21         THE COURT:  Okay.  Thank you.  Yes.

22         MR. DONATO:  -- know, so it wasn't supposed to -- I

23  know, Thanksgiving, but --

24         THE COURT:  Right, right.

25         MR. DONATO:  Excuse me, sir, again.  The Committee

1  requested it.  We worked well with the Committee.  If there's

2  a -- if we make it, you know, January 7th, if we make it

3  December, you know, 20th, we're completely fine with that.  We

4  don't want to do, right?  The Committee -- we are adversaries.

5  We are very strong, professional, you know, communications and

6  courtesies.  I didn't even try to negotiate.  Be completely --

7  if the census -- let's do something between November 23 and

8  January 18.  We are fine with that.  Okay.  But I did --

9  little -- he wrote and called me and said, if you think

10 January 18 is the day that's not a hill that we're going to die

11 on, if you think that's appropriate.  If it turns out that it's

12 a little bit shorter than our standpoint, it's completely fine.

13 That is the exact reason why we nudged it from the 23rd to the

14 18th of January.

15         And also, to be fair to myself, when we filed our

16 motion we ended up adjourning them for about six or eight weeks

17 to allow to catch up and some of those dates did seem a little

18 bit crypt.  So we're kind of jumping around here.  I guess the

19 first piece of the Committee response is that, you know,

20 make -- they're stepping away from the abuse claim supplement,

21 you know, and I don't know why.  I mean, I think it's because

22 they say the claim objections --

23         THE COURT:  Well --

24         MR. DONATO:  -- in other cases.

25         THE COURT:  -- let me stay with this for a minute.

93

1   So the first question I have is, should the abuse claim

2   supplement be mandatory.  And by "mandatory," I mean, that

3   there would be some sort of automatic disallowance of a claim

4   without -- if the abuse case on that was not contained thereon

5   and --

6           MR. DONATO:  And that is not our position.

7           THE COURT:  That's not your position and --

8           MR. DONATO:  Not our position.

9           THE COURT:  -- and the Syracuse disclosure, I think

10  Albany had a similar, was something along the lines of you

11  should file this.  If you don't, some -- I've seen variations

12  between either your claim may be subject to objection or in

13  what I consider to be sort of maybe preferable or layperson

14  terms, it says, you may not be able to vote on the plan or

15  participate in distribution, which I think makes it clearer

16  that that's a potential consequence.

17          MR. DONATO:  And I think that's a great idea.

18  It's -- so the Syracuse language -- and by the way, Albany is

19  different than Syracuse, significantly different because in

20  Albany they don't talk about the failure to file the

21  supplemental claim.  Okay.  I've read every one of them and I

22  recall debtor's counsel.  That one says, if you don't file a

23  proof of claim -- you don't file a 410 your claim is subject to

24  disallowance.  And I laugh because -- okay, add a new sentence

25  to that.

1          So what Syracuse says is all claimants shall submit

2    proofs of claim in substantial conformance with official

3    Form 410.  Any proof of claim asserting a sexual abuse should

4    be accompanied by the completed, you know, abuse claim

5    supplement.  Then most important, and it's in black -- you

6    know, bold language and, again, I have no problem if we modify

7    it, but it says, the failure to submit completed abuse claim

8    supplement.  That's what we're talking about, not the proof of

9    claim.  All right.  With any proof of claim asserting the

10   sexual abuse claim may be the basis for a valid objection to

11   such claim.  I know exactly what you're talking about because I

12   read them all.  Some of it says, you may not receive payment

13   under a plan, or something like that.

14          THE COURT:  Right.

15          MR. DONATO:  And maybe that's a better way.

16          But this is the kind of thing.  We shouldn't be

17   stepping away from the supplemental claim form.  We -- come on.

18   We're not -- if creditors, we have the sympathy.  We have it,

19   but if you're going to submit a claim for money on a personal

20   tort with seven or eight carriers, right, so you've got all

21   conflicting kind of things, we've got to know when, where, how,

22   et cetera, and we need as much detail as possible.

23          Now, I'm not in agreement with the carriers asking

24   for additional questions.  Okay.  And this is -- so we're kind

25   of sliding from that.  We think that the ones that we hammered

1    out in Rochester and then refined in Syracuse, so we started in

2    Rochester.  It was the first case that we filed.  By the way,

3    we did that with input.  Had input from all the carriers in

4    creating the claim form.  There were prior forms, but we added

5    certain things to it.  We were fine and Syracuse has all of

6    those questions set and we think that's a proper balance.  It's

7    about six pages and the actual substance is about two, you know

8    because that's the nature of the claim piece in the

9    supplemental claim form.  All the other stuff deals with

10   confidentiality and things like that.  We think that that's a

11   real good balance.  I know we'll let the carriers argue that

12   they want other information, maybe make a determination to add

13   a question.

14          The Committee's response agreed with me.  Everything

15   in our claim, except for the last question, which was, have you

16   received any payment in a different case, I would submit Judge

17   Cangilos, Kinsella, they've been through this.  They vetted all

18   of this and I would respectfully submit that's a good balance

19   because, again, we're not taking a position.  If you don't

20   submit your supplemental claim form, your claim is denied.  I

21   think carriers might, but we are not doing that.

22          THE COURT:  Are you -- and maybe you're not --

23          MR. DONATO:  -- doing that.  We are trying to be

24   sensitive.

25          THE COURT:  -- in a position to say this or not, but

1   I looked at the orders and the abuse claim supplements out in

2   Minnesota and the insurers are saying those asked for very

3   extensive disclosures on the part of abuse claimants.  Is there

4   any sort of lessons to be learned from there?  I mean, and I

5   think that representation was that those matters were

6   successfully mediated.  Is there -- are any lessons to be

7   learned about whether that we think that discouraged claimants

8   and/or on the flip side whether getting that information

9   facilitated the -- but you should -- having said that, I also

10  find it interesting that the order -- the abuse claim

11  supplement in Syracuse is similar to the order you're -- the

12  settlement you're proposing here.  And I don't see lots of

13  claims objections on the docket and I don't -- I'm not -- don't

14  believe that the hold-up in mediation is, well, we just don't

15  have enough information because the abuse claim supplement

16  wasn't sufficiently comprehensive.

17          MR. DONATO:  I think that's exactly right because it

18  works.  You've got to give a little bit more information.

19  Again, these are tort claims.  They're unliquidated.  What

20  happened?  How did this occur?  So, yeah, that's exactly right.

21          I can't answer your question directly about

22  Minnesota.  I didn't have direct involvement in Minnesota.  I

23  guess I would say it worked because they all settled, but

24  things have changed as these cases have progressed.

25          So as far as -- most important point for us, we think

1  that language similar to what's in Syracuse should be utilized.

2  We think that the supplemental claim form should absolutely be

3  encouraged, not stepping away from it like the Committee is and

4  not doing it, as I indicated, because they don't want claim

5  objections.  I don't think it's proper.  Do not believe there's

6  any basis to take the supplemental claim form and cloak it with

7  a mediation privilege.  I explained why that's an end around

8  the claim allowance process.  And we are fine.  I know we're

9  not supposed to be in the middle, but in this context I would

10  say we set the template in Syracuse.  We think that's a good

11  reasonable basis and I -- as far as we're concerned, if the

12  Court approves something in that regard, that would be more

13  than acceptable to us and it would allow us to get the process

14  going.

15         As far as the proof of claim date, I just want the

16  Court to know, I did agree with the Creditors' Committee simply

17  because they asked for it.  If the Creditors' Committee is

18  willing to make an adjustment or something, I don't want to

19  pull my consent, is what I'm saying.  But we are okay with

20  that.  We just didn't want to be unfair to the victims.

21         THE COURT:  Thank you.

22         MR. DONATO:  Thank you.

23         THE COURT:  Mr. Scharf?

24         MR. SCHARF:  Thank you.  Your Honor, I'd like to

25  respond.  I'll try to respond to the insurer's issues, but I'd

1 like to reserve some time to address them if --

2        THE COURT:  Sure.

3        MR. SCHARF:  -- address them if they raise anything

4 oral argument.

5        THE COURT:  That's fine.

6        MR. SCHARF:  Thank you.  Your Honor, I do want to

7 address a couple of things up front.  One is this issue about

8 false claims.  We don't want false claims either.  I read every

9 proof of claim in every case that I work on.  We have a handful

10 of people from prisons who submit claims -- who have submitted

11 claims in multiple cases.  I recognize their handwriting and

12 every iteration of their name at this point.  Well, we try to

13 weed out the false claims.

14        In addition, the state court counsel who represent

15 survivors in this context do intake.  These are not folks who

16 are sitting there kind of call center just getting -- you know,

17 paying $50 to get a referral for -- from a call center.  They

18 do intake.  They do not want false claims filed.  They do not

19 want people to come forward who are lying about what happened.

20 It takes away from the true survivors and it would undermine

21 our efforts to represent an advocate for survivors.

22        And I'll try to -- I'll address this issue you said

23 about this balance between what the law requires and what the

24 case needs, throughout my presentation.  I'll also start -- let

25 me start with the date because I think that's an easy one to

1  explain.  So the original motion was filed I think before the

2  Committee was formed.  It was adjourned to allow the Committee

3  to review it, to get up to speed, and the November 23rd date

4  was incidentally Thanksgiving Day.  And I'll just --

5         THE COURT:  And also, I think the day before the

6  adult survivor --

7         MR. SCHARF:  Act closed --

8         THE COURT:  -- window closes.

9         MR. SCHARF:  Right.  Yeah.  So there's --

10        THE COURT:  I think it rolls to Friday because it's

11 Thanksgiving and --

12        MR. SCHARF:  And there's two reasons why we asked to

13 have this moved to January.  One, we need enough time to fill

14 out the forms to get survivor -- discuss them with survivors,

15 get signatures, have consultation, make sure the proof of claim

16 reflects the actual survivor statements, you know, and there

17 may be additional information that's provided.  People do

18 supplement these things.

19        And at the same time, that period between

20 Thanksgiving and Christmas (a) professionals are busy,

21 professionals take time off.  We'd like to accommodate that.

22 At the same time, that time period is incredibly difficult for

23 survivors.  Calling somebody up two weeks before Christmas

24 because they're getting ready to meet their family or may or

25 may not know about their abuse or may have all sorts of

1  lingering emotions, as we all understand about that holiday

2  season for people who are traumatized, can re-traumatize people

3  in a terrible way, so it has to be handled in a gentle way.

4  And if somebody needs to wait until a couple days after

5  Christmas to talk to their counsel, let's give them until a

6  couple days after Christmas and talk to their counsel.

7         THE COURT:  Let me ask you, though, do you not see

8  the virtue?  I know Judge Buckeye, I think, had this in the

9  context of the CB -- having the proof of claim deadline

10  correspond with the closing of the CBA window and he found that

11  to be sort of a beneficial correspondence.

12         MR. SCHARF:  Um-hum.

13         THE COURT:  If we were to make it the 24th, if we

14  were to roll it to that Fri -- November 20, for the Friday

15  after Thanksgiving, the 24th, there would then, I think, be

16  correspondence between the closing of the adult survivor window

17  and the proof of claim deadline.  Are there not -- does that

18  not -- is that not a factor that would militate in favor of

19  setting that as a bar date --

20         MR. SCHARF:  I antici --

21         THE COURT:  -- and -- I'm sorry.  And then we're

22  also, albeit you're -- it's the day before -- the day after

23  Thanksgiving, you're avoiding that holiday time concern that

24  you're raising and we're balancing that against -- we're

25  closing the universe and getting those abuse claim supplements

1  in the hands of the people and you look at them so that we can

2  move mediation forward.

3      MR. SCHARF:  Sure.  So (a), I think we have to

4  have -- for people who may not have come forward, probably have

5  to have more than a 40-ish day deadline just because just time-

6  wise it will take two weeks to get documents out, printed,

7  newspapers up and running, et cetera.  So I think that just

8  realistically the 24th wouldn't work.

9      In addition, Judge Buckeye entered that decision in

10  the context of the Diocese trying to truncate the window.

11  So -- and it wasn't contested in Rochester.  But when Rochester

12  filed, Judge Warren expressed concern about truncating the

13  window against the will of the New York Legislature that opened

14  the window for a certain amount of time and he ended up

15  entering an order that made the bar date co-terminus with the

16  window as it was originally presented.  Of course, COVID

17  extended that and he declined to extend that.

18      But I think that the -- Judge Buckeye's decision was

19  driven more by this is the will of the Legislature to allow

20  people to come forward, as opposed to just looking at fit

21  neatly and frankly, doing something the day after Thanksgiving.

22  It would be a burden on professionals.

23      (Laughter)

24      But no, so I think that it's that period --

25  Thanksgiving has the same issues as people are meeting with

1  their same families.  Getting past the holidays is incredibly

2  helpful for survivors.

3        Nobody wants to move these cases fast-forward more

4  than the survivors do.  They've been waiting for 50 years, in

5  some cases, for their day in court and for justice.  And, you

6  know, to delay justice for an extra 30 days is something that

7  we think would be reasonable.  That said, again, as we said, we

8  think that there's other parts of this process that can move

9  forward before the bar date.

10        The other difference here is we know the complaints.

11  We know which recent -- or which individuals have been

12  identified as perpetrators, so you can start investigating

13  that.  We know the universe of complaints.  So that's why we

14  picked January 18th.  It wasn't -- it was driven by that need

15  to get past the holidays for some people.

16        So in terms of the bar date motion, there's a number

17  of points we want to make.  The first is that it has to be

18  voluntary.  It has to be subject to a mediation privilege and

19  we want it to be limited to the questions that we propose.

20        THE COURT:  Let me ask you first, if by voluntary

21  you mean that there is -- do you mean it is not prop -- it

22  would not be a proper objection to the claim?  The absence of

23  an abuse claim would, therefore, not be a proper objection to

24  the claim or you mean that it would not be the basis for an

25  automatic disallowance of the proof of claim?

1    MR. SCHARF:  Both.

2    THE COURT:  Okay.

3    MR. SCHARF:  We very simply have to go back to Rule

4 9009(a) which tells us what a proof of claim form can have and

5 it says you have to use the official form and you're allowed to

6 deviate it, but the deviations are like ministerial kind of

7 things.  They're -- you know, or to accommodate -- you know,

8 give people -- I'm just looking at the rule.  Expand the

9 prescribed areas for responses, delete space not needed for

10 responses, delete items requiring detail and question of

11 category.  There's nothing in there about --

12    THE COURT:  Right, but --

13    MR. SCHARF:  -- adding questions.

14    THE COURT:  But if I enter an order with language

15 similar to Syracuse --

16    MR. SCHARF:  Um-hum.

17    THE COURT:  -- that says, should file, and maybe the

18 basis for objection or may cause you not to be able to

19 participate in a distribution, I'm not ruling -- I'm not

20 foreclosing a claimant from making the argument that you're

21 making now --

22    MR. SCHARF:  Sure.

23    THE COURT:  -- which is that my claim should not be

24 disallowed solely because I didn't fill out the settlement --

25 or that is left for another day.

1          MR. SCHARF:  I think we're making -- I think the

2    Diocese is making a mountain out of a mole hill here.  The in

3    terrorem affect of those words for somebody who may not be

4    sophisticated is not necessary.  We want to encourage people to

5    file these things.  And believe me, if they don't file a

6    supplement, we'll be on the phone trying to get the information

7    because we -- when somebody just -- you know, when somebody

8    files a proof of claim for a slip-and-fall and says, hey, slip-

9    and-fall accident, tort claim, a million dollars.  Okay.  Or

10   unliquidated.

11          When we represent trusts, committees, debtors, we

12   always file a books-and-records objection to that kind of

13   claim.  We just have no basis to understand that claim.

14          The Diocese can still do that.  It just can't -- and

15   I'll flip to the -- let me delay that discussion.  But in terms

16   of the -- there's no need for the in terrorem affect of saying

17   this may be subject to a disallowance, because then we're going

18   to be here in three or four or five years and somebody is going

19   to have not filled out their claim and there's going to be an

20   argument as to whether or not you meant it will be disallowed

21   versus maybe disallowed and maybe it becomes an issue with plan

22   voting.  There's no need for it.  We propose language that

23   encourages people to file it in bold.

24          The filing of the confidential proof supplement is

25   voluntary, but each of these claimants is encouraged to submit

1  these forms.  We'll send out a letter in the proof of claim

2  package and the Committee strongly encouraging people to do

3  this.  We just don't want to have the notion that this may be

4  subject to disallowance.

5         We find, frankly, in the case of -- there may be pro

6  se people out there, there may still be adult claimants out

7  there.  That kind of language can just drive people away from

8  filing the proof of claim form.   So, you know, they may not

9  understand how to answer a question why they're being asked a

10 question, et cetera.

11        That's all I have on that topic and I can move on to

12 the other points.

13        So let me move on to the issue of why this has to be

14 subject to the mediation privilege.  And yes --

15        THE COURT:  Answer my Omaha problem.  Tell me what

16 Mr. Donato is supposed to do if someone says on their abuse

17 claim supplement, I was abused by the Diocese of Omaha.

18        MR. SCHARF:  We would do what we would do in any case

19 with a tort claim.  File a books-and-records objection saying,

20 we don't understand what's the basis for this claim, and then

21 it becomes he's filed his objection and now the burden would

22 shift back to the claimant to supplement it.

23        The problem we have here is that frankly, there are

24 different pleading standards for complaints in state court

25 versus federal court.  And in New York and when you ask --

especially when you get into some of the questions that the

insurers want to ask, you're really getting into -- the main

issue here is not necessarily -- it's not -- it's not -- the

main issue here is not the guy in Omaha or the Methodists.  The

issue here is somebody at a parish or a school or a religious

order that may have a connection to the Diocese.

          The information about that relationship between a

religious order and a Diocese is not something the survivor has

access to.  That information is in the Diocesan's possession,

perhaps the religious order's possession, a school's

possession.  And so right now, when people filed their state

court claims, they can assert that kind of claim and they would

have to do discovery to connect the dots between -- and let me

just give an example.

          There's a -- let's say, there's a parish school, a

school owned and run by a parish, which has a religious order

nun staffing it.  So the Diocese might say, we're not liable

for that.  That person should be entitled to conduct discovery

to understand -- in state court would be entitled to conduct

discovery to connect the dots between the Diocese and religious

order; what's the connection to the Diocese and the parish;

what's the connection between the parish and the school, the

Diocese and the school, and then what's connection between the

reli -- is there a contract for that religious order to operate

in that school.  Is there some sort of indemnification --

1           THE COURT:  Right, sure.

2           MR. SCHARF:  -- agreement.  So having that

3 information out there, so giving insurance companies and the

4 defendant half the story without the ability to go conduct

5 discovery on the other half of the source is simply unfair.

6           THE COURT:  So your concern is the abuse claim

7 supplement says, I was -- I'm a survivor of abuse.  It happened

8 with Sister So and So at this place.  The Diocese brings a

9 motion -- objection to claim --

10          MR. SCHARF:  Um-hum.

11          THE COURT:  -- saying, well, Sister So and So wasn't

12 at this order, we're not liable, you have not fitted a prima

13 facie case --

14          MR. SCHARF:  Under --

15          THE COURT:  Under --

16          MR. SCHARF:  -- <u>Twombly</u> and <u>Iqbal</u>, right.

17          THE COURT:  Right, right.  And then you're stuck

18 saying, why we -- I mean, discovery and I said, well, you don't

19 get discovery.  You didn't state a claim on its face.

20          MR. SCHARF:  Right.

21          THE COURT:  So I toss -- why shouldn't we want to be

22 resolving -- getting --

23          MR. SCHARF:  Well, because --

24          THE COURT:  -- moving beyond those claims?

25          MR. SCHARF:  So here's the problem you have and this

1 becomes a practical problem as well as just -- it's just a

2 fairness issue, right?  Maybe those people should be conducting

3 2004 examinations of the Diocese to understand their liability.

4 Maybe they should have their state court cases go forward

5 again -- severed and go forward as parishes to get that

6 discovery.  Right now everything is stayed.  They would have

7 other avenues of getting it.

8          The practical problem with this kind of objection, by

9 the way, is let's say that the person is successful in knocking

10 the Dioceses out -- sorry, knocking the claim against the

11 Diocese out.  They're still a claim against the parish.

12 They're still a claim against the school.  There's still a

13 claim.  And the Diocese is going to ask for a channeling

14 injunction for the benefit of those people and now how do you

15 put them back in the bankruptcy, the case is disallowed.  So it

16 does create a practical problem.

17          But fundamentally, it's just a question of fairness.

18 If we're asking people to provide extra information to aid in

19 mediation, it should be extra information in the context of

20 mediation, end of story, period, full stop.

21          THE COURT:  Thank you.

22          MR. SCHARF:  So that's that issue.

23          THE COURT:  Yeah.

24          MR. SCHARF:  And finally, let me turn to the

25 questions that the insurance companies are proposing and I will

1  address the one question -- I think we -- we proposed some kind

2  of semantic changes and I think kind of not -- non-

3  controversial changes to the proof of claim form and those were

4  attached to our --

5              THE COURT:  Yes.

6              MR. SCHARF:  -- objection.  There's one question,

7  which we asked to strike, which was a question -- Mr. Donato

8  couched it as, you know, have you settled with anybody else.  I

9  think it actually reads a little differently.  It's have you

10 asserted a claim against anyone else.  That question was

11 extremely relevant in Rochester and Buffalo and other cases

12 where the statute of limitations had not -- and the window had

13 not closed yet because we didn't know the universe of claims.

14 We didn't know if somebody had actually sued the Diocese.

15 Somebody may have submitted a proof of claim form.  Maybe they

16 sued the Diocese and maybe not.  Maybe they participated in an

17 IRCP program, maybe they inserted an informal claim at the IRCP

18 level and we just need to know what was out there and what had

19 gone on.

20             So here there was a 124 filed cases.  We know what

21 they are.

22             THE COURT:  But doesn't that make the question more

23 relevant, not less relevant?

24             MR. SCHARF:  No, because it -- it's -- it was

25 relevant to understand who was the universe being sued.  So

1  have you -- so if you asserted a claim against the Diocese, can

2  you give us a copy of the complaint, can you let us take a look

3  at it.

4         Here, they're going to give everybody the complaints.

5  We know the complaints, so we just don't need to ask that

6  question, you know.  It's like an extraneous question at this

7  point.  That's all.

8         THE COURT:  But if they hadn't brought a claim

9  already --

10        MR. SCHARF:  Then we would know that when they filed

11 the proof of the claim.

12        THE COURT:  Okay.

13        MR. SCHARF:  I mean, it just -- they have a list of

14 all the losses, right, so we'll know at that point.

15        And then with respect to the insurer questions, let

16 me address those.  So the insurer questions, again, they're

17 trying -- the problem with the insurer questions, again,

18 they're going far, far beyond what is necessary to start the

19 process, right?  We need to understand who, what, where and

20 when.

21        The insurers are asking for questions that, in some

22 cases, require legal conclusions and some cases require

23 knowledge that's really outside the knowledge of a survivor.

24 And so, for example, LMI and Century proposed a couple of

25 questions.  Who at the Roman Catholic Diocese of Ogdensburg

1   knew that your abuser was abusing you or others?  A ten-year-

2   old that's being abused isn't necessarily going to know who at

3   the Diocese knew about the abuse.  That's a completely unfair

4   question and, frankly, could drive somebody away from

5   responding to the question or enter -- or filing a proof of

6   claim if I don't know the answer.  And again, our survivor

7   group is not made up of credit managers who normally file

8   claims in these cases.  They're individuals and their level of

9   comfort with the legal system varies.  Their education level

10   varies.  Their world experiences vary and they're a traumatized

11   individual.

12        So there's -- how do they know that?  The answer to

13   that question is in the files of the Diocese and the knowledge

14   of the Diocese.  It's not a question for a proof of claim form.

15        THE COURT:  Aren't the insurers going to tell me,

16   we'll tell you exactly where we got those questions from?  It's

17   directly tied to the applicable standard for liability on the

18   part of the Diocese and we're trying to elicit from as many

19   places as possible the answer to the question of, is there a

20   basis for liability from the -- on the part of the Diocese.

21   And some of that information may be in the possession of the

22   Diocese.  That's why we have a 2004 exam motion against the

23   Diocese asking for this information.

24        And we also want to see if there's information

25   with -- the abuse claimants have that relate to very

1  specifically those questions of whether there is prima facie

2  case for liability against the Diocese which, again, they need

3  possibly to defend the case later.  But now to try to value the

4  case --

5         MR. SCHARF:  Um-hum.

6         THE COURT:  -- which means ascertaining in part

7  whether they think there's a risk of liability on the part of

8  the Diocese.

9         MR. SCHARF:  So they can come back to us and ask.  So

10  first, this is a proof of claim form, which by law you can't

11  expand.  This is a -- not an interrogatory.  If this were a

12  question in an interrogatory at the beginning of the case, I

13  presume the answer would be this is information within the

14  knowledge of the defendant and we will use discovery to

15  discover it.

16         So it's -- you can't take a proof of claim form,

17  which is not subject to objections, motion practice, or motions

18  to compel, quash, et cetera, whatever we would do with

19  discovery.  It's a proof of claim form.  Who, what, where and

20  when.  And if they need -- and then when they get the Diocese

21  files, they'll know that there's now evidence that Father XYZ,

22  the Diocese had notice of Father XYZ's proclivity of abuse as

23  of this date.  There'll be a letter.  Whatever evidence they

24  have.  And if somebody is abused before that date, they can

25  come back and ask us about it and they can ask the survivor and

ask the state court counsel, so there will be a way for them --
or a time for them to ask for this information outside of the
proof of claim form.

So again, we don't need to throw this into an
interrogatory and if we were lit -- and again, these cases are
stayed as to the survivors.  The survivors aren't getting the
benefit of discovery.  They're not getting depositions.
They're -- some of the state court counsel who represent
Committee members may have access to CBA files and redacted
form, et cetera, but there's a lot of folks out there who are
not going to get access to the CBA documents through the
bankruptcy process.

So let's create a level playing field.  If they have
questions they want to ask, they can ask them after the proof
of claim is filed after they've gotten the discovery from the
Diocese and see what blanks they need filled in.

THE COURT:  And are you able to speak to the question
I asked Mr. Donato?  We've been at this.  It's not, by any
stretch, the first Diocesan case filed in New York, let alone
across the country.  Do we have any sort of even anecdotal or
systematic evidence of -- look, when we ask the types of
questions that they asked in Minnesota, which is similar to the
types of questions that I'm being asked to approve here, we
were able to resolve things more expeditiously, efficiently
versus when we make the barrier lower it becomes more difficult

1 to move the case forward.  And again, I'm asking you about

2 cases you're not involved in, so you're not in any obligation

3 to say things you don't -- you don't know.  I just don't --

4          MR. SCHARF:  Yeah.  I mean, the Minnesota cases also

5 had a different dynamic in that one state court lawyer

6 represented probably 95 percent of the survivors, so there was

7 that ability.  And I don't know what went on behind the scenes,

8 but it's a different dynamic than when --

9          THE COURT:  Okay.

10          MR. SCHARF:  -- we have different people and a

11 different group representing all the survivors.

12          And frankly, we've had cases where this information

13 was not on a proof of claim form.  And I have not memorized

14 every proof of claim form.  I've read a lot of them, but I

15 haven't memorized them.  But I can recall cases without

16 breaching mediation confidentiality where we were asked, can

17 you give us some more information about this type of -- this

18 claim one -- you know, these quest -- certain questions about

19 claims.  And sometimes it's a legal issue.  We'll respond.

20 Sometimes it's a question of what's the notice evidence and we

21 can respond and sometimes it's a question of what are the

22 dates, I need to know what insurance policy we're talking

23 about, and we can respond.

24          THE COURT:  And --

25          MR. SCHARF:  So all of these things can be addressed

1  through mediation and, frankly, they can be addressed through

2  formal discovery, if the need arises.

3          THE COURT:  And am I right to think that I might look

4  at the Diocese in Syracuse and say, well, they have abuse claim

5  supplement there?  It's not protected by any mediation

6  privilege and I don't see the docket full of objections to

7  claim.  Am I anticipating that you're going to say, well,

8  that's because they're still in mediation and if mediation

9  fails, your concern that we're going to get a flood of

10  objections --

11          MR. SCHARF:  I --

12          THE COURT:  -- to claim --

13          MR. SCHARF:  Yeah.

14          THE COURT:  -- using the information on the abuse

15  claims supplement?

16          MR. SCHARF:  I'm not -- so let me -- can I put

17  Syracuse to the side because I can't speak intelligently about

18  it.

19          THE COURT:  Okay.

20          MR. SCHARF:  But I will speak -- I can talk about

21  Rochester.

22          THE COURT:  Okay.

23          MR. SCHARF:  In Rochester the Diocese did file 60, 50

24  claim objections.  There was then a deal with the Committee --

25          THE COURT:  Based on information in the abuse claim

1 settlements?

2          MR. SCHARF:  Yes.

3          THE COURT:  Okay.

4          MR. SCHARF:  And those were then adjourned.  An

5 insurance company filed claims -- 38 claims -- the non-settling

6 insurance company in that claim -- case filed 38 claim

7 objections.  We're disputing their standing to do so, but it's

8 a real concern.  Rockville Center happened.

9          So before Rockville Center, we did not -- it was not

10 an issue that we had anticipated.  After Rockville Center

11 became a different -- we're now -- we've now been educated by

12 events in a real case where it has been an issue and cases have

13 been -- and claims in that case have been.

14          THE COURT:  And is there legal authority beyond

15 what's in your papers already for me either having the power to

16 impose that as a condition and/or the obligation to impose it

17 as a condition?

18          MR. SCHARF:  I think you have the obligation to

19 impose it as a condition.  Again, given Rule 9009 doesn't even

20 allow -- so does not allow you to actually order a supplement

21 or require a supplement or suggest a supplement.  And really,

22 if you just -- if you don't order it, if you don't allow it and

23 the supplement is voluntary, you're going to get Form 410s

24 filed and people will say, I'll give you the information at

25 mediation.

1          I mean, we're -- we just -- there's a practical

2     problem here that, you know, it -- I just think we can avoid by

3     making it subject to the mediation privilege.

4          THE COURT:  Thank you.

5          MR. SCHARF:  And then again, you know, there's --

6     I'll give you a -- look, we represent a liquidating trust in an

7     opioid case -- small opioid case.  Mr. Donato represented the

8     debtor at one point.  And we got 2000 claims from an attorney

9     and we couldn't figure out how those folks had any connection.

10    We filed an objection, said we don't understand how there's any

11    connection.  And so there are ways to do it without having the

12    information in the proof of claim in the supplement.

13         THE COURT:  Thank you.

14         Mr. Donato, can I -- can I just -- before I hear from

15    the insurers, go -- I -- if you need a minute, I want to ask

16    you a question on that very issue before I get to the insurers.

17         MR. DONATO:  There's a question I want to ask --

18         THE COURT:  And again, just on this issue, though.  I

19    mean, I hear Mr. Scharf saying, you're up here saying, we just

20    want the abuse claim supplement to help facilitate mediation,

21    but I'm assuming you're going to tell me, that's without

22    prejudice to your right to use it in a claims objection.  I

23    mean, that's why you're arguing against the mediation privilege

24    because you believe that you want to preserve your ability to

25    use that information to object to the claim.

1            MR. DONATO:  There is no basis whatsoever to just

2   cloak a proof of claim in the mediation privilege.  There's no

3   authority cited.  I mean, it's -- yes, I'm agreeing with you.

4   The whole -- this is all a -- I can't say escape hatch because

5   that doesn't work.  It's an end around.

6            THE COURT:  No, but -- wait.  What Mr. Scharf is

7   saying is, we are deviating from the requirements under the law

8   for what constitutes a perfect claim.

9            MR. DONATO:  Yes.

10            THE COURT:  Deviating materially --

11            MR. DONATO:  Sure.

12            THE COURT:  -- I'm going to say.  We're -- and again,

13   I'm going to say, we're requiring more of a --

14            MR. DONATO:  Yes.

15            THE COURT:  -- sex abuse claimant than we would a

16   slip-and-fall.  Okay.  They don't have to say, did the Diocese

17   have notice that it was an emergency, right, event.  I mean,

18   none of that, right?  They just file a claim and that's that.

19            MR. DONATO:  Exactly.

20            THE COURT:  So we are imposing an additional

21   requirement.  You're saying to me the justification for doing

22   that is that it facilitates mediation and, as I said before,

23   okay, I get that.  Well, if that's the reason, if that's the

24   justification for deviating from the otherwise generally

25   applicable requirements for a proof of claim, why are we then

giving you an extra arrow in your quiver that you weren't otherwise entitled to?  You're sort of -- you're doing a bait-and-switch.  You're inducing me to give you information beyond what I would ordinarily be required to give you to facilitate mediation, but then you also want to reserve the right to use that as a sword against me later.

MR. DONATO:  It's not just to facilitate the mediation.  It's to facilitate a resolution.  Mr. Scharf walked up here and said, we don't promote false claims.  We -- that's what this is about.  This is all a ruse.

Counsel is very skilled, very experienced, but the bottom line is, it is totally appropriate.  You have the authority and you can join the other 25 Diocesan bankruptcy judges who added stuff to the proof of claim.  I know that there's an area on the 9009 about how far you can go.  You'll be the 25th judge, if you go this way, to do it.  Okay.

What are we doing?  We're trying to weed out claims. We are trying to move the settlement process.  Right now I'm asking that you do it under the umbrella of the mediation.  I'm not limited to that.  If we litigate -- God forbid.  If we litigate we have to be -- have to have the same exact ability to weed out weak claims.  We have no intention of doing any of that right now, but that's what's going on.  The real purpose of the Committee's response is to take -- basically, change the Bankruptcy Court to say, I can file a claim but you can't file

120

1  an objection.  That's totally --

2            THE COURT:  Well, I specifically heard Mr. Scharf say

3  you could --

4            MR. DONATO:  -- the claim allowance --

5            THE COURT:  -- file an objection.

6            MR. DONATO:  Well, yes, but I can't use the

7  information in the claim to make the objection.  He wants me to

8  do a books and records to simply file 124 claims that say, I

9  looked at my books and records and I don't have any of these

10 claims in my books and records, so therefore, I'm filing a

11 books and records exchange objection?  That's not going to move

12 the ball.

13           Mr. Scharf says, just come back to me and ask me

14 questions.  That's what we're trying to avoid.  I don't want

15 insurance companies asking 75 questions.  Six separate ones.

16 Depositions, follow-up, the whole point.  Frankly, the

17 Committee's position hurts the survivors.

18           Let's get the basic information out.  Let's utilize

19 it as appropriate under the Bankruptcy Code in order to seek a

20 resolution, whether it's under mediation, in litigation or just

21 us trying to resolve the case because it's not just limited to

22 the mediation piece.

23           THE COURT:  Thank you.

24           MR. SCHARF:  Your Honor, those cases where those

25 orders were entered were on consent with the Committee's

1  involvement.  The only time I can recall where I was overruled

2  on objections to questions that were being asked as in USA

3  Gymnastics when the people had filed -- the survivors had

4  filed -- or completed the exact same form that the Dio -- that

5  the debtor in that case was asking for in mediation.

6       So here we're -- anything that was done before on

7  consent deviating from the law was done on consent and the

8  landscape changed a little bit.

9       I also just want to make one comment, because we're

10  going to hear this a lot, that the Committee is not acting in

11  the best interests of survivors.  The Committee represents

12  survivors.  The Committee is composed of survivors.  We know

13  what they're -- what -- we're doing the work to protect them.

14       THE COURT:  I think, Mr. Donato, I think the issue is

15  you're asking an abuse claimant to give a simplified form,

16  meaning that your form is not quite as simplified as the

17  Committee's but it's much more simplified than the insurers',

18  and then potentially later on going to treat that abuse claim

19  supplement like it's a complaint and then argue that it doesn't

20  satisfy Iqbal's notice pleading requirements.

21       And so it gets -- you're sort of, again, kind of

22  inducing the person to give very basic details and then saying,

23  well, see, now you didn't prove -- you didn't state a claim.

24       I mean, I guess maybe I solve that problem by giving

25  them leave to amend.  Is that the answer?  Like then, fine.

122

1  If -- if it's facially not sufficient, Mr. Scharf or the

2  claimant can come in and say, look, yeah, I know, Judge; give

3  me leave to amend and I'll put in what I told -- you know,

4  wrote -- my mom wrote a letter to the Chancery and this, that

5  and the other thing, right?  Is that --

6          MR. DONATO:  You're reading my mind.  Judge Glenn did

7  exactly that.  We're just talking about a claim allowance

8  process.  He didn't knock claims out.  He said, replead, you

9  know, set forth more detail.

10         And just so we're clear, the key in this case is

11 notice.  Okay.  That's what this -- let's talk about the

12 elephant in the room here.  It's notice.  If a Diocesan

13 employee did some bad act and the Diocese had no prior notice,

14 there is no liability.  That's what we're talking about here.

15 So that's why the carriers are pushing on notice.  I'm not in

16 their camp, but this is what we're talking about here.

17         I think the Syracuse questions are properly balanced.

18 They are not overly aggressive.  I think they strike the

19 balance that you actually -- when we first started to chat you

20 said, you know, I'm looking at the balancing of all the pieces.

21 I think it balances it perfectly.  I think this attempt to add

22 the mediation privilege is simply to alter our ability if ever

23 needed to review and analyze claims in the entire case process,

24 not limited to mediation.

25         THE COURT:  Okay.  Mr. Scharf, what about my liberal

1  leave to amend in the event that we start seeing abuse claim

2  supplements being treated as complaints in Iqbal motions?

3       MR. SCHARF:  If you go that route and there's -- you

4  do not make the subject of mediation privilege with liberal

5  leave to amend, I think it has to be coupled with the right to

6  discovery or the ability to conduct discovery because right now

7  survivors are kind of in a Catch-22.

8       THE COURT:  Aren't you upset with the Supreme Court

9  in Iqbal and isn't that a problem for -- isn't that an issue

10  you need to take beyond me because that's not my -- I mean, as

11  much as I might think that they should be entitled to discovery

12  first, Iqbal says what Iqbal says and, last I checked, they

13  have more authority than I do.

14       MR. SCHARF:  Alternatively, you could just grant --

15  we could just grant stay relief to sever or just allow

16  everybody to sever their claims against the parish.  I mean,

17  there are state court cases out there that are not against the

18  debtor.

19       THE COURT:  Right.

20       MR. SCHARF:  So while everything is being stayed,

21  while people are not moving for motions to sever, you know, if

22  we create a process where people think they're going to have to

23  get discovery down the road, you're going to start seeing a lot

24  more motions for relief from stay.  You're going to start

25  seeing a lot more 2004 motions.  Let's not use the combination

1  of a proof of claim form and a stay as a sword, you know, when

2  things are meant to be a shield and to help the process.

3          THE COURT:  Okay.  Thank you, Mr. Scharf.

4          To the insurers.  I'm going to take attorneys in the

5  courtroom first and then I'll ask if anyone wants to be heard

6  on the telephone.

7          Mr. Haberkorn?

8          MR. HABERKORN:  Thank you, Your Honor.  A lot to

9  cover, so we'll try to be quick.

10          Our objection -- I've heard a lot about no one wants

11  these false claims.  Of course, no one wants false claims.  We

12  100 percent agree.  So why not require some common sense,

13  simple safeguards in the proofs of claim?  It doesn't make --

14  to prevent these false claims, it makes no sense.

15          THE COURT:  Well, okay, but that gets back in -- that

16  gets back to the balancing I proposed to Mr. Donato.  Yes,

17  nobody wants false claims, but we also don't want to discourage

18  abuse claimant survivors from filing claims by creating a

19  process that is too intrusive, too detailed, too cumbersome

20  for -- some of them may be pro se -- for them to access.  So

21  it's not an issue of -- no one here is saying, we want

22  legitimate claims discouraged and no one here is saying, we

23  want false claims encouraged.  It's about how are we striking

24  the right balance between those two ends.

25          MR. HABERKORN:  Understood, Your Honor.  Understood.

1  And that's why I think our -- we made some proposed small

2  changes to the proposed form that I think does strike that

3  balance.

4          For -- just to walk through some, the addition of the

5  simple yes/no question.  The New York Child Victims Act was --

6  had one clear requirement, the complaint had to be filed

7  between the dates of August 14, 2019 and August 13, 2021.  That

8  window has closed.  Just a simple, did you file a complaint,

9  yes or no; if yes, when was it filed.

10         THE COURT:  What do you say to Mr. Scharf's rejoinder

11  that you already know whether they filed a complaint or not?

12         MR. HABERKORN:  Your Honor, the issue is by asking

13  that question we're making -- we are ensuring that the claims,

14  the claimants have acknowledged that they're attesting to the

15  fact that they filed a claim, that -- and then asking them to

16  attach the claim which some of these complaints, these -- on

17  the public docket they're anonymized.  It's a heavy burden to

18  go through and go, okay, well, we have them, let's try to

19  figure out whose is whose and which goes to which group of

20  claim, when we can simply ask them, well, you have the

21  complaint.  You say you filed it.  Just attach it.  It's a very

22  simple request.  And I fail to see how that's much of a burden

23  for anyone who has filed a complaint.

24         The fact that it couldn't be any more simple.  And

25  §502(b)(1) of the Bankruptcy Code requires that a proof of

1 claim present a viable claim in a bankruptcy proceeding.

2 That's simply what we're trying to get at.  There's a prima

3 facie case for a viable claim being made in the proof of claim.

4        THE COURT:  But you don't dispute that I'm being

5 asked by pretty much by everybody to deviate materially from

6 the form proof of claim?  I mean, it is ordinarily the case

7 that there's very -- unless it's based on a writing, there's

8 very little demanded of.  In this case there would be very

9 little demand of a slip-and-fall claimant in order to file a

10 viable proof of claim.  And we are asking, again, with -- I

11 think with good reason.  Everyone agrees there's good reason to

12 ask a sex abuse claimant in a situation like this for this

13 additional information, but we are asking them to do something

14 more. And  you're asking me to go even one step further, which

15 is essentially plead facts in a supplement to a proof of claim

16 sufficient to survive a motion to dismiss, which is way beyond

17 what the ordinary proof of claim requirement -- proof of claim

18 requires.

19        MR. HABERKORN:  Your Honor, this -- we completely

20 agree.  This is significantly different from your ordinary

21 monetary claim on the basis of a bond or a credit agreement or

22 even a trade claim.  This is -- these are complicated fact-

23 intensive tort claims.  Based on facts and knowledge that,

24 quite frankly, only one person in the world possesses and

25 unfortunately, that's the abuse victim.

1          THE COURT:  Oh, and the Diocese.  I mean, the Diocese

2  in many of the situations is why the party possessed the most

3  pertinent information in terms of whether it had notice or not,

4  you know.

5          MR. HABERKORN:  Well, that's what we're trying to get

6  at.

7          THE COURT:  But you're asking the claimant for it, is

8  what I'm saying.  You're imposing a burden on the claimant to

9  ask for information that in -- especially if it's a -- was

10  it -- they were a child of the time is very much within the

11  knowledge of the Diocese and would be surprisingly extreme if

12  you could answer that question when you were alleging abuse at

13  age eight, who at the Diocese knew about it.  What do I even

14  know at the Diocese at this -- Diocese, what does that even

15  mean.  All I can tell you is, this happened to me, this priest

16  in this place and this -- roughly, this time.  How would I know

17  who knew at the Diocese?

18          MR. HABERKORN:  And, Your Honor, the intent of that

19  wasn't to prohibit a claimant from saying, I don't know.  It's

20  completely reasonable for someone to not know.  It's simply to

21  get the small percentage -- to ascertain information from the

22  small percentage who do know.  And of course --

23          THE COURT:  I know, but --

24          MR. HABERKORN:  -- those questions could be modified

25  further to clarify that.

1        THE COURT:  But you're saying that and, again, I have

2   a greater degree of comfort if you're saying that because,

3   look, Judge, in the mediation we want to be able to use that

4   information or the absence of that information to, again, like

5   I've said, ascertain the potential scope of liability and,

6   therefore, determine whether any payment, some payment, large

7   payment is -- warrants on this claim.  That is of less concern

8   to me than asking someone for information that's not ordinarily

9   required by the proof of claim form that then gets turned

10  around and whip-sawed on them as the basis of a claims

11  objection saying, you know, you did not plead facts sufficient

12  to state a cause of action under Iqbal to -- for negligence

13  against the Diocese, therefore, your claim is disallowed.

14        MR. HABERKORN:  And while that's not the same

15  standard, the proofs of claim must present at least a prima

16  facie case.  They must have a prima facie claim.  And if they

17  can't -- if they don't include even the most basic facts that

18  are asserted as part of their claim, then we should be able to

19  object.  I mean, primarily it would be used in mediation, of

20  course, but -- and this kind of goes to the mediation privilege

21  issue as well, mediations aren't iron-clad.  Like if it falls

22  apart, we should be able to investigate the veracity of the

23  claims presented.

24        THE COURT:  Well, what prevents you from doing that?

25  Why -- I mean, you would claim person is going to come in, the

1 abuse claim supplement says it was, you know, Father So and So

2 at such and such a parish; Diocese says, we don't know anything

3 about Father So and So.  No records about him whatsoever, no

4 issues with the frequency of his transfers, no other

5 complaints.  And then you go back to that particular claimant

6 and say, tell us more.  Tell us more about, you know, who told

7 what, who knew what to who and this, that and the other.  And

8 you are resolving it on a case-by-case basis, as opposed to

9 imposing an extra burden on the whole universe of claimants and

10 then, again, potentially a disincentive to a universe of

11 potential claimants.

12          MR. HABERKORN:  Respectfully, Your Honor, there is

13 also a bala -- a counter to this argument that we cannot ask

14 additional questions.  There's also Rule 1001, which requires

15 the process to be run in a way that is most expedial --

16 expeditious, efficient and just for the estate.

17          Thus, requiring the bare minimum and then having to

18 go back and conduct discovery on every single one of these --

19          THE COURT:  We're way beyond the bare minimum.  No

20 one is proposing the bare minimum.  We're way beyond -- bare

21 minimum is 410.  We're not propose -- no one is proposing the

22 bare minimum.  Everybody in this case is proposing something

23 that is beyond the bare minimum.  It's just a question of how

24 much, how far, how detailed.

25          MR. HABERKORN:  Understood, Your Honor.

1          So I suppose in that case, then are -- I would

2    understand Your Honor's comment, we're all in agreement that

3    the modifying the form would --

4               THE COURT:  Everyone --

5               MR. HABERKORN:  -- or --

6               THE COURT:  -- here is in agreement that we can

7    solicit abuse claim supplements along with the proof of claim.

8               MR. HABERKORN:  Understood, Your Honor.

9               THE COURT:  What's disputed is, is it -- I'm going to

10   call it.  I'm going to say mandatory in the sense that failure

11   to complete it is, in and of itself, grounds for an objection

12   to the claim.  How much information are we asking for and what

13   uses can that abuse claim supplement be put to and then can

14   attorneys sign.  That's how I sort of define -- that's how I

15   think of this.  Everyone is in agreement.  We can ask for it,

16   include it.  It's what happens if you don't do it; can your

17   attorney sign it; what can be done with the information.

18              MR. HABERKORN:  In all fairness, Your Honor, the idea

19   that even a fraction of these claimants will submit the

20   supplemental questionnaire without any kind of consequence for

21   not doing so, without even just notice that it can be the

22   grounds of an objection, it's just not realistic.  Well, we had

23   that information.  I mean, don't -- we should know that from

24   Syracuse.  I mean, excuse me.  We know that we don't have -- I

25   mean, people -- how many people submitted abuse claim

1  settlements, roughly, in Syracuse?

2         MR. SCHARF:  Every one.  Almost every one.  I think

3  very one.

4         THE COURT:  Yeah, that's not a question I need to --

5  that's the per -- and again, I realize correlation doesn't

6  equal causation and I'm asking all of you questions about cases

7  that you weren't involved in.  That's the part that is

8  frustrating to me is I have on the one hand people saying, you

9  make this bar too low and you're going to get a flood of false

10 claims and no one is going to fill them out.

11        Well, I don't know.  Did that happen when we had --

12 because I've seen language that -- Syracuse has language

13 similar to this.  Albany has language similar to this.  And I'm

14 not aware of a flood of false claims and tons of claims

15 objections in those cases.

16        And on the other hand, you have given me sample

17 orders, primarily from out in Minnesota that asks this sort of

18 very in-depth questions that you asked.  And I would be

19 interested to know if, boy, you know what, we had all this

20 extra information and there's no evidence that discouraged

21 people from filing claims and actually because we had all that

22 information on the front end, we were able to get to a

23 resolution much more quickly and efficiently.  I just -- I

24 don't -- I'm being presented with a parade of horribles on both

25 sides.  It seems to me that's not something I should

1  necessarily have to guess about.  We should -- we have data

2  already.  We just haven't -- it hasn't been compiled and

3  presented to me.

4           MR. HABERKORN:  Yes, Your Honor.

5           MS. STIPPEL:  Your Honor --

6           THE COURT:  Yes.

7           MR. STIPPEL:  Oh, I apologize.  My name is Taylor

8  Stippel.  I'm an attorney at Jeff Anderson & Associates.  And I

9  don't know if now is the appropriate time, and I don't mean to

10  cut off Mr. Haberkorn, but I think I can speak to a couple of

11  questions that you had when the time is appropriate.

12           THE COURT:  You okay with that, Ms. Stippel jumping

13  in, Mr. Haberkorn, or do you want to continue with your

14  argument?  I'm fine either way.

15           MR. HABERKORN:  I can step back if that's okay.

16           THE COURT:  All right.  Go ahead, Ms. Stippel.  And

17  just can you state your appearance for the record, please,

18  Ms. Stippel?

19           MS. STIPPLE:  Yes, absolutely.  Apologies, Your

20  Honor.  Again, this is Taylor Stippel, S-T-I-P-P-E-L, from Jeff

21  Anderson & Associates.  Our firm has represented survivors

22  across the state of New York including Syracuse, as well as

23  across the state of Minnesota, and we are the firm that

24  represented the survivors in Minnesota that Mr. Scharf was

25  referring to.

1          And so, Your Honor, first I wanted to just

2   acknowledge that I agree with your comments.  I've heard you

3   use the phrase "bait and switch"; I've heard you use the phrase

4   "use as a whip-saw."  And we do believe that Your Honor is

5   correct about what will happen if there's more information in

6   these claim forms that --

7          THE COURT:  Well, just to be clear, Ms. Stippel, I

8   said that I was worried about that.  I didn't say that it was.

9          MS. STIPPEL:  Okay.

10          THE COURT:  I haven't decided whether it is or isn't.

11   I'm worried about that and I think that's the perception, but

12   just to be clear, that's not -- I've not made any ruling to

13   that effect, but go ahead.

14          MS. STIPPEL:  Understood, Your Honor.  And I just --

15   I thought that your words were appropriate and understand

16   that's not what you're ruling, but I'm sure that you've

17   expressed, and we believe that that appears very -- is very

18   real and it's justified.

19          So with respect to Syracuse, you know, I heard

20   Mr. Haberkorn state that it's unrealistic to think that people

21   will submit the abuse claim supplement if they aren't required

22   to.  In Syracuse, it's our reading of that bar date order that

23   survivors were not required to fill out more than the Form 410.

24   But all of our survivors, we represented over 120 of the 390-

25   plus claimants in Syracuse, we worked really closely with every

1  one of our people to get that abuse claim supplement filled

2  out.

3         We intend to do the same thing here where we

4  represent nearly half of the claimants.  So we completely agree

5  with Mr. Scharf that that form should not be mandatory.  It

6  should not be that survivors who are the most vulnerable group

7  of creditors that could possibly exist in a bankruptcy case

8  like this, these survivors should not be required to do more

9  than a creditor has to do, much more sophisticated creditors in

10 other cases.  And if they aren't required to fill out that

11 form, I want everybody on this hearing to rest assured that we

12 at least, representing about half the folks here, would intend

13 to submit that ACS or the abuse claim supplement for all the

14 people we're working with.  So that's one point I wanted to

15 highlight.

16         THE COURT:  Thank you, Miss --

17         MS. STIPPEL:  And with respect to -- yeah.  And, Your

18 Honor

19         THE COURT:  Go ahead.

20         MS. STIPPEL:  -- the issue of Minnesota.

21         THE COURT:  Yes, go ahead.

22         MS. STIPPEL:  And yeah.  And so our law firm

23 represented the survivors, the vast, vast majority of survivors

24 in Minnesota.  And respectfully, Your Honor, the landscape has

25 just changed since Minnesota.  Before 2019 these cases did

1   resolve consensually with all parties globally.  The Diocese,

2   the parishes, the insurance company.  Beginning in 2019 window

3   legislation would pass throughout the country for survivors in

4   New York, New Jersey and California.

5         When the insurers began to be exposed to much more

6   liability than they ever had been before, there have been fewer

7   settlements and that breaching the mediation privilege in any

8   of these cases where we're involved, which is every Diocese

9   case in New York, when I say that there's been one settlement

10  reached in Rochester and it has been confirmed that it's on its

11  way.  We didn't face what we are facing from the insurers here

12  in Minnesota.

13        So I respectfully submit, Your Honor, that the

14  context has changed.  These insurers, I believe, are trying to

15  add questions to this claim form that they will later weaponize

16  using claim objections against these survivors.  Your Honor

17  noted that, you know, in response to Mr. Haberkorn noting and

18  asserting that these facts are -- only one person in the world

19  possesses these facts, the survivor, that's not true.  The

20  insurers are going to ask the survivors to include information

21  that they just don't have access to.  They don't know what

22  notice the Diocese had.  They don't know what relationship a

23  school, a particular school that was staffed by a religious

24  order, what relationship that school has to the Diocese.

25        To take these survivors, who filed complaints in

1 state court under a notice pleading standard whose cases were

2 advancing and as litigation was ramping up and started to get

3 discovery then the bankruptcy happened and they were completely

4 divested of their right to get more information, to ask these

5 survivors to include in a claim form to merely preserve their

6 rights information there's no way they'd have access to and

7 then weaponize their lack of information and assert claim

8 objections, which they've intimated already today that they

9 will do, we're hopeful the Diocese won't, it sounds like that's

10 not on their radar now, but something that could happen -- Your

11 Honor, we think that's inappropriate.

12        So we completely agree with the Committee.  We agree

13 with Mr. Scharf and I stand ready to address any other

14 questions the Court might have.  Thank you.

15        THE COURT:  Thank you, Ms. Stippel.

16        Mr. Haberkorn.

17        MR. HABERKORN:  Just to briefly respond, in Syracuse

18 the form did state that it could be grounds for a claims

19 objection.  It didn't --

20        THE COURT:  Yeah.

21        MR. HABERKORN:  -- completely --

22        THE COURT:  No.

23        MR. HABERKORN:  In other words, the disclaimer was --

24        THE COURT:  Yeah, that's -- yes.

25        MR. HABERKORN:  -- still there.

1          THE COURT:  Yes.

2          MR. HABERKORN:  It's -- and -- excuse me.  Sorry.

3          It seems like we run the risk by not including the --

4   you know, even some basic information, like that we've

5   requested, the yes/no questions specifically.  The more basic

6   ones, the less controversial questions as opposed to the who

7   knew about it.  And so leaving those to the side, I think the

8   yes/no question about the complaint is critical.  The fact that

9   the proof of claim should be paid by the claimant themselves is

10  also critical in this case.

11         THE COURT:  What's my authority?  So the rules say

12  that the signer of a proof of claim attests that he or she has

13  a "reasonable belief" that the information is true and correct.

14  So if you have attorneys signing these claims and you do not

15  believe they have a reasonable belief the information is true

16  and correct, why can't you through me, we police that through

17  objections that presumably raises -- set attorney misconduct

18  issues.  Why is that not sufficient?  And then I would say

19  also, what is the legal basis for me to require someone to sign

20  their own proof of claim when the rules permit signature by a

21  person or someone authorized to sign on their behalf, which

22  very often includes an attorney?

23         MR. HABERKORN:  Quite frankly, Your Honor, from a

24  practical perspective it's to protect the sanctity of these

25  proceedings.

1        THE COURT:  But I'm saying, you can -- can't you

2 protect the sanctity of the proceedings just as well through --

3 you think there's a reason to think this is a bogus claim or

4 without basis and an attorney signed it?  You have a mechanism

5 to address that as opposed to me imposing a requirement upon

6 sex abuse claimants that is not imposed upon ABC credit union

7 down the street, Wells Fargo Bank slip-and-fall claimant?

8        MR. HABERKORN:  Respectfully, Your Honor, we need to

9 avoid the risk of any sort of false claims like we saw in

10 bank -- in Boy Scouts.  Like --

11        THE COURT:  But even if you are able to address that,

12 you have other avenues through which you -- if you think

13 there's been a flood of false claims, if you think there are

14 attorneys signing proof of claims, but they don't have a

15 reasonable basis to believe are true and correct, you have a

16 mechanism to address that.  You -- I enter an order, which I'm

17 not sure I have the authority to do anyway.  I enter an order

18 telling a sex abuse claimant, you must sign the proof of claim,

19 and there's a person out there that because of what they

20 experienced just cannot bring themselves to sign their name,

21 they actually cannot find it within themselves to be

22 traumatized in that way and I'm going to deprive them of

23 their -- I'm going to disallow their claim?

24        MR. HABERKORN:  Well, first off, this was the

25 approach taken in both Harrisburg and New Orleans so there is

1  precedent for requiring signatures.

2         Additionally, the issues in <u>Boy Scouts</u> just even the

3  auditor right now has determined that they needed -- that the

4  new questionnaires for 75,000-plus claims needed -- that are

5  being audited now, need to be signed by the claimant

6  themselves.  So even though there was a realization that that

7  was important --

8         THE COURT:  But that hasn't happened invariably.

9  That's -- that is one situation.

10        To me, you're asking me to impose a burden and create

11  a problem to forestall a hypothetical problem that you have the

12  ability to address in any event.

13        MR. HABERKORN:  Yes, but after imposing significant

14  burden on the estate, on the insurers, it's --

15        THE COURT:  Fair enough.

16        MR. HABERKORN:  -- going to be --

17        THE COURT:  I get that.  Yeah.

18        MR. HABERKORN:  Yeah.

19        THE COURT:  Fair enough.

20        MR. HABERKORN:  It's all about efficiency is what

21  we're looking for.

22        The other point that I -- that we're looking for a

23  change to is the confidentiality agreement and this one, I

24  actually think, is just a clarification because we don't

25  actually think that it intended to -- the proposed language

1  intended to close off the proof of claims in this way.  It

2  needs to be clear that the proofs of claim can be used in

3  depositions, just questioning of witnesses when the veracity of

4  these claims are being tested during the claims allonge

5  process, during the plan confirmation process.  It needs to be

6  available.  The Section 502 compels this Court to permit such

7  use for purposes of verifying and challenging proofs of claim.

8           THE COURT:  Let me ask you, why the question about

9  religious practices, the frequency of mass attendance and

10  why -- what's the purpose of that question?

11           MR. HABERKORN:  Just to confirm that they were a

12  regular -- just to proof that that was there where why went,

13  what they attended, that they were a member of that

14  congregation.  If they didn't -- they're making a claim that

15  something happened at church, at the school, at this campus.

16  If they didn't attend regularly, then we -- then it raises, you

17  know, a potential red flag that needs to be investigated.

18           THE COURT:  Okay.  Thank you.

19           MR. HABERKORN:  Pause.  Like I said, a lot to get to.

20           I also wanted to -- we touched on this briefly, but

21  the -- we agree fully with Mr. Donato's position on the

22  mediation privilege issue.  I think it's too great a

23  restriction.  It -- and, quite frankly, it would create

24  additional cost expense to an extreme amount for -- you know,

25  the Diocese for all the other parties involved, just

1  investigating all these claims again, even though the

2  information was provided once.

3       THE COURT:  But I don't -- I don't -- I see how it

4  creates additional work for the Diocese or the insureds if they

5  want to bring a claims objection.  I'm not sure it creates any

6  extra work in terms of accomplishing the main end to which --

7  the main benefit that I'm being pitched as a rationale for

8  including it, which is it helps us with mediation.

9       So, in other words, if you get the abuse claim

10  settlement subject to a claim -- a mediation privilege, that

11  helps you in mediation, which was the whole idea of having the

12  abuse claim settlement.  Yeah, it does make your ability to

13  object to the debtor's claim a little more onerous and

14  expensive, but I think that's -- again, that's back to my --

15  Ms. Stippel, I'm not endorsing this view.  That's back to my

16  concern about we're bait-and-switching somebody into giving us

17  basic facts, basic information to the best of your recollection

18  and then later on holding that -- holding that information to a

19  pleading standard that the person could not reasonably have

20  been expected to know they were being held to.

21       MR. HABERKORN:  But that comes back to the point that

22  I made at the very beginning and have repeated several times.

23  It's simply requiring a prima facie claim to be made and --

24       THE COURT:  I know, but you have to understand this

25  in the context of bankruptcy.  That a proof of claim requires

compliance with 410. That's prima facie pre-deemed allowed

claim unless objected to. You -- people file proofs of claims

all the time that do not satisfy Iqbal's pleading standard,

right? They just file a claim. And that's -- and then subject

to your right to object, it is deemed allowed unless objected

to and if you object to it, you object to it.

But what I'm saying here is, if I don't have the

protection of the mediation privilege aren't I effectively

allowing you to transform these claim supplements into

complaints and then turn around and claim that they're subject

to 12(b)(6) dismissal and that's what -- that's -- I'm not

saying you don't have the right to make the argument that they

haven't stated a claim.

Fine. I'm saying that that is an argument that needs

to be dealt with in the claims objection process without the

benefit of using something that was intended for one purpose to

a different purpose.

MR. HABERKORN: At the end of the day, the claim --

the questions in the supplement go directly to claim -- to the

confirmation process -- the plan confirmation process. And in

the event that the mediation were to break down, we don't --

obviously don't want that. That's bad.

But these Diocese cases have had a nasty habit of

going through mediators quite quickly. To suddenly say that

they cannot be used at all for purposes of anything outside of

1 mediation, including, you know, plan confirmation, claims

2 allowance, any of this is just a step too far.

3          We're not saying it shouldn't be confidential.

4 Absolutely not saying that.  They are going to be subject to

5 very strict confidentiality requirements.  We understand that

6 the information is incredibly sensitive and -- but that's a

7 different requirement all together than closeting these to the

8 mediation and nothing else.

9          THE COURT:  But I think that there's arguably a

10 question that has not been answered, which is, do I -- right

11 now I hear the Committee saying, we consent to the addition of

12 the abuse claim supplement, but our consent is conditioned on

13 the understanding it will be protected by the mediation

14 privilege and absent such consent -- absent such privilege, we

15 withdraw our consent.  Do I have that correct?

16          MR. SCHARF:  Yes, Your Honor.

17          THE COURT:  Yes.  So then the question becomes do I

18 have the authority under the applicable rules of bankruptcy

19 procedure to compel the submission of an abuse claim supplement

20 absent the consent of the Committee to modify the Form 410

21 materially in my view without the consent of the Committee.

22          MR. HABERKORN:  With good cause, yes.  I believe that

23 1001 combined -- Rule 1001 combined with -- appears on 1003

24 absolutely permits this Court to make modifications to the Form

25 410.  It's in -- good cause is shown based -- for nothing else

144

1  on the complexity of these claims.  It just needs to be a

2  little bit more information provided.

3      MR. WEISS:  Your Honor, can I add something to that

4  point?  This is Matt Weiss from Interstate.

5      THE COURT:  Yes, go -- well, Mr. Weiss, I appreciate

6  that.  Let me come back to you.  I do have -- I've several

7  attorneys in the gallery here who wish to be heard, so let me

8  come back to you.  To the extent your points are not a

9  representation on behalf of several insurance insurers here and

10 to the extent the issues -- the arguments you want to make are

11 not made by other counsel, we'll come back to you.

12     MR. WEISS:  Okay.  Thank you.

13     THE COURT:  Go ahead.

14     MR. HABERKORN:  I just wanted to point to the -- this

15 good cause standard the Fourth Circuit in A. H. Robbins, 862

16 F.2d 1092, they open a decision to disallow claims by claimants

17 failed to complete a questionnaire.  It's directly to this

18 issue.  This has been done before.  It's been -- it's been

19 looked at.

20     And so there is absolutely grounds for you to be able

21 to do this and, you know, especially your (indiscernible)

22 would even like bankruptcy.

23     Just want to make sure I've addressed all the other

24 points.  There were a lot of them.  I think that's everything I

25 wanted to cover.

1          THE COURT:  Thank you, Mr. Haberkorn.

2          MR. HABERKORN:  I appreciate it, Your Honor.

3          THE COURT:  Thank you.

4          MR. HABERKORN:  And I will cede the podium.

5          THE COURT:  Thank you.

6          MR. KAHANE:  Thank you, Your Honor.  Jeff Kahane,

7  Duane Morris, on behalf of London Market insurers.  There's

8  been so much said today about so much stuff.  I might not be

9  able to hit it all just because it's -- but this is the 15th

10 abuse bankruptcy case that I've appeared in.  And the lack of

11 sufficient information provided by claimants is the primary

12 cause why these cases take so long.

13         In Rockville Center when we opposed the motion for a

14 bar date because they didn't include a question about notice

15 and the judge ruled against us so the debtor sent out a form

16 and didn't have it and when the debtor looked at the proof of

17 claim forms, many of which didn't include allegations of notice

18 and objected to a bunch of them, and the judge said, well, but

19 you sent out a proof of claim form that didn't have it, so I'm

20 going to give them all another chance.

21         We're just trying to avoid this double litigation

22 over claims that are facially deficient.  I'm not talking about

23 fraudulent claims.  I'm talking about claims that for whatever

24 reason don't set forth facts that establish -- even alleging a

25 debtor's liability.  And in New York while there's four

1    elements if you don't allege all the elements you haven't made

2    that.

3          Now, you're in federal court.  They're all filing

4    their claims in federal court.  They have to meet the federal

5    standard.  It's not that much more of a burden.  They may not

6    know and they would say that but, I mean, there's the -- last

7    week Judge Glenn permanently disallowed 33 proofs of claim

8    because they failed to allege notice.  And every single one of

9    them had been objected to before and they was given leave to

10   amend and so four months later they were doing the same thing

11   again and none of them had added facts about the notice.

12         So it seems worthwhile to consider just asking

13   everyone like, you know, trying to elicit all the relevant

14   information.  When the claim -- when we have the relevant

15   information, the insurer can sit down across mediation table

16   and say, well, we've got some bad ones, we've got some not so

17   bad ones.  We've got some that aren't worth anything.  And very

18   quickly, hopefully, get to a number.

19         We think that with respect to the field, nothing

20   legally has changed about these claims.  There's been no change

21   in the law.  Minneapolis had a window, but after the Diocese of

22   Winona case it became very difficult to mediate these cases.

23         Mr. Scharf, who I've met on the phone back on the

24   Diocese of Helena case, although he probably doesn't remember,

25   you know, we got into a room and we settled the Diocese for

1  Rochester case.  At the beginning of the year I had never met

2  him in person before, but that wasn't in the context of the

3  mediation.  That was a judicial settlement conference.  And

4  Judge Warren had just had enough and said -- sat down.

5          MR. SCHARF:  I want to ask counsel not to discuss

6  that what happened at the settlement --

7          MR. KAHANE:  Oh, I'm not going to say anything else

8  about it, only but --

9          MR. SCHARF:  You said Judge Warren said he had

10  enough.

11          MR. KAHANE:  Oh, I'm sorry.  He was -- he issued an

12  order --

13          MR. SCHARF:  It was a settlement.  End of story.

14          MR. KAHANE:  It was in the context of the judicial

15  settlement conference, not --

16          THE COURT:  All right.

17          MR. KAHANE:  -- a mediation.

18          THE COURT:  We can move on.  I got it.

19          MR. KAHANE:  All right.  Obviously our clients don't

20  want to pay money, but we want -- our clients want to get to

21  the end of whatever that end result is as quickly as possible

22  so they can assess their liability, put a preserves if

23  necessary, whatever is required.

24          But without the information, these seem just drag

25  and, you know --

1          THE COURT:  But let me ask you this.  So if I have an

2     abuse claim supplement part of the process and I can sort of go

3     back and forth about where to strike the right balance, do we

4     need more questions than the Committee is proposing?  Do we

5     need every question that you're proposing?  We come out

6     somewhere hopefully on the right -- strike the right balance,

7     that serves the end of trying to get this resolved by

8     mediation.

9          And then if I grant the mediation privilege, that

10    also then resolves the concern that, again, we're inducing a

11    claimant to do something that other claimants are not required

12    to do that -- go ahead.

13         MR. KAHANE:  Except that it's not -- these claimants

14    are pretty unusual to have this many negligence claims asserted

15    in a bankruptcy case.  When you're talking about asbestos,

16    that's a part liability claim.  That's automatic liability.  I

17    was exposed to your product, I got asbestosis, that's the end

18    of the discussion.  Negligence is not discussed.

19         When you're talking about the hearing aid claims or

20    the hearing impaired claims, all these things are different

21    types of claims.

22         THE COURT:  All right.  But isn't that an argument

23    you need to make to Congress, that they should revise 410, have

24    a special Form 410-T for mass tort claims with negligence that

25    requires more information on the front end?  The fact of the

1  matter is, 410 asks for the information it asks for and the

2  Rules say that it's supposed to be in substantially that form.

3  I do have some authority I think to ask for additional

4  information, but then that -- again, it's about balancing.

5        And so if I am going -- again, I think pretty

6  materially beyond what 410 requires, four good reasons because

7  it will facilitate mediation and with the consent of the

8  Committee, to me that is a much more modest step than me

9  imposing a requirement and according to your argument imposing

10 a requirement making it mandatory, making failure to comply

11 subject to ipso facto disallowance.  And then also causing that

12 additional information to elevate the requirement from the

13 basic 410, this is going to be treated as a complaint and

14 evaluated under <u>Iqbal</u>.

15       MR. KAHANE:  Yeah.  The problem, though, is that it

16 leads to a huge number of claim objections because if every --

17 if all the information we have heard in a claim that we can

18 cognize, take -- and with respect to the claim is they filed a

19 proof of claim and it says that they were harmed by the

20 negligence of the Diocese and they want ten million dollars or

21 whatever the number is or unliquidated.  We have to object to

22 that claim whether or not they could allege --

23       THE COURT:  Right.

24       MR. KAHANE:  -- all things.  And so instead of having

25 30 claim objections we're going to have 120.

1          THE COURT:  I don't follow.  Why?  The claims are

2    what they are; the defenses are what they are.  And you have

3    the same ability to suss that information that you would

4    otherwise.  It's just you don't have the sort of -- the extra

5    leg up of being able to point to their abuse claim supplement

6    and say, well, that's your claim and on its face it doesn't

7    meet <u>Iqbal</u>.

8          MR. KAHANE:  But with respect to the abuse claim

9    supplements that do meet <u>Iqbal</u>, those are claims that don't --

10   aren't going to elicit an objection.

11         THE COURT:  Okay.  All right.

12         MR. KAHANE:  I think that's pretty much all I had

13   today.

14         THE COURT:  All right.  Thank you.  I appreciate it.

15         MR. KAHANE:  Thank you, Your Honor.

16         MR. SCHAPP:  Your Honor, Jon Schapp on behalf of

17   Wausau.

18         Judge, as I understand it, and I'm not a bankruptcy

19   lawyer, so forgive me if I say some wrong things, but I think

20   the idea at the end of the day is to confirm a plan.  You've

21   heard -- I believe every person in this courtroom get up and

22   say, the way to do this is through mediation.  That's the best

23   way to do it.  It's the most efficient so that the money

24   doesn't go to these people but goes to the claimants here.

25         The best way to do this is mediation.  In order for

mediation to be successful, the insurers -- I'll only speak for
me, but I think it generally applies to everyone else.  We're
going to have to pay money.  If I don't pay any money the case
isn't going to settle.  How am I going to pay money?  I'm going
to get information.  More is better than less.  The more
information I have, the more I will have an ability to pay
money.  The less I have, the less of an ability and willingness
to do so.

Going hand in hand with more information is the need,
the absolute requirement that I could rely on the information.
And if you're telling me here's a form that we're filling out
but this is only for mediation and if mediation falls apart or
even if it doesn't and I want to raise some issues with the
Court about any of them, you can't do anything with this piece
of paper.  That piece of paper has to be thrown out because it
was only for the purpose of mediation.

That piece of paper is pretty worthless to me and we
might as well skip the whole mediation to begin with because if
I can't rely, if I don't get this information and I can't rely
on the accuracy of the information, what's the point?  It's
useless.  If we have to just throw these out without any value
to them whatsoever, I can't rely on them.

THE COURT:  I don't think anyone is saying you have
to thrown them out.  I think that the -- it does not transform
the proof of claim into a complaint subject to Iqbal standard.

1  You certainly can act on it.  I mean, I think first of all,

2  it's -- I understand everyone to be saying it's tremendously

3  useful in the mediation, which is not something to be

4  dismissed.  It's the whole driving force behind it.

5        But -- and in the event that mediation fails, you now

6  know based on the information in the abuse claim supplement

7  that the person was in Omaha or told no one or whatever the

8  case may be and you have the ability to obtain that information

9  through other avenues and object to the claim as you would any

10 other claim that's filed in the case.  It's just you're not

11 being given the extra legal leg up of having the proof of claim

12 judged on a more rigorous standard than a slip-and-fall

13 claimant's claim is judged.

14        MR. SCHAPP:  Well, I think we're talking about two

15 different things, Judge.  One question is, can we use this and

16 does it have to meet the standard of pleading.  It's another

17 thing to say -- and I think there's a very easy solution to

18 that issue, which is, everybody's got a right to amend on any

19 claim that's -- that it's raised on this and you've heard

20 everybody sort of agree with that concept.  But it's another

21 thing to say, this document is subject to mediation privilege

22 and can't be used for any other purpose.

23        THE COURT:  I understand, but isn't the problem going

24 to -- isn't the opportunity to amend illusory because we're

25 going to say, look, absent discovery I can't amend because

1  there's no way in which I can satisfy <u>Iqbal</u> because I can't --

2  I need discovery to do that and you're not going to let me have

3  it.  So you can tell me I can amend all day long, but I can't

4  do it.

5       MR. SCHAPP:  Well, I guess I'm not understanding why

6  not.  Why can't they get discovery if they -- if there's a

7  claim objection --

8       THE COURT:  The facts that established the

9  negligence, they're going to say are very much -- because I was

10 abused when I was eight years old, I have no idea who the

11 Diocese knew or reasonably should have known of that.  I need

12 to get that from the Diocese.

13      MR. SCHAPP:  Which I think is a -- the most likely

14 scenario.

15      THE COURT:  Yes, right.

16      MR. SCHAPP:  So what would prevent them at that point

17 from getting discovery on that issue?

18      THE COURT:  When the claim gets disallowed because it

19 doesn't satisfy notice pleading saying knew -- I'm guessing the

20 Diocese knew.  I don't think that satisfies notice.  Isn't that

21 the argument you're going to make, doesn't satisfy notice

22 pleading because there's no basis for it?

23      MR. SCHAPP:  That's not my intention right now on

24 that standard, but -- and again, I think that's a very

25 different question than saying, you can't use this proof of

154

1    claim form because -- or you can't use this proof of claim

2    supplement because it was subject to mediation privilege.  I

3    think those are very two different things.

4          THE COURT:  Okay.  I think the issue is that to what

5    extent is the abuse claim supplement become part of the proof

6    of claim for reasons beyond mediation.

7          MR. SCHAPP:  Well, that's a far more limited question

8    than saying, mediation privilege applies to this document,

9    which is what really concerns me that this piece of paper I

10   can't rely on it, I can't believe what's stated in it because

11   that person, no matter what happens, will never be subject to

12   cross-examination about it, will never have to prove those

13   facts that are established in there and then can change their

14   story completely without any consequences to that.

15         THE COURT:  So Mr. Scharf, what do you say on that

16   point?  So I issue an order that says something like for

17   purposes of a claims objection any information contained on the

18   abuse claim supplement shall not be considered part of the

19   proof of claim.  But no one else is under any limitation in

20   terms of can they introduce it as evidence, can they cross-

21   examine someone about it, can they cross-examine the claimant

22   about it.  They can use it for other purposes.  It's just not

23   going to be the basis for a claims objection saying that that's

24   part of the proof of claim.

25         MR. SCHARF:  I guess the question really is somebody

1  submits a proof of claim under penalty of perjury and you can't

2  test the perjury.  I guess if the limitation was simply to

3  explore the perjury maybe that should be allowed, but maybe the

4  mediation -- for that purpose, to explore the perjury, whether

5  or not the person committed perjury, but beyond that I think

6  we're just opening a door that I think we may not understand

7  the consequences of on the fly.

8                THE COURT:  Okay.  All right.

9         I mean, is that what I'm hearing you say, Mr. Schapp,

10 that you would be at least theoretically supportive of limited

11 privilege or limited qualification, such that we're not

12 giving -- go ahead.

13               MR. SCHAPP:  I think the problem is that if we can go

14 back to Your Honor's Omaha example --

15               THE COURT:  Yes.

16               MR. SCHAPP:  -- if it says in the proof of claim

17 supplement Omaha, are we not allowed to use that, to say you're

18 admitting you were not abused in the Diocese of Ogdensburg.

19 You've admitted that in the supplement.  We should be able to

20 use that.  That's very different --

21               THE COURT:  Right.

22               MR. SCHAPP:  -- than the very limited, doesn't meet

23 the <u>Iqbal</u> standard.

24               THE COURT:  Well, I understand.  I guess my concern

25 is, did you tell anyone about the abuse.  Answer, no.  Then you

1  bring a claims objection saying, look, on its face it can't

2  be -- they plead no notice on behalf of the Diocese.

3        MR. SCHAPP:  Well, I think, Your Honor, you could

4  order that that example that you just gave, which you seem more

5  concerned about, understandably, is not -- that alone isn't the

6  subject of a claim objection, because I would admit that

7  there's a possibility and, again, I don't expect almost anybody

8  to be able to say, yes, to the question of, yes, I am aware of

9  who of the Diocese was aware of this abuse.  I expect that to

10 be minimal, but we would like to know if they are, if there is

11 that information out there.  More information is better.

12       THE COURT:  No, I don't think anyone -- I get that.

13 Right.  It's just the issue of to what use is it being put.

14 Is -- that's -- and it's not unfounded for the Committee to be

15 worried that insurers will seek to use abuse claim supplements

16 to argue it doesn't satisfy Iqbal because that's what's -- has

17 happened.

18       MR. SCHAPP:  And I think -- but again, I think

19 there's a vast difference between saying you can't use it for

20 the very limited purpose of not satisfying that --

21       THE COURT:  I think that's an important

22 clarification.  I get that.

23       MR. SCHAPP:  -- and anything beyond that.

24       THE COURT:  I think that's an important

25 clarification.  Thank you.

1          Is anyone else on the telephone wish to be heard?

2          MR. WEISS:  Yes, Your Honor.  This is Matt Weiss from

3   Interstate.  I just wanted to weigh -- I mean, I think kind of

4   the conversation has gravitated towards this mediation

5   privilege issue and whether the claim supplement should be --

6   protect -- I mean, limited as far as evidentiary value.

7          I think the way this all squares, you know, I go back

8   to citing Rule 9009(a) and, you know, I think that probably it

9   stands for nothing more than the proposition you can't

10  disqual -- disregard the claim simply because the supplement

11  wasn't included.  But if what the debtor is proposing I think

12  the language the debtor is suggesting here is actually stronger

13  than a lot of other Diocese cases as far as, you know, your

14  claim -- I don't know the exact wording.  It may -- you know,

15  ay be subject to disallowance or you may not be able to vote or

16  pursue distribution.  I think that's all relevant after because

17  I think the key here is that, yes, well, not having the

18  supplement they may not on first day invalidate the claim.  You

19  have to show -- to have a valid claim it still has to have

20  prima facie validity under Rule 3001(f) and the case law we

21  cited in our brief with LMI says to do that you need to show

22  facts to support a claim under, you know, like a pleading

23  standard.  That's how it's been interpreted by a federal court.

24         And so yes, I mean, if you're including a supplement

25  that's information that's certainly relevant.  And the way it

1 will play out, if you don't have the necessary information to

2 supplement and the debtor brings a claim objection, then you're

3 in contested matters.  The claimant will obviously have the

4 ability to seek discovery as they need in connection with that

5 contested matter.

6          So I think they would be able -- and like you said,

7 you're -- I think it's appropriate you would allow them to

8 amend the claim to include that information if needed.  So I

9 think the claimants' rights are protected here, as they should

10 be.

11          You know, the only -- the main concern that we have

12 as insurers and has been expressed is that, you know, yes,

13 there -- you don't have to rely -- theoretically, if you didn't

14 rely on the proof of claim and required other ways of

15 establishing a claim, it just creates a lot more complications

16 in the bankruptcy case.

17          I think Rockville Center is a good example of that

18 where there's been 16 omnibus claim objections filed, so it's

19 a -- become a major burden on the estate.  It's a major burden

20 on parties involved.  I think frankly, it's a major burden on

21 claimants.  Rather than force -- not force -- requiring as a

22 supplement to provide information necessary to flesh out their

23 claim, the other information has to be provided eventually.  So

24 the alternative is depositions and interrogatories and to do

25 that for 175 different claimants if it has to be done, if the

1  information is not being provided in the supplement, I think

2  that just creates a lot of problems for the -- really, all the

3  parties in interest in the case.

4        So I think that's why it should -- the claimants

5  should be put on notice that they don't provide information to

6  supplement they risk having their claim invalidated and the

7  claim supplement should be used for any evidentiary purpose.

8  Preclusive claimant supplements, yes, they're important for

9  mediation, but they're also important to resolve the case and

10 to have a finite understanding of what the liability to the

11 debtor is and what they're subject to and what the insurers may

12 have to potentially be required to provide payments for.

13       So, you know, it's not just a media -- it's not just

14 for mediation.  There's other important roles that the proof of

15 claim and the supplement play in the bankruptcy case.  So I

16 think that's why we strongly believe that it should be

17 mandatory and it should be -- should not be covered by any kind

18 of privilege that limits its use in connection with the

19 bankruptcy case.  Thank you.

20       THE COURT:  Thank you.  Mr. Weiss, I didn't address

21 this with the other -- and I'll certainly give you

22 opportunities if you wish to be heard -- I didn't address the

23 issue of the claims bar date.  You know, you heard the argument

24 as a pract -- I hear the Diocese and the Committee saying, look

25 it, at this point given that it's already, you know,

1  October 3rd, we practically cannot get this out, get the

2  appropriate notices with sufficient time.  So November 24th

3  isn't going to work.  Mr. Scharf raised some concerns about,

4  you know, having abuse claimants trying to experience this and

5  work through this during the holidays.  Do you have a position

6  on the proposed date of January 18th as the bar date,

7  Mr. Weiss?

8          MR. WEISS:  No, we haven't a formal position on it.

9  That seems reasonable to me.

10          THE COURT:  Okay.  I think there was some objection.

11          Mr. Kahane, I think you had objection.  You were not

12  happy with the date.

13          MR. KAHANE:  No, I think that's fine, Your Honor.  We

14  don't have --

15          THE COURT:  Okay.  All right.  Any other concerns,

16  insurers?  Okay.  All right.  Thank you.

17          Mr. Donato, I think I've hopefully -- I think I've

18  got it, but if there's something you want to tell me briefly.

19          MR. DONATO:  Be very, very brief.  I'm not applying

20  it to this case, but if you impose a mediation privilege on

21  these forms, you have a situation where you have no checks and

22  balances.

23          THE COURT:  Let me ask you.  It seems like there was

24  a germ of a potential compromise about the scope of the

25  privilege, just with Mr. Scharf.  That's what I heard.  Is that

1 worth exploring that piece?

2          I mean, I'll just tell you what I'm going to do.

3 Okay.  We're going to have language, just like in Syracuse,

4 should file.  Failure to file may -- I have to think about

5 whether it's going to say may be the result of an objection or

6 that sort of more plain language.  Okay.  So that's what's

7 going to happen.

8          The attorneys are going to be able to sign the abuse

9 claim supplemental and proof of claim.  We're going to do

10 January 18th as the claims bar date.  And so then I will leave

11 it to you whether you want me to reserve decision on this

12 mediation privilege and I'll decide what the scope, if any, of

13 the privilege is or whether you want me to give you -- counsel

14 the opportunity to try to resolve that consensually.

15          MR. DONATO:  I think it would make sense.  I heard

16 some possible germ of a resolution.

17          THE COURT:  So did I.

18          MR. DONATO:  I don't know how developed it was.  If

19 you're saying, give us a couple days kind of a thing; is that

20 what you're thinking?

21          THE COURT:  Yes.  Yes.

22          MR. DONATO:  I think that makes sense.  We've worked

23 out many, many things in the past.

24          I just want to make an observation, though.  A

25 mediation privilege means you'll never see the ACS.  That means

1  you'll never have access to the ACS.  With the utmost respect

2  to that, not applying it to this case, a mediation privilege

3  creates -- presents the opportunity for creativity because

4  there's no check and balance.  That's why they're doing it.

5  They can do whatever they want.  It's under penalty of perjury,

6  but you'll never see it.

7          THE COURT:  Okay.  I understand there might be -- I

8  don't think you're saying this to Mr. Scharf --

9          MR. DONATO:  No, I said I'm not applying it to this

10 case.

11         THE COURT:  There may be other -- there may be other

12 people who would take advantage of the mediation privilege.  I

13 appreciate that.

14         Having said that, the ostensive -- the argument being

15 presented to me against the mediation privilege is not that and

16 the argument being presented to me, as I think you could tell,

17 has some traction, that I am by leaving the abuse claim

18 supplement wide open and also having it be considered part of

19 the proof of claim, I am subjecting -- I'm worried, honestly,

20 that if I don't give the privilege given the concerns that are

21 raised, nobody is going to fill out abuse claim settlements

22 because they're going to be worried that it's going to be

23 subject to proof of claim to <u>Iqbal</u> notice pleading standards

24 and they're going to get a flood of objections or a significant

25 number of them might.  That's what I'm worried about.

1    And also that for those that do that that is not a

2 proper result and not what the Code intends.  Like I said, I

3 think if people thought -- think that more should be asked in

4 Form 410 in these type situations, to me that's an issue for

5 Congress, not for me.

6    MR. DONATO:  I understand.

7    THE COURT:  But -- so -- but I think -- again, I

8 think if there is an opportunity to -- I'm also sensitive to

9 the, wait a minute, the Omaha problem and the, wait a minute,

10 someone submitting something to this Court under penalty of

11 perjury and they can't be cross-examined about it --

12    MR. DONATO:  No check, no balance.

13    THE COURT:  -- there's no -- it's basically just a

14 free say whatever you want --

15    MR. DONATO:  Right, right.

16    THE COURT:  -- and a get-out-of-jail-free card, I'm

17 not comfortable with that either.

18    But what I heard here was maybe we can --

19    MR. DONATO:  Okay.  And we'll work on that.

20    THE COURT:  -- have both -- have the protection

21 against Iqbal while also having some accountability, as you

22 said, with checks -- check and balance.

23    MR. DONATO:  We'll give it a shot.  I'm not convinced

24 we'll be able to do it.

25    Just two other quick observations.  People have been

164

1  talking about pro ses.  Let's stop.  One hundred twenty-four

2  lawsuits, a lawyer in every one.  Okay.  We've got all these

3  people talking about, oh, if a pro se had to read this thing

4  and saw the ACS and, oh, my goodness, we chill them.  Stop.

5  There's 124 lawsuits.  The statute is closed.  That doesn't

6  mean there won't be some claims, but the 124 law firms.

7  There's no pro se.  So what they're doing is creating

8  situations where, you know, you have to worry like, oh, wow,

9  the pro se is looking at this.

10         You just heard Taylor Stippel.  She says through

11  Anderson's office they fill out the proofs of claim, they vet

12  it, they do all that stuff.  There's not a pro se concern here.

13  What's going on is, as direct as I can be, there is an attempt

14  by the Committee to alter the claims of due process.  It's

15  under the guise of protecting the abused claimants.  Twenty-

16  four Dioceses have entered orders like this.  Claims have been

17  filed without delay.  There's 850 in Buffalo.  There's 370 in

18  Syracuse, 470 in -- that's not going to be a chilling thing.

19         What they don't want is to have to deal with the

20  reality if the wheels come off there are claims that are not

21  appropriate and they're altering the claims allowance process

22  under Title 11 and that's what's wrong.  But I'll take your

23  invitation and maybe we can take a couple of days, see if

24  there's a way that we can address it.  If we can't and we'd

25  like to -- I guess we would ask you to make the decision,

1  probably would like to have an opportunity to submit something

2  to you on that.

3        THE COURT:  Okay.  All right.  I do want to --

4  everyone stay after and get the -- my law clerk's email address

5  because I do want Word versions of everyone's proposed bar date

6  orders and abuse claim settlement forms as well.

7        But Mr. Scharf, you wish to be heard briefly?

8        MR. SCHARF:  Just one clarification and then I just

9  want to make a couple of observations.  Just in terms of --

10        THE COURT:  Can you use the microphone just because

11  there's parties on the phone.  I want to make sure they can

12  hear.

13        MR. SCHARF:  Just a couple of clarifications and then

14  just a couple of comments.

15        In terms of a clarification, you've given us some

16  guidance as to the direction of the Syracuse language.

17  Attorneys can sign January 18 as a bar date.

18        In terms of the questions on the form have you made

19  a --

20        THE COURT:  So I'm going to work through that and

21  it's going to be more exploratory than the one you proposed and

22  less exploratory that the ones that the Committee proposed --

23  or than the insurers proposed.  I will say this.  I think

24  you've already sort of told me the questions that you find most

25  objectionable, Mr. Scharf, or that would be most likely to be a

1  disincentive to claimants coming forward and I believe the

2  insurers have given me a good sense of the questions they

3  consider pretty much essential to be included.

4       But I'll give parties leave to submit if you want --

5  you know, please don't -- I don't need another 25 pages, but a

6  small additional opportunity for briefing if there were

7  particular questions that beyond what you've already referenced

8  that you felt were particularly objectionable and burdensome or

9  that the insurers felt were particularly essential to

10 efficient, expeditious resolution of the mediation process.

11      MR. SCHARF:  Sure.  I think our response --

12      THE COURT:  I think it does too that way.

13      MR. SCHARF:  -- is pretty comprehensive on that.

14 I'll just double-check in case there's something we missed.

15      THE COURT:  Okay.

16      MR. SCHARF:  And then just in terms of looking at the

17 veracity of these claims trying to -- I'm just going to address

18 the insurers aren't looking for the information.  They're

19 looking for an admission.  And, you know, part of what we may

20 be able to accomplish is to -- in the terms of limiting the use

21 of the form, maybe we can come to some resolution on that.

22 I -- we hear you.

23      THE COURT:  Yeah.  It seems to me that -- yeah, it's

24 not -- maybe it's -- this is something that I'm iterating off

25 the top of my head, but it seems like a stipulation that it

1  shall not be deemed part of their proof of claim for claims

2  allowance purposes is -- might be where you go with it.

3          MR. SCHARF:  Sure.

4          THE COURT:  I don't know, but that's a thought.  I'm

5  not saying that that's what I would rule if you don't resolve

6  it, but that's --

7          MR. SCHARF:  Right.

8          THE COURT:  That may -- I'm -- if there is a way to

9  allow for the checks and balance, Mr. Donato has referenced

10 without the bait-and-switch concern that I referenced.  Then

11 that would be something I think that would make sense.

12         MR. SCHARF:  Sure, I think we can -- with your

13 guidance I think we can all put our thinking caps on and try to

14 do that in the next couple of days.

15         THE COURT:  Thank you.  Okay.  So I will reserve

16 decision on the motion to set a bar date.  I will not issue

17 anything until -- is a week -- I know we have the holiday

18 coming up.  Is a week to October 10th give the parties leave to

19 submit additional submissions on or before October 10th, give

20 you more time than that?

21         UNIDENTIFIED SPEAKER:  Just one day, October 11th.

22         THE COURT:  October 11.  October 11th for additional

23 submissions.  Actually, that will be deemed submitted as of

24 October 11th.  Obviously, if you're able to reach consent

25 language let me know by then, otherwise I'll issue my own order

1  and I will be resolving the scope of the privilege, if any,

2  that would be afforded the abuse claim settlement.  Very good.

3  Thank you.

4          Anything further -- thank you for a well organized

5  argument and we look forward to seeing you again.  Thank you.

6          ATTORNEYS:  Thank you, Your Honor.

7          COURTROOM DEPUTY:  All rise.  Court is adjourned.

8                    * * * * *

## C E R T I F I C A T I O N

        I, RUTH ANN HAGER, court approved transcribers,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, and to the best of our ability.


/s/ Ruth Ann Hager
RUTH ANN HAGER              DATE:  October 25, 2023